Judge Berman

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAMUEL T. COHEN, derivatively
and on behalf of BEAR STEARNS
COMPANIES, INC.,

                             Plaintiff,

vs.

BEAR STEARNS COMPANIES, INC.,
JAMES E. CAYNE, SAMUEL L.
MOLINARO, JEFFREY M. FARBER,
JEFFREY MAYER, MICHAEL MINIKES,
ALAN D. SCHWARTZ, WARREN J.
SPECTOR, HENRY BIENEN, CARL D.
GLICKMAN, MICHAEL GOLDSTEIN,
ALAN C. GREENBERG, DONALD J.
HARRINGTON, FRANK T. NICKELL,
PAUL A. NOVELLY, FREDERIC V.
SALERNO, VINCENT TESE, WESLEY S.
WILLIAMS, JR.

                             Defendants.

---

Civil Action No.

**VERIFIED SHAREHOLDER'S
DERIVATIVE COMPLAINT**

<u>DEMAND FOR JURY TRIAL</u>

RECEIVED
NOV 19 2007
U.S.D.C. S.D.N.Y.
CASHIERS

---

       Plaintiff, Samuel T. Cohen, upon his personal knowledge, as to the allegations pertaining to him, and belief as to all other allegations, based upon, amongst other things, the investigations made by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein and alleges the following:

## INTRODUCTION

       1.     This is a shareholder derivative action brought by a shareholder of Bear Stearns Companies, Inc. ("Bear Stearns" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal  for breach of fiduciary duties, corporate mismanagement, waste of corporate

assets and violations of the Securities Exchange Act of 1934 (the "Exchange Act"), that occurred between March 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to Bear Stearns and other damages, such as to its reputation and goodwill.

2.      Bear Stearns is a multifaceted financial institution that offers, among other things, investment banking and prime brokerage services; it is the second largest prime brokerage firm in terms of aggregate client assets. Bear Stearns is the fifth-largest U.S. investment bank by market cap and generates more of its revenue from mortgage securities and domestic markets than many of its peers, a statistic which has left the Company poorly positioned as the housing market has tumbles.

3.      During the Relevant Period, Bear Stearns, under defendants' direction, recklessly spent billions of dollars purchasing subprime loans to be used for future collateralized debt obligations. Due to increasing delinquency among subprime mortgage borrowers and the impending subprime mortgage crisis, these actions were reckless.

4.      During the Relevant Period, defendants failed to take appropriate reserves for the large amount of Collateralized Debt Obligations ("CDO's") in its portfolio, both on and off the balance sheet, and this information was not disclosed to investors. CDOs are complex financial instruments that combine slices of varying assets and debt. Many CDOs are backed by subprime mortgages - loans given to customers with poor credit history. As those mortgages have increasingly defaulted, banks are being forced to write down the value of bonds and CDOs backed by the loans.

5.      Defendants actively concealed the Company's failure to write down impaired securities containing subprime debt. Defendants directed the Company to issue false and

2

misleading statements regarding the Company's business and financial condition. While defendants were directing Bear Stearns to issue improper statements concerning its exposure to the subprime market crisis, they were also directing Bear Stearns to acquire a subprime loan portfolio for $1.2 billion from a troubled subprime mortgage lending company.

6.      On November 14, 2007, the Company announced that it expects to write-down $1.2 billion of its assets linked to mortgage related investments in the fourth quarter. The write-down is equal to 9% of Bear Stearns's equity and will result in a net loss for the Company.  However, more losses are forthcoming as the extent of the damage to the Company continues to grow.  During a November 14, 2007 conference call, the Company's Chief Financial Officer commented with respect to the exposure of the Company, saying "We're not satisfied by the results and the magnitude of the write-down's....[t]he market is still challenging, and the size of the write-down may change."

7.      In fact, Bear Stearns was well aware of the impending crisis well in advance of the recently announced write-down as deterioration in the market accelerated in July, when two Bear Stearns-managed hedge funds worth billions of dollars, and heavily invested in subprime mortgage securities, collapsed as defaults increased.  On November 14, 2007, the Secretary of State of Massachusetts filed a complaint against Bear Stearns alleging that one of its units failed to notify hedge funds' independent directors that it was trading securities from its owns accounts with hedge fund it also advised.  The two hedge funds suffered billions of dollars in losses.

8.      As a result, Bear Stearns' credibility with investors has been wiped out. During the Relevant Period, the Company's value has declined more than $10 billion from its peak in February 2007, quarterly net income for the period ended in August 2007 sank

61% to $171.3 million, or $1.16 a share, from the year-earlier period and revenue fell to $1.3 billion from $2.13 billion last year.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over all claims asserted herein under 28 U.S.C. § 1332, as complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds the jurisdictional minimum of this Court.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Bear Stearns has its principal place of business in this District; Plaintiff's claims arose in this District; and Bear Stearns has suffered and will continue to suffer harm in this District and is a citizen of New York.

## THE PARTIES

11.     Plaintiff Samuel T. Cohen is, and was at the time of the transaction of which Plaintiff complains, an owner and holder of Bear Stearns common stock.  Plaintiff, who is a citizen of Baltimore City, Maryland, currently owns 115 shares of Bear Stearns stock.

12.     Defendant Bear Stearns Companies includes all of its predecessors and affiliated entities, (collectively, "Bear Stearns"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, N.Y.

13.     Individual Defendant ("James E. Cayne") was at all times relevant hereto Chairman of the Board of Directors and Chief Executive Officer of Bear Stearns.  Cayne

4

became Chairman of the Board on June 25, 2001 and has been Chief Executive Officer of Bear Stearns for more than five years and prior to June 25, 2001, was President of Bear Stearns.

14.    Individual Defendant Samuel L. Molinaro, Jr. ("Molinaro") serves as Executive Vice-President, Chief Operating Officer ("COO") and Chief Financial Officer ("CFO").

15.    Individual Defendant Jeffrey M. Farber ("Farber") has been Controller of Bear Stearns since January 7, 2004.  Farber was Assistant Controller of the Company from May 2000 to January 7, 2004 and since May 1, 2000 a Senior Managing Director of Bear Stearns.

16.    Individual Defendant Jeffrey Mayer ("Mayer") is the Senior Managing Director of the Company and was named to the Bear Stearns Executive Committee on August 5, 2007.

17.    Individual Defendant Michael Minikes ("Minikes") serves as Treasurer of Bear Stearns.

18.    Individual Defendant Alan D. Schwartz ("Schwartz") was appointed President of the Company on August 5, 2007 and serves as the Company's Co-Chief Operating Officer and is a member of the Company's Board of Directors.

19.    Individual Defendant Warren J. Spector ("Spector") resigned on August 5, 2007 from the position of President, Co-Chief Operating Officer and as a Director.

20.    Individual Defendant Henry Bienen ("Bienen") is a member of the Company's Board of Directors, is a member of the Audit Committee and is a member of the Qualified Legal Compliance Committee.

21.     Individual Defendant Carl D. Glickman ("Glickman") is a member of the Company's Board of Directors, is a member of the Audit Committee, serves as Chairman of the Compensation Committee and is a member of the Qualified Legal Compliance Committee.

22.     Individual Defendant Michael Goldstein ("Goldstein") is a member of the Company's Board of Directors and is a member of the Audit Committee.

23.     Individual Defendant Alan C. Greenberg ("Greenberg") is a member of the Company's Board of Directors.

24.     Individual Defendant Donald J. Harrington ("Harrington") is a member of the Company's Board of Directors and is a member of the Compensation Committee.

25.     Individual Defendant Frank T. Nickell ("Nickell") is a member of the Company's Board of Directors, a member of the Compensation Committee and a member of the Corporate Governance and Nominating Committee.

26.     Individual Defendant Paul A. Novelly ("Novelly") is a member of the Company's Board of Directors, a member of the Audit Committee, a member of the Corporate Governance and Nominating Committee, serves as Chairman of the Finance and Risk Committee and is sa member of the Qualified Legal Compliance Committee.

27.     Individual Defendant Frederic V. Salerno ("Salerno") is a member of the Company's Board of Directors, a member of the Audit Committee, a member of the Corporate Governance and Nominating Committee, a member of the Finance and Risk Committee and a member of the Qualified Legal Compliance Committee.

28.     Individual Defendant Vincent Tese ("Vincent") is a member of the Company's Board of Directors, a member of the Audit Committee, a member of the

Compensation Committee, a member of the Corporate Governance and Nominating Committee, a member of the Finance and Risk Committee and is Chairman of the Qualified Legal Compliance Committee.

29.      Individual Defendant Wesley S. Williams, Jr. ("Williams") is a member of the Company's Board of Directors, is a member of the Audit Committee and is a member of the Qualified Legal Compliance Committee.

30.      Defendants Cayne, Molinaro, Mayer, Farber, and Schwartz are sometimes collectively referred to in this Complaint as the "Officer Defendants."  Because of their positions with the Company, the Officer Defendants possessed the power and authority to control the contents of Bear Stearns's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Officer Defendants are liable for the false statements pleaded below.

31.      Defendants Bienen, Cayne, Glickman, Goldstein, Greenberg, Harrington, Nickell, Novelly, Salerno, Schwartz, Tese, and Willams are sometimes collectively referred to in this Complaint as the "Director Defendants."  By reason of their positions as directors of the Company and because of their ability to control the business and corporate affairs of

the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. As a result of these duties, the Director Defendants are obligated to use their best efforts to act in the interests of the Company and shareholders to ensure that no waste of corporate assets occurs. The Director Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## DEFENDANTS DUTIES

32.     Officers, directors and/or fiduciaries of Bear Stearns have the ability to control the business and corporate affairs of Bear Stearns. The Individual Defendants owe Bear Stearns and its shareholders fiduciary obligations of trust, loyalty and good faith and are required to use their ability to control and manage Bear Stearns in a fair, honest and equitable manner. The Individual Defendants are not, however, to act in furtherance of their own personal interest or benefit when acting on behalf of the Company.

33.     Each of the Individual Defendants as officers and directors owe Bear Stearns and its shareholders a duty of good faith, loyalty and fair dealing in the business affairs of the Company. Moreover, the Individual Defendants had a duty, as officers and directors of a publicly traded company, to disseminate accurate and truthful information with respect to the financials, operations, management, performance and forecasts of Bear Stearns.

34.     The Individual Defendants directly and/or indirectly controlled, by virtue of their positions as officers and directors of the Company, wrongful acts alleged herein as well as the dissemination of false and misleading statements they caused the Company to issue. Each of the Individual Defendants had access to adverse non-public information about the financial condition, management, and operations of Bear Stearns.

35.     The Individual Defendants breached their duties of good faith ad fair dealing by allowing defendants to cause and causing Bear Stearns to issue false and misleading financial results and by failing to prevent the Individual Defendants from taking illegal actions.

## FACTUAL BACKGROUND

36.     Bear Stearns is one of the world's leading wealth management, capital markets and advisory companies. Bear Stearns offers a broad range of financial services to private clients, small businesses, and institutions and corporations.   In fact, Bear Stearns is the second-biggest underwriter of mortgage bonds in the U.S.

37.     The recent subprime mortgage crisis began with mortgages that were loaned to subprime borrowers, borrowers with low-rated credit history.   The loans were then packaged into security and debt obligations and sold into commercial paper markets. Mortgage backed securities are generally sold as commercial instruments, such as bonds and CDOs.  When the borrowers began to default on their mortgage payments, due to increasing interest rates, investment banks, such as Bear Stearns, began to feel the effects in the market for mortgage backed securities.

38.     Since 2006, the erosion of the market for securities linked to subprime mortgages has led to a global credit-market contraction. Holdings of CDOs as well as its

high-risk home loans and bonds, are among the types of securities have been suffering the most. Bear Stearns, being the 10th largest underwriter of asset-backed CDOs last year, with $9.4 billion for CDOs, has taken one of the biggest hits.

39.    Bear Stearns developed a scheme to conceal a tremendously risky subprime mortgage portfolio. Bear Stearns used this portfolio as the collateral for debt instruments sold or held by Bear Stearns.  During the Relevant Period, the defendants directed Bear Stearns to acquire a large inventory of securities backed by mortgages made to subprime borrowers. These actions were reckless due to the impending subprime mortgage crisis and increasing delinquency rates among subprime borrowers.

40.    Despite these material adverse circumstances, defendants directed Bear Stearns to issue a series of improper statements that proclaimed record growth. Bear Stearns has misled investors regarding its financial condition and exposure to risk in the subprime market by failing to disclose the risks created by its subprime lending activities.

41.    In fact, the Company's CEO, James E. Cayne stated in a press release issued at the end of the fourth quarter in 2006 that, "collateralized loan and debt origination activities increased substantially. The credit franchise delivered its best results ever as the high yield, leverage finance and credit trading areas all produced record revenues. In addition, on March 15, 2007, Cayne, reassured investors at a press release that "We are pleased with this excellent performance, revenues for the first quarter were up for every business segment...[g]rowing the company remains a core focus as we continue to invest in the clearing, mortgage, international and asset management franchises with successful results."

42.    However, Bear Stearns was not able to conceal the truth any longer when the it was forced to reveal the risks and value of its mortgage-backed securities to the market and by November 14, 2007, was forced to reveal the extent of its overvaluing of its mortgage-backed debt instruments and announced a write-down of approximately $1.2 billion of mortgage-backed debt instruments held on its balance sheet.

43.    In fact, Bear Stearns credit rating was cut by Standard & Poor's after the securities firm revealed it would write down the value of subprime assets by $1.2 billion, leading to its first quarterly loss since becoming a public company. According to analysts at Sanford C. Bernstein & Co., "About half of Bear Stearns's revenue is derived from fixed income, and a quarter of that comes from mortgage-backed securities. Bear Stearns has been among the worst performers on the Amex Securities Broker/Dealer Index this year partly because the firm is more reliant on fixed-income revenue and the U.S. market than its peers-it is down 39 percent this year, worst among the five- largest brokers."

44.    One analyst has commented "although Bear Stearns had smaller subprime losses than rivals like Merrill Lynch in the third quarter, investors are concerned that Bear Stearns is too reliant on the U.S. mortgage market for future earnings." In fact, the write-down will lead to a loss in the fourth quarter, making fourth quarter 2007 the first unprofitable quarter since at least 1985, when Bear Stearns went public.

45.    In addition, preceding the recent announcement of its massive write-down, during June and July 2007, two hedge funds managed by the Company were roiled by mortgage losses and subsequently went bankrupt. The failure of the two mortgage –related funds, Bear Stearns High-Grade Structured Credit Strategies Fund and High-Grade Structured Enhanced Leverage Fund, cost investors $1.6 billion. On November 15, 2007,

Massachusetts securities regulators filed a complaint accusing Bear Stearns of fraud for allegedly improperly trading with two in-house hedge funds that collapsed in June and July 2007. Bear Stearns allegedly traded mortgage-backed securities for its own account with the hedge funds without notifying the independent directors in advance. Advance disclosure of principal trades is required to make sure trades are fair to investors. Securities Regulators have commented that "hundreds" of principal transactions- including those involving mortgage-backed securities and collateralized debt obligations – were processed without prior approval from the funds' independent directors. In 2006, 79% of principal transactions lacked prior approval, while 59% were missing prior approval in 2005, and 30% in 2004. As a result, earnings at Bear Stearns dropped 61 percent in third quarter 2007, the biggest earnings decline in more than a decade. In fact, the company, under Chief Executive Officer James "Jimmy" Cayne, has cut 900 jobs, or about 6 percent of its workforce.

46.     Currently, Bear Stearns credibility with its investors is poor as during this year alone, the Company's share value has already fallen 40%.

47.     The true facts, which were known by the defendants but concealed from the investing public during the Relevant Period were as follows:

    a.  Defendants' portfolio of CDOs contained over a billion dollars worth of impaired and risk securities, most of which were backed by subprime mortgage loans;

    b.  Defendants failed to properly account for highly leveraged loans such as mortgage securities; and

c. Defendants failed to record impairment of debt securities which they knew or disregarded were impaired, causing the Company's results to be false and misleading.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

48.    Defendants failed to disclose to shareholders known risks regarding its exposure in the subprime debacle and consistently assured shareholders, in Company financial statements, that the Company had sound risk management policies, and continued to release positive earnings statements.

49.    For example, on March 16, 2006, the Company issued a press release in connection with the filing of its Form 8-K for the second fiscal quarter. The press release highlighted record revenue growth and positive trends in Bear Stearns strategic actions. The press release stated in part:

- *Bear Stearns Reports Record Quarterly Results*

- *Highest Ever Net Revenues, Net Income and EPS*

- *Net Revenues Rise 19% to $2.2 Billion*

- *Net Income Increases 36% to $514 Million*

- *Earnings Per Share Up 34% to $3.54*

- *Record Net Revenues from Institutional Equities, Fixed Income and Wealth Management*

The Bear Stearns Companies Inc. today reported record earnings per share (diluted) of $3.54 for the first quarter ended February 28, 2006, up 34% from $2.64 per share for the first quarter of 2005. Net income for the first quarter of 2006 was a record $514 million, up 36% from $379 million for the first quarter of 2005. Net revenues were a record $2.2 billion for the 2006 first quarter, up 19% from $1.8 billion in the 2005 first quarter. The annualized return on common stockholders'

equity was 20.1% for the first quarter of 2006 and 17.1% for the trailing 12-month period ended February 28, 2006.

"I am extremely pleased to report our second consecutive quarter of record net revenues, record net income and record earnings per share," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "These results were driven by strong contributions from all of our businesses, and in particular we saw record revenues in the Institutional Equities, Fixed Income and Wealth Management areas. We are proud of this quarter's outstanding results and look forward to the rest of 2006."

### Capital Markets

Capital Markets net revenues for the first quarter of 2006 were a record $1.7 billion, up 20% from the first quarter ended February 28, 2005.

- Institutional Equities net revenues were a record $488 million, up 56% from $313 million for the first quarter of 2005. Equity derivatives delivered a second consecutive record quarter on the strength of increased customer activity levels and market-share gains. International sales and trading revenues increased in the first quarter of 2006 compared with the year-ago quarter, and risk arbitrage net revenues rose reflecting improved market conditions and increased customer activity.

- Fixed Income net revenues were a record $889 million, up 3% from $866 million in the year-ago quarter. The credit businesses were extremely strong, led by the credit derivatives and leveraged finance areas. *Mortgage-related revenues increased from the prior year period, as origination volume remained high and customer demand increased. During the quarter, we ranked as the number one underwriter of U.S. Mortgage-backed securities.*

- Investment Banking net revenues were $297 million in the first quarter of 2006, up 36% from $217 million in the comparable prior-year period. Significantly higher U.S.-completed M&A volumes led to higher advisory, merger and acquisition-related revenues. Merchant banking related revenues also increased compared with the year-ago-period reflecting higher performance fees on merchant banking fund investments and increased principal gains.

### Global Clearing Services

First quarter 2006 Global Clearing Services net revenues were $264 million down 2% from $270 million in the first quarter of 2005. Net interest revenues were unchanged from the prior-year quarter as increased net interest spreads

served to offset lower customer balances. Commission revenues declined reflecting marginally lower transaction volumes and rates. Average customer margin debt balances for the quarter ended February 28, 2006 were $64.5 billion, up from $64.0 billion in the prior year quarter. Average customer short balances decreased to $78.2 billion from $88.5 billion for the first quarter of 2005. Average free credit balances were $29.9 billion in the current quarter, down from $31.1 billion in the first quarter last year.

## Wealth Management

Wealth Management net revenues for the first quarter of 2006 were a record $223 million, an increase of 32% from $169 million in the first quarter of 2005. Net revenue growth was largely due to increases in performance and management fees.

- Private Client Services net revenues were $129 million in the first quarter of 2006, an increase of 13% from $114 million in the 2005 first quarter. The increase was mainly attributable to the continued growth of fee-based activities and assets.

- Asset Management net revenues grew 71% to a record $94 million for the first quarter of 2006 from $55 million in the prior year's quarter. The increase is due to higher performance and management fees. Assets under management rose 14% to $45.4 billion as of February 28, 2006, compared with $40.0 billion as of February 28, 2005.

## Expenses

- Compensation as a percentage of net revenues was 47.9% in the first quarter of 2006 as compared with 49.3% for the quarter ended February 28, 2005.

- Non-compensation expenses were $386 million for the quarter ended February 28, 2006, an increase of 9% from $353 million in the 2005 first quarter. The increase is primarily due to higher professional fees, occupancy, communications and technology and legal costs.

The pre-tax profit margin rose to a record 34.4% in the first quarter of 2006 as compared with 31.5% in the quarter ended February 28, 2005.

As of February 28, 2006, total capital, including stockholders' equity and long-term borrowings, was approximately $57.6 billion. Book value as of February 28, 2006 was $75.46 per share, based on 145.2 million shares outstanding.

**Quarterly Common Stock Cash Dividend Declared**

The Board of Directors of The Bear Stearns Companies Inc. declared a regular quarterly cash dividend of 28 cents per share on the outstanding shares of common stock payable April 28, 2006 to stockholders of record on April 18, 2006.

**Quarterly Preferred Stock Cash Dividends Declared**

The Board of Directors of The Bear Stearns Companies Inc. declared the following regular quarterly dividends: (i) a cash dividend of $3.075 per share on the outstanding shares of 6.15% Cumulative Preferred Stock, Series E (which is equivalent to 76.875 cents per related depositary share); (ii) a cash dividend of $2.86 per share on the outstanding shares of 5.72% Cumulative Preferred Stock, Series F (which is equivalent to 71.50 cents per related depositary share); and (iii) a cash dividend of $2.745 per share on the outstanding shares of 5.49% Cumulative Preferred Stock, Series G (which is equivalent to 68.625 cents per related depositary share); all payable April 15, 2006 to stockholders of record on March 31, 2006.

50.     Bear Stearns failed to disclose, however, that being "ranked the number one underwriter for mortgage backed securities for the quarter" also meant that it retained a significant risk exposure on these securitizations.

51.     On June 15, 2006, the Individual Defendants caused or allowed Bear Stearns to file its Form 8-K for the second quarter and the Company issued a press release announcing its earnings. The press release highlighted record revenue growth and positive trends in Bear Stearns actions. The press release stated in part:

- *Bear Stearns Reports Third Consecutive Record Quarter*

- *Earnings Per Share Rose 78% To A Record $3.72*

- *Record Net Income Of $539 Million, An 81% Increase*

- *Record Net Revenues Of $2.5 Billion*

- *Institutional Equities, Fixed Income And Global Clearing Services Post*
- *Record Quarterly Net Revenues*

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $3.72 for the second quarter ended May 31, 2006, up 78% from $2.09 per

16

share for the second quarter of 2005. Net income for the second quarter of 2006 was $539 million, up 81% from $298 million for the second quarter of 2005. Net revenues for the 2006 second quarter were a record $2.5 billion, up 33% from $1.9 billion for the 2005 second quarter. The annualized return on common stockholders' equity for the second quarter of 2006 was 20.1%, and 18.7% for the trailing 12-month period ended May 31, 2006.

"We are very pleased to report our third consecutive quarter of record setting results. The first half of 2006 has proven to be our best ever," said James E. Cayne, chairman and chief executive officer. "Our success in increasing the depth and breadth of our business both domestically and internationally has fueled our enthusiasm and appetite for further growth. We will continue to explore ways to expand our business through launching new products, gaining market share in existing product areas, and increasing our presence internationally."

**<u>Capital Markets</u>**

Capital Markets net revenues for the second quarter of 2006 were $2.0 billion, up 40% from $1.4 billion for the quarter ended May 31, 2005.

- Institutional Equities net revenues were a record $554 million, up 42% from $390 million for the second quarter of 2005. Higher customer activity levels and favorable market conditions across the equity franchise drove these record results. Equity derivatives and international sales and trading produced record net revenues this quarter.

- Fixed Income net revenues were a record $1.2 billion, up 45% from $808 million in the second quarter of 2005. The mortgage franchise retained its number one industry ranking for the first half of fiscal 2006. Securitization and trading volumes remained high, and origination flow from the vertical integration of the mortgage platform rose producing record net revenues. Interest rate derivatives and foreign exchange produced record net revenues contributing to a record quarter in the interest rate products area. Robust customer activity levels led to record net revenues in both the distressed debt and leverage finance areas driving record net revenues in the credit businesses this quarter.

- Investment Banking net revenues were $278 million, up 20% from the $232 million in the prior year quarter. Merger and acquisition advisory fees increased significantly this quarter as a number of previously announced transactions were completed during the quarter. Underwriting net revenues were up as equity new issuance volumes increased compared with the year-ago quarter. These gains

were partially offset by decreases in merchant banking net revenues compared with the prior year quarter.

## Global Clearing Services

- Global Clearing Services net revenues were $290 million for the second quarter 2006, up 5% from $276 million in the year ago quarter. Net interest revenue increases were driven by higher average customer margin balances and improved net interest margins. Average customer margin debt balances for the quarter ended May 31, 2006 were a record $68.4 billion, up 6% from $64.7 billion in the prior year quarter. Customer short balances averaged $80.2 billion during the second quarter of 2006 down from $86.8 billion in the prior year period.

## Wealth Management

Wealth Management net revenues for the quarter ended May 31, 2006 were $151 million, down 3% from $156 million in the second quarter of 2005.

- Private Client Services net revenues were $129 million, an increase of 22% from $106 million in the 2005 second quarter. Increased investor activity and management fees from an increase in fee-based assets were the primary drivers of these results.

- Asset Management net revenues were $22 million for the second quarter of 2006 a decrease of 56% from $50 million in the prior year's quarter mainly due to a decline in performance fees on proprietary hedge funds. Assets under management increased 20% to $48 billion on May 31, 2006, from $40 billion on May 31, 2005.

## Expenses

- Compensation as a percentage of net revenues was 48.8% in the second quarter of 2006 as compared with 49.3% for the second quarter of 2005. Year-to-date compensation to net revenues was 48.4% for 2006 versus 49.3% for the six months ended May 31, 2005.

- Non-compensation expenses were $445 million for the quarter ended May 31, 2006, a decrease of 9% from $488 million in the 2005 quarter. The decline in non-compensation related expenses is primarily due to a reduction in litigation related costs partially offset by increased communications and technology and occupancy costs associated with increased headcount. In addition, CAP plan related expenses and minority interest expense increased in conjunction

with increased profitability.

The pre-tax profit margin increased to 33.4% in the quarter ended May 31, 2006 from 24.7% in the 2005 second quarter.

As of May 31, 2006, total capital, including stockholders' equity and long-term borrowings, was approximately $58.4 billion. Book value as of May 31, 2006 was $79.30 per share, based on 147.0 million shares outstanding.

52.     On September 14, 2006, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its earning for third quarter 2006. The press release highlighted record revenue growth and positive trends in Bear Stearns actions. The press release stated in part:

- *Bear Stearns Reports Third Quarter Earnings Per Share Of $3.02*

- *Net Income Rises 16% To $438 Million*

- *Highest Ever Net Revenues, Net Income And Earnings Per Share*

- *For The First Nine Months Of 2006*

- *All Business Segments Contribute To Strong Growth*

- *Capital Markets Net Revenues Up 13%*

- *Wealth Management Net Revenues Rose 36%*

- *Global Clearing Services Net Revenues Increase 4%*

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $3.02 for the third quarter ended August 31, 2006, up 12% from $2.69 per share for the third quarter of 2005. Net income for the third quarter of 2006 was $438 million, up 16% from $378 million for the third quarter of 2005. Net revenues were $2.1 billion for the third quarter, up 17% from $1.8 billion for the third quarter of 2005. The annualized return on common stockholders' equity for the third quarter 2006 was 15.8%, and 18.4% for the trailing 12-month period ended August 31, 2006.

"Bear Stearns produced excellent results for the third quarter and record results for the first nine months of 2006," said James E. Cayne, chairman and chief executive officer. "Our franchise continues to grow as we selectively

hire talented professionals worldwide. We are seizing opportunities in the marketplace to both expand our existing core businesses and enter new areas where we can profitably develop our market presence. I am proud of our success and I am enthusiastic about our future."

**Capital Markets**

Net revenues for the Capital Markets segment were $1.5 billion for the quarter ended August 31, 2006, up 13% from $1.4 billion for the third quarter of 2005.

- Institutional Equities net revenues were $436 million for the third quarter of 2006, a 31% increase from $334 million for the comparable prior-year quarter. Strong results from domestic and international sales and trading, structured equity products and energy/commodity activities all contributed to this robust performance.

- Fixed Income net revenues were $878 million for the third quarter 2006, up 19% from $739 million reported for the quarter ended August 31, 2005. Mortgage-related revenues increased from the prior year period as customer activity and gains in market share more than offset declining industry volumes. Bear Stearns continues to be ranked as the number one underwriter of U.S. Mortgage-backed securities for the third quarter as well as for the nine months ending August 31, 2006. The credit businesses remained very strong, led by the leveraged finance and credit trading areas.

- Investment Banking net revenues were $232 million for the quarter ended August 31, 2006, down 23% from $300 million for the year-ago third quarter. Excluding merchant banking, Investment Banking net revenues increased 8% due to increased merger and acquisition advisory fees as a number of previously announced transactions were completed during the quarter. Partially offsetting the increase in merger and acquisition advisory fees were reduced underwriting net revenues reflecting lower industry activity levels as compared with the prior- year quarter.

**Global Clearing Services**

Net revenues for Global Clearing Services were $269 million for the quarter ended August 31, 2006, up 4% from $258 million for the quarter ended August 31, 2005. Higher customer margin debt and customer short balances resulted in increased net interest revenues. Average customer margin debt balances were $68.8 billion during the quarter ended August 31, 2006, up 9% from $63.4 billion in the comparable quarter of fiscal 2005. Customer short

balances averaged $82.1 billion for the third quarter of 2006, compared with $81.3 billion for the third quarter of 2005.

## Wealth Management

Wealth Management net revenues for the quarter ended August 31, 2006 were $231 million, an increase of 36% from $170 million for the quarter ended August 31, 2005.

- Private Client Services net revenues were $127 million in the third quarter of 2006, up 12% from $114 million in the prior-year quarter. Increased client activity levels and the continued growth in fee-based assets drove the increase in net revenues for the 2006 third quarter.

- Asset Management net revenues rose 87% to $104 million for the third quarter of 2006 from $56 million in the prior-year quarter. Performance fees increased compared with the third quarter of 2005 as our proprietary hedge fund products recorded strong performance. Management fees also increased as assets under management increased 25% to $50.2 billion at quarter end, up from $40.3 billion on August 31, 2005.

## Expenses

- Compensation as a percentage of net revenues was 48.1% for the third quarter of 2006 versus 47.0% in the quarter ended August 31, 2005. Compensation as a percentage of net revenues for the nine months ended August 31, 2006 was 48.3% and 47.9% for the full year ended November 30, 2005.

- Non-compensation expenses were $437 million for the quarter ended August 31, 2006, a rise of 15% from $381 million for the comparable prior-year period. The increase is primarily related to occupancy fees, higher communications and technology costs associated with additional headcount as well as higher professional fees.

The third quarter 2006 pre-tax profit margin was 31.3% as compared with 32.0% for the third quarter of 2005.

As of August 31, 2006, total capital, including stockholders' equity and long-term borrowings, was $61.9 billion. The book value of Bear Stearns common stock at August 31, 2006 was $81.52 per share, based on 146.3 million shares outstanding.

53.    On October 10, 2006, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its acquisition of ECC Capital Corporation ("ECC").    ECC Capital Corporation was a mortgage finance real estate investment trust (REIT) that originated and invested in residential mortgage loans. ECC Capital offered a series of mortgage products to borrowers, with a particular emphasis on "nonconforming" borrowers who generally do not satisfy the credit, collateral, documentation or other standards required by conventional mortgage lenders and loan buyers and it managed a portfolio of these loans. The press release emphasized that the acquisitions would give the Company a *"substantial stake in the subprime lending business."* The press release stated in part:

> The Bear Stearns Companies Inc. has agreed to acquire ECC Capital Corporation's mortgage banking platform, the two companies announced today. Under the agreement, Bear Stearns' mortgage bank subsidiary, Bear Stearns Residential Mortgage Corporation, will purchase the subprime mortgage origination platform of ECC Capital's subsidiary, Encore Credit Corp. Encore Credit, specializing in subprime mortgage origination, will operate as a separate division of Bear Stearns Residential Mortgage Corporation.

> "The acquisition of ECC Capital's origination unit will give Bear Stearns a substantial stake in the subprime lending business," said Jeff Verschleiser, a senior managing director in the mortgage department at Bear Stearns. "We continue to diversify our product mix to give independent mortgage brokers additional options through Bear Stearns Residential Mortgage Corporation. With our advanced technology, sophisticated risk management systems and capital markets expertise, we are well positioned to continue to broaden our already formidable mortgage franchise."

> Shabi Asghar, ECC Capital's President and Co-CEO, said, "As part of the Bear Stearns team, the Encore Credit sales force can now expect to have access to more competitive loan pricing, to have a broader product menu and to be integrated into Bear Stearns' state-of-the-art production platform technology, which will provide our brokers with greater efficiency and service. Our origination business seems to be a natural fit with Bear Stearns' expansion in the subprime market." Mr. Asghar will be President and CEO of the business unit after the transaction closes. As part of the acquisition, Bear

22

Stearns will take over Encore Credit's operating centers in Irvine, Cal., Downers Grove, Ill. and Glen Allen, Va. Bear Stearns will also acquire selected portfolios of whole loans. Encore Credit will leverage the benefits of Bear Stearns Residential Mortgage Corporation's existing technology, legal and compliance infrastructure. Bear Stearns Residential Mortgage Corporation expects to employ most of the personnel of Encore.

This acquisition is the latest addition to Bear Stearns' market-leading mortgage franchise. Bear Stearns Residential Mortgage Corporation began operations in April 2005 to provide mortgage brokers with an easy, streamlined solution for financing home loans. With an innovative technology platform called BearDirect.net, it now lends some $600 million per month in primarily Alt-A loans. Coupled with Encore Credit's mostly subprime mortgage origination, the combined platform will generate over $1 billion in loans per month.

"Bear Stearns has been buying loans from ECC Capital for over three years and the performance of its loans has been favorable compared with other originators in the marketplace," Mr. Verschleiser said. "Encore has a very strong sales organization, and as part of Bear Stearns Residential Mortgage Corporation we will be able to expand Encore Credit's product mix and improve its pricing and funding costs."

54.     During October 2007, the Individual Defendants recklessly directed Citigroup to acquire ECC and purchase $1.2 billion of ECCs whole subprime loan portfolio.

55.     On December 14, 2006, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing fourth quarter earnings for 2006. The press release highlighted record revenue growth and positive trends in Bear Stearns strategic actions. The press release stated in part:

- *Bear Stearns Reports Best Ever Quarter*

- *Record Net Income of $563 million, up 38%*

- *Earnings Increase 38% to a Record $4.00 Per Share*

- *Full Year Results Set A Record For The Fifth Consecutive Year*

- *Net Income Increases 40% to $2.1 Billion*

- *Annual Earnings Per Share of $14.27*

- *Net Revenues Increase 25% to a Record $9.2 Billion*

- *Firm Increases Quarterly Dividend 14% to $0.32 Per Share*

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $4.00 for the fourth quarter ended November 30, 2006, up 38% from $2.90 per share for the fourth quarter of 2005. Net income for the fourth quarter of 2006 was $563 million, up 38% from $407 million for the fourth quarter of 2005. Net revenues for the 2006 fourth quarter were $2.4 billion, up 28% from $1.9 billion for the 2005 fourth quarter. The annualized return on common stockholders' equity for the fourth quarter of 2006 was 20.5%.

For the full fiscal year ended November 30, 2006, earnings per share (diluted) were a record $14.27, up 38% from $10.31 for fiscal 2005. Net income for the fiscal year 2006 was $2.1 billion, up 40% from the $1.5 billion earned in the twelve-month period ended November 30, 2005. Net revenues for fiscal year 2006 were $9.2 billion, an increase of 25% from $7.4 billion in the prior fiscal year. The after-tax return on common stockholders' equity was 19.1% for fiscal 2006.

"We are pleased to announce Bear Stearns' fifth consecutive year of record net income and earnings per share," said James E. Cayne, chairman and chief executive officer. "Our continued success is a testament to our unwavering focus on serving our clients with excellence; attracting and retaining talented professionals and profitably expanding our broad and diverse franchise. I look forward to 2007 and our continued expansion both internationally and domestically."

## Capital Markets

### Fourth Quarter

Net revenues in Capital Markets, which includes Institutional Equities, Fixed Income and Investment Banking, were $1.8 billion for the fourth quarter of 2006, up 26% from $1.4 billion for the fourth quarter ended November 30, 2005.

- Institutional Equities net revenues were $397 million, up 7% from $373 million for the fourth quarter of 2005. Record results from risk arbitrage and continued strong results from equity derivatives and international sales and trading contributed to this strong performance.

- Fixed income net revenues were $1.1 billion, up 25% from $839

million in the fourth quarter of 2005. The credit business produced record results led by the credit derivatives, distressed debt and leveraged finance areas. Mortgage revenues increased reflecting higher volumes and increased commercial-mortgage securitization activity.

- Investment Banking net revenues were $364 million in the fourth quarter of 2006, up 58% from the $231 million in the comparable prior year period. This increase reflects fees from higher underwriting and merger and acquisition transaction volumes.

**Full Year**

Capital Markets net revenues were a record $7.0 billion for fiscal year 2006, an increase of 25% over the previous record of $5.6 billion reported in 2005.

- Institutional Equities net revenues for the fiscal year ended November 30, 2006 were up 33% to a record $1.9 billion from $1.4 billion in fiscal 2005. Equity derivatives, risk arbitrage, energy/commodity activities and international sales and trading all delivered record results.

- Fixed Income net revenues were a record $4.0 billion in 2006, up 23% from $3.3 billion in 2005. This was the sixth consecutive year of record results and was led by revenue growth in the mortgage and credit departments. In the mortgage business, the record results were driven by market share gains in commercial mortgage-backed securities and the growth in captive origination volumes from the vertical integration of the mortgage platform. In addition, collateralized loan and debt origination activities increased substantially. The credit franchise delivered its best results ever as the high yield, leverage finance and credit trading areas all produced record revenues.

- Investment Banking reported net revenues of $1.2 billion for fiscal 2006, up 19% from $980 million in the prior fiscal year. The increase in net revenues was due to greater transaction volumes in both underwriting and advisory areas.

**Global Clearing Services**

**Fourth Quarter**

- Fourth quarter 2006 Global Clearing Services net revenues were $281 million, up 7% from $263 million in the fourth quarter of 2005. Net interest revenues increased due to higher margin debt and customer

25

short balances. Average customer margin debt balances for the quarter ended November 30, 2006 were $72.0 billion, up from $67.4 billion in the prior year quarter. Customer short balances averaged $90.0 billion during the fourth quarter of 2006, up from the prior year fourth quarter average of $81.2 billion.

## Full Year

- Net revenues for the 2006 fiscal year in Global Clearing Services were $1.10 billion, up 3% from $1.07 billion in fiscal 2005. Net interest revenues increased due to higher levels of customer margin debt balances partially offset by declining commission revenues. Average customer margin debt balances for the fiscal year were $68.4 billion as compared with $64.9 billion for the year ended November 30, 2005. Customer short balances averaged $82.6 billion during the 2006 fiscal year, down from the average of $84.4 billion for 2005.

## Wealth Management

### Fourth Quarter

In the Wealth Management segment, which includes Private Client Services and Asset Management, net revenues were $245 million for the quarter ended November 30, 2006, up 33% from $184 million in the fourth quarter of 2005.

- Private Client Services revenues were $133 million in the fourth quarter of 2006, an increase of 14% from $117 million in the 2005 quarter. Increased equity in client accounts, higher activity levels, and robust growth in fee-based assets drove the quarterly revenue increase.

- Asset Management net revenues grew 66% to $112 million for the fourth quarter of 2006 from $67 million in the prior year quarter. The rise in net revenues was due to increased performance fees from hedge fund products, as well as management fees from a growing base of assets under management.

### Full Year

Wealth Management net revenues were $850 million for fiscal 2006, an increase of 25% compared with $679 million in fiscal 2005.

- Revenues from Private Client Services rose 15% to $518 million for the 2006 fiscal year from $450 million for fiscal 2005. The improvement reflects the growing contribution of revenues from fee-based assets.

- The Asset Management business reported record net revenues of $332 million for the 2006 fiscal year, up 45% from $229 million in the prior year. Growth in alternative assets under management together with increased performance fees contributed to these excellent results.

Assets under management rose to $52.5 billion as of November 30, 2006, up 25% from $41.9 billion as of November 30, 2005.

## Expenses

### Fourth Quarter

- Compensation as a percentage of net revenues was 43.6% for the fourth quarter of 2006 compared with 46.2% for the quarter ended November 30, 2005.

- Non-compensation expenses were $469 million for the quarter ended November 30, 2006, up 9% from $429 million in the 2005 quarter. The increase is primarily related to higher occupancy fees, professional fees, and communications and technology costs associated with additional headcount.

The 2006 fourth quarter pre-tax profit margin was 37.0%, as compared with 31.1% for the prior year quarter.

### Full Year

- For the twelve-months ended November 30, 2006, compensation as a percentage of net revenues was 47.1% as compared with 47.9% for the 2005 fiscal year.

- Non-compensation expenses for the fiscal year 2006 were $1.74 billion, 5% higher than the $1.65 billion reported in 2005. The increase is primarily related to increased occupancy expenses, professional fees, and communications and technology costs associated with an expanding workforce.

For fiscal year 2006 the pre-tax margin was 34.1% versus 29.8% in fiscal year 2005.

As of November 30, 2006, total capital, including stockholders' equity and long-term borrowings, was $66.7 billion. Book value on November 30, 2006 was $86.39 per share, based on 145.7 million shares outstanding. The company repurchased approximately 10.6 million shares of its common stock during fiscal 2006.

**Quarterly Common Stock Cash Dividend Declared**

- The Board of Directors of The Bear Stearns Companies Inc. declared a regular quarterly cash dividend of 32 cents per share on the outstanding shares of common stock payable January 26, 2007, to stockholders of record on January 16, 2007. This represents a 14% increase over the 28 cent per share quarterly dividend paid since January 2006.

**Quarterly Preferred Stock Cash Dividends Declared**

- The Board of Directors of The Bear Stearns Companies Inc. declared the following regular quarterly dividends: (i) a cash dividend of $3.075 per share on the outstanding shares of 6.15% Cumulative Preferred Stock, Series E (which is equivalent to 76.875 cents per related depositary share); (ii) a cash dividend of $2.86 per share on the outstanding shares of 5.72% Cumulative Preferred Stock, Series F (which is equivalent to 71.50 cents per related depositary share); and (iii) a cash dividend of $2.745 per share on the outstanding shares of 5.49% Cumulative Preferred Stock, Series G (which is equivalent to 68.625 cents per related depositary share); all payable January 15, 2007 to stockholders of record on December 29, 2006.

56.     In the beginning of 2007, the subprime mortgage crisis began to intensify and Bear Stearns continued to disseminate false information to investors regarding its exposure in its portfolio of mortgage-backed securities.

57.     On February 13, 2007, the Company filed its Form 10-K, which included the same financial results previously reported. The Form 10-K also included a certification by Defendant Cayne, which stated:

CERTIFICATION

I James E. Cayne, certify that:

1. I have reviewed this Annual Report on Form 10-K of The Bear Stearns Companies, Inc.

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make

the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.   Designed such disclosure controls and procedures, or cause such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information and;

    b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

58.     Individual Defendant Molinaro signed a nearly identical certification included in the Form 10-K.

59.     On March 15, 2007, Bear Stearns issued its results for the first quarter of 2007, in a press release which stated in part:

- *Bear Stearns Reports First Quarter 2007 Results*

- *Net Revenues Rise In Every Business Segment*

- *Net Revenues Rise 14% to $2.5 Billion*

- *Net Income Increases 8% to $554 Million*

- *Earnings Per Share Up 8% to $3.82*

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $3.82 for the first quarter ended February 28, 2007, up 8% from $3.54 per share for the first quarter of 2006. Net income for the first quarter of 2007 was $554 million, up 8% from $514 million for the first quarter of 2006. Net revenues were $2.5 billion for the 2007 first quarter, up 14% from $2.2 billion in the 2006 first quarter. The annualized return on common stockholders' equity was 18.3% for the first quarter of 2007 and 18.6% for the trailing 12-month period ended February 28, 2007.

"We are pleased with this excellent performance, revenues for the first quarter were up for every business segment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Growing the company remains a core focus as we continue to invest in the clearing,

mortgage, international and asset management franchises with successful results."

## Capital Markets

Capital Markets net revenues for the first quarter of 2007 were $2.0 billion, up 15% from $1.7 billion in the first quarter of 2006.

- Institutional Equities net revenues were $513 million, up 3% from $500 million for the first quarter of 2006. Equity derivatives delivered a record quarter with improved market conditions leading to increased customer activity. International sales and trading revenues increased in the first quarter compared with the year-ago quarter, and risk arbitrage net revenues rose reflecting a high level of activity in announced merger and acquisition transactions.

- Fixed Income net revenues were $1.1 billion, up 27% from $907 million in the year-ago quarter. The credit business produced record results led by the credit derivatives and distressed debt areas. The interest rate area also produced strong results reflecting increased volatility and higher customer volume. Residential mortgage-related revenues decreased from the prior year period, reflecting weakness in the U.S. residential mortgage-backed securities market.

- Investment Banking net revenues were $303 million in the first quarter of 2007, up 3% from $296 million in the comparable prior-year period. Equity underwriting and merger and acquisition activity remained strong in the first quarter of 2007. However, merchant banking revenues were lower than in the prior year quarter. Excluding merchant banking revenues, Investment Banking net revenues increased 20% compared with the first quarter of 2006.

## Global Clearing Services

- First quarter 2007 Global Clearing Services net revenues were $276 million, up 5% from $263 million in the first quarter of 2006. Net interest revenues increased from the prior-year quarter as interest-bearing balances rose to record levels. Average customer margin debt balances for the quarter ended February 28, 2007 were $81.3 billion, up from $64.5 billion in the prior year quarter. Average customer short balances increased to $94.0 billion for the first quarter of 2007 from $78.2 billion for the first quarter of 2006. Average free credit balances were $33.8 billion in the current quarter, up from $29.9 billion in the first quarter last year.

## Wealth Management

Wealth Management net revenues for the first quarter of 2007 were $255 million, an increase of 14% from $225 million in the first quarter of 2006. Net revenue continued to grow with higher levels of assets under management.

- Private Client Services net revenues were $136 million in the first quarter of 2007, an increase of 5% from $130 million in the 2006 first quarter. The increase was mainly attributable to revenues associated with the continued growth of fee-based assets.

- Asset Management net revenues grew 25% to $119 million for the first quarter of 2007 from $95 million in the prior year's quarter. The increase was primarily due to higher management fees and investment performance. Assets under management rose 19% to $54.1 billion as of February 28, 2007, compared with $45.4 billion as of February 28, 2006.

**Expenses**

- Compensation as a percentage of net revenues was 48.5% in the first quarter of 2007 as compared with 47.9% for the quarter ended February 28, 2006.

- Non-compensation expenses were $442 million for the quarter ended February 28, 2007, an increase of 15% from $386 million in the 2006 first quarter. The increase is primarily due to higher professional fees, occupancy and communications and technology costs.

The pre-tax profit margin in the first quarter of 2007 was 33.7% as compared with 34.4% in the quarter ended February 28, 2006.

As of February 28, 2007, total capital, including stockholders' equity and long-term borrowings, was approximately $71.8 billion. Book value as of February 28, 2007 was $90.57 per share, based on 145.1 million shares outstanding.

60.    On April 9, 2007, the Company filed its Form 10-Q for the first quarter which included the same financial results previously reported.

61.    On June 12, 2007, the media reported that two hedge fund controlled by Bear Stearns had fallen 23% from the beginning of 2007 to present.  "The High-Grade Structured Credit Strategies Enhanced Leverage Fund, was widely exposed to subprime mortgages, or home leans to borrows with weak credit histories." The two hedge funds managed by the Company were roiled by mortgage losses and subsequently went bankrupt.  The failure of the two mortgage cost investors $1.6 billion.

62.    On this news, on August 5, 2007, Bear Stearns announced it was replacing Spector as President of the Company.  However, despite Spector's resignation and the failure of the

63.    On September 20, 2007, the Company issued a press release in connection with its third quarter earnings for 2007.  The Company, seemingly no longer able to sustain its profitability due to its risks and exposure in the subprime market, *reported earnings down 62% from the same quarter for 2006.*  However, the Individual Defendant Cayne continued to reassure investors of "solid revenues in Investment Banking and record revenues in Global Equities and Global Clearing Services,"…and went on to state that he was "confident in the underlying strength of [the Company's] business and proud of the effort and determination displayed by [the Company's] employees during these challenging times." Additionally, at this time, the Company's Board of Directors increased the Company's share repurchase program to all employees to purchase up to $2.5 billion worth of common stock.  The press release stated in part:

> The Bear Stearns Companies Inc. today reported earnings per share
> (diluted) of $1.16 for the third quarter ended August 31, 2007, down
> 62% from $3.02 per share for the third quarter of 2006. Net income
> for the third quarter of 2007 was $171.3 million, down 61% from
> $438 million for the third quarter of 2006. Net revenues were $1.3
> billion for the third quarter, down 38% from $2.1 billion for the third
> quarter of 2006. The annualized return on common stockholders'
> equity for the third quarter of 2007 was 5.3%, and 13.7% for the 12-
> month period ended August 31, 2007. Third quarter results include

approximately $200 million in losses and expenses related to the BSAM High-Grade hedge funds.

"The third quarter was characterized by extremely difficult securitization markets and high volatility levels across asset classes. While our fixed income results clearly reflect these market conditions, we reported solid revenues in Investment Banking and record revenues in Global Equities and Global Clearing Services." said James E. Cayne, chairman and chief executive officer. "I am confident in the underlying strength of our business and proud of the effort and determination displayed by our employees during these challenging times."

## CAPITAL MARKETS

Net revenues for the Capital Markets segment were $1.0 billion for the quarter ended August 31, 2007, down 36% from $1.6 billion for the third quarter of 2006.

- Institutional Equities net revenues were a record $719 million for the 2007 third quarter, a 53% increase from $471 million for the comparable prior-year quarter. This strong performance was driven by record results in structured equity products and robust international sales and trading net revenues.

- Fixed Income net revenues were $118 million for the 2007 third quarter, down 88% from $945 million reported for the quarter ended August 31, 2006. Market conditions in both the mortgage and credit businesses were extremely challenging this quarter. A general re-pricing of risk in the market led to significant reductions in both mortgage and credit-related revenues as volumes decreased while asset values declined.

- Investment Banking net revenues were $211 million for the quarter ended August 31, 2007 down 9% from $232 million for the year-ago third quarter. Merger and acquisition advisory fees increased as a number of announced transactions were completed during the quarter. Total underwriting net revenues were flat as increased equity underwriting revenues were offset by lower fixed income underwriting revenues. Merchant Banking revenues decreased during the quarter due to changes in mark-to-market values of several portfolio companies.

**Global Clearing Services**

Net revenues for Global Clearing Services were a record $332 million for the quarter ended August 31, 2007, up 30% from $255 million for the third quarter of 2006. Higher average customer margin debt and average customer short balances resulted in increased net interest revenues. Average customer margin debt balances were $102.2 billion during the quarter ended August 31, 2007, up 49% from $68.8 billion in the comparable quarter of fiscal 2006. Customer short balances averaged $102.2 billion for the third quarter of 2007, compared with $82.1 billion for the third quarter of 2006.

**Wealth Management**

Wealth Management net revenues for the quarter ended August 31, 2007 were a negative $38 million compared with $233 million for the quarter ended August 31, 2006.

- Private Client Services net revenues were $148 million in the third quarter of 2007, up 15% from $128 million in the prior-year quarter. Increased client activity levels driven by market volatility and the continued growth in fee-based assets drove the increase in net revenues for the 2007 third quarter.

- Asset Management net revenues were a negative $186 million for the third quarter of 2007 compared with $105 million in the prior-year quarter. Included in the quarter's results is a loss of approximately $200 million relating to the BSAM High-Grade hedge funds. The negative impact included the reversal of accrued performance fees, the write down of hedge fund investments and receivables, and lower management fees related to proprietary hedge fund products. Assets under management increased 15% to $57.8 billion at quarter end, up from $50.2 billion at August 31, 2006.

**Expenses**

- Compensation as a percentage of net revenues was 49.9% for the third quarter of 2007, versus 48.1% in the quarter ended August 31, 2006. Compensation as a percentage of net revenues for the nine months ended August 31, 2007 was 49.0% versus 48.3% for the nine months ended August 31, 2006.

- Non-compensation expenses were $492 million for the quarter ended August 31, 2007, an increase of 13% from

$437 million for the comparable prior-year period. The increase is primarily related to occupancy fees, higher communications and technology costs associated with additional headcount as well as higher professional fees.

The third quarter 2007 pre-tax profit margin was 13.1%, compared with 31.3% for the third quarter of 2006.

As of August 31, 2007, total capital, including stockholders' equity and long-term borrowings, was $78.2 billion. Book value as of August 31, 2007 was $91.82 per share, based on 144.6 million shares outstanding, primarily reflecting open-market stock repurchases during the quarter.

**Share Repurchase Authorization**

The Board of Directors approved an amendment to the company's share repurchase program authorizing the purchase of up to $2.5 billion in aggregate cost of common stock. This amendment supercedes the previous $2.0 billion authorization, under which the company had acquired approximately $1.3 billion of common stock. The share repurchase program will be used both to acquire shares of common stock for the company's employee stock award plans and for up to $1.0 billion in corporate share repurchases. Purchases may be made in the open market or through privately negotiated transactions in 2007 or beyond.

**Quarterly Common Stock Cash Dividend Declared**

The Board of Directors of The Bear Stearns Companies Inc. declared a regular quarterly cash dividend of 32 cents per share on the outstanding shares of common stock payable October 26, 2007 to stockholders of record on October 16, 2007.

**Quarterly Preferred Stock Cash Dividend Declared**

The Board of Directors of The Bear Stearns Companies Inc. declared the following regular quarterly dividends: (i) a cash dividend of $3.075 per share on the outstanding shares of 6.15% Cumulative Preferred Stock, Series E (which is equivalent to 76.875 cents per related depositary share); (ii) a cash dividend of $2.86 per share on the outstanding shares of 5.72% Cumulative Preferred Stock, Series F (which is equivalent to 71.50 cents per related depositary share); and (iii) a cash dividend of $2.745 per share on the outstanding shares of 5.49% Cumulative Preferred Stock, Series G (which is equivalent to

68.625 cents per related depositary share); all payable October 15, 2007 to stockholders of record on September 28, 2007.

64.     During the Relevant Period, Bear Stearns's financial filings are devoid of any disclosure of the risks the Company faced with regard to its exposure in the subprime market. Bear Stearns statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in no knowing or should have known that Bear Stearns (1) was more exposed to the subprime market crisis than it had disclosed; (2) it purchase of billions of subprime loans during the Relevant Period and the acquisition of ECC were reckless and would eventually lead to over a billion dollars in write=-downs and lost revenues and (3) As a result of the foregoing, Bear Stearns reported earnings during the Relevant Period were inaccurate.

## DEMAND FUTILITY

65.     Plaintiff brings this action derivatively in the right and for the benefit of Bear Stearns to redress damage suffered and to be suffered by Bear Stearns as a direct result of Defendants' breaches of fiduciary duty, corporate mismanagement, abuse of control and violations of the Exchange Act. This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have. Plaintiff will adequately and fairly represent the interests of Bear Stearns and its shareholders in enforcing and prosecuting their rights.

66.     Plaintiff has not made any demand on the present board of Directors of Bear Stearns to institute this action because such demand would be a futile and useless act for the foregoing and following reasons:

67.    Bear Stearns's current board consists of 12 directors. A majority of the directors, if not all, face a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand.

68.    During the Relevant Period, Director Defendants authorized the acquisition of ECC, a company troubled by the subprime mortgage crisis. The Board did not exercise valid business judgment when it rendered the decision to acquire a Company's whole subprime loan portfolio worth $1.2 billion. Moreover, the Board failed to properly discuss or consider the negative effects that the acquisition of ECC's subprime assets would have on the Company's business and business prospects. Accordingly, demand is futile.

69.    During the Relevant Period, Individual Defendants Bienen, Glickman, Goldstein, Novelly, Salerno, and Tese, were members of Bear Stearns's audit committee. The audit committee's role is one of oversight. It is responsible for ensuring the integrity of Bear Stearns financial statements. The audit committee completely failed to fulfill its oversight role by allowing Bear Stearns to file financial statements with the SEC that, as discussed above, did not accurately describe the risks the Company faced as a result of its over exposure to CDOs and subprime loans. As such, each of these defendants cannot independently analyze or investigate the claims asserted in this action because each face a real and substantial danger of personal liability in this action.

70.    Notwithstanding Defendants knowledge of the claims and causes of action raised by Plaintiff, Bear Stearns's Board of Directors has failed and refused to seek recovery for Bear Stearns for any of the wrongdoing alleged by Plaintiff herein. Plaintiff has not made a demand on shareholders of Bear Stearns for any of the wrongdoing alleged herein by Plaintiff. Plaintiff has not made any demand on shareholders of Bear Stearns to institute this

action since such demand would be a futile act because (1) Bear Stearns thousands of shareholders and is a publicly held company; (2) A demand on such a large number of shareholders would be impossible for Plaintiff to make as Plaintiff cannot know all of the contact information for all shareholders; and (3) Assuming all shareholders could be located and identified, a demand on all of them would force Plaintiff to incur massive expenses.

71.     The acts complained of constitute violations of the Exchange Act and violations of fiduciary duties owed by Bear Stearns's officers and directors and these acts are incapable of ratification.

72.     The Director Defendants are not disinterested parties as they participated in and approved or allowed the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Bear Stearns's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein.

73.     Each key officer and director knew of and/or directly benefited from the wrongdoing complained of herein.

74.     Each Director Defendant authorized and/or allowed the false statements disseminated directly to the public and securities analysts. These false statements were made available to and distributed to shareholders by Defendants who authorized and/or permitted the issuance of various improper statements and principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute this suit whether or not the suit was instituted by them.

## COUNT I

### (Breach of Fiduciary Duties of Care, Loyalty and Good Faith)

75.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

76.     As alleged in detail herein, Cayne, and each of the Individual Defendants, had a duty to Bear Stearns and its shareholders to, amongst other things, ensure that the Company operated in a diligent, honest and prudent manner.

77.     Plaintiff asserts this claim derivatively on behalf of Bear Stearns against Cayne and all of the Director Defendants.

78.     Cayne and the Individual Defendants have breached their fiduciary duties of care, loyalty and good faith owed to Bear Stearns and its stockholders.

79.     Further, each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

80.     By reason of the foregoing, Bear Stearns has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

81.     Plaintiff and Bear Stearns have no adequate remedy of law.

## COUNT II

**(Derivatively Against All Defendants for Violation of the Exchange Act §§ 10(b) and 10b-5)**

82.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

83.    During the Relevant Period, Individual Defendants made false and inaccurate statements concerning Bear Stearns's financial condition and business prospects to its shareholders and the public.

84.    Individual Defendants knew, consciously disregarded and were reckless and grossly negligent in causing the false and misleading statements to be made.  Individual Defendants caused the Company's commons tock to be inflated due to the improper reporting of the value of the Bear Stearns's business prospects, especially concerning the Company's reckless acquisition of ECC, which further increased the risk and exposed the Company to the subprime mortgage crisis.  Accordingly, Individual Defendants violated the Exchange Act §10(b) and Rule 10b-5.

85.    Therefore, during the Relevant Period, Individual Defendants directly and proximately caused Bear Stearns's damages.

## COUNT III

### (Corporate Waste)

86.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

87.    Plaintiff alleges this cause of action on behalf of Bear Stearns against Cayne and the Individual Defendants.

88.     Each Individual Defendant owes and owed to Bear Stearns the obligation to protect Bear Stearns's assets from loss or waste.

89.     Individual Defendants' failure to adequately evaluate and monitor Bear Stearns's risk in the CDO market constituted a waste of Bear Stearns's corporate assets and was grossly unfair to Bear Stearns. No person of ordinary, sound business judgment could conclude that Cayne's and the Individual Defendants' decision to become so overextended in the risky CDO market was a sound exercise of business judgment.

90.     By reason of the foregoing, Bear Stearns has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

91.     Plaintiff and Bear Stearns have no adequate remedy at law for the wasteful and wrongful conduct engaged in by the Individual Defendants.

92.     Plaintiff and Bear Stearns are therefore entitled to judgment against the Individual Defendants as specified below.

## COUNT IV

### (Against All Defendants for Abuse of Control)

93.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

94.     Defendant Cayne and the Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Bear Stearns, for which they are legally responsible.

95.     As a direct and proximate result of these defendants' abuse of control, Bear Stearns has sustained significant damages.

42

96.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

## COUNT V

### (Against All Defendants for Gross Mismanagement)

97.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

98.    By their allegations alleged herein, Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Bear Stearns in a manner consistent with the operations of a publicly held corporation.

99.    As a direct and proximate result of these defendants' gross mismanagement and breaches of duty alleged herein, Bear Stearns has sustained significant damages in excess of $1 billion dollars.

100.    As a result of the misconduct and breaches of duty alleged herein, these defendants are liable to the Company.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and in favor of Bear Stearns against all of the Defendants as follows:

A.    Against all the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and waste of corporate assets;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Bear Stearns and its shareholders

from a repeat of the damaging events described in this Complaint, including but not limited to, adopting the following remedial measures:

   a.  strengthening the board's supervision and oversight responsibilities and developing a system to ensure the board accurately manages the Company's risk potential;

   b.  prohibiting an individual from concurrently serving as the Chief Executive Officer and the Chairman of the Board;

   c.  allowing the Company's shareholders to nominate at least one candidate for election to the board; and

   d.  a policy of ensuring the accuracy of the qualifications of Bear Stearns's directors, executives and other employees;

  C.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts fees, costs and expenses; and

  D.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

  Plaintiff demands a trial by jury.

Dated:  November 19, 2007      Respectfully submitted,

           **BROWER PIVEN**
           A Professional Corporation

        By: _____
           David A.P. Brower (DB-4923)
           Elizabeth A. Schmid (ES-1294)
           488 Madison Avenue, Eighth Floor
           New York, New York 10022
           Telephone: (212) 501-9000
           Facsimile: (212) 501-0300

           *Counsel for Plaintiff Sam Cohen*

## VERIFICATION

I, Samuel T. Cohen, verify:

I am the Plaintiff in the above-entitled action; I hereby verify that I was a shareholder of The Bear Stearns Companies, Inc. at the times the misconduct complained of in the Verified Derivative Complaint for Breach of Fiduciary Duties ("Complaint") occurred. Additionally, I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of November 2007 at Baltimore, Maryland.

Samuel T. Cohen