UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL T. COHEN and JEROME BIRN, On Behalf of Themselves and All Others Similarly Situated and Derivatively on Behalf of THE BEAR STEARNS COMPANIES, INC., | Civil Action No. 07-cv-10453-RMB |
| Plaintiffs, | |
| vs. | VERIFIED SECOND AMENDED SHAREHOLDER DERIVATIVE AND CLASS COMPLAINT |
| JAMES E. CAYNE, SAMUEL L. MOLINARO, JEFFREY M. FARBER, JEFFREY MAYER, MICHAEL MINIKES, ALAN D. SCHWARTZ, WARREN J. SPECTOR, HENRY BIENEN, CARL D. GLICKMAN, MICHAEL GOLDSTEIN, ALAN C. GREENBERG, DONALD J. HARRINGTON, FRANK T. NICKELL, PAUL A. NOVELLY, FREDERIC V. SALERNO, VINCENT TESE, WESLEY S. WILLIAMS, JR., | |
| Defendants, | DEMAND FOR JURY TRIAL |
| -and- | |
| THE BEAR STEARNS COMPANIES, INC., a Delaware corporation, | |
| Nominal Defendant | |

U.S. DISTRICT COURT
S.D.N.Y.
RECEIVED
08 APR 10 PM 8:19

Plaintiffs Samuel T. Cohen and Jerome Birn ("Plaintiffs"), upon their personal knowledge as to the allegations pertaining to them, and upon information and belief, based upon, amongst other things, the investigations made by their attorneys, as to all other allegations, submit this Verified Second Amended Shareholder Derivative and Class Complaint against the defendants named herein, and allege the following:

## INTRODUCTION

1.    This is a hybrid shareholder derivative and class action brought by shareholders of The Bear Stearns Companies, Inc. ("Bear Stearns" or the "Company") on behalf of the Company and

holders of Bear Stearns common stock against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, corporate mismanagement, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 (the "Exchange Act"), that occurred beginning no later than March 2006 and continuing to the present (the "Relevant Period"). On behalf of Bear Stearns, this action seeks, among other things, damages, corporate governance reforms, restitution and the declaration of a constructive trust to remedy defendants' violations of state and federal law. On behalf of the Class (as defined below), this action seeks relief against Bear Stearns senior officers and directors arising out of their efforts to sell Bear Stearns via an unfair process at a grossly inadequate and unfair price (the "Acquisition") to JPMorgan Chase & Co. ("JPMorgan").

2.       During the Relevant Period, Bear Stearns, under defendants' direction, recklessly spent billions of dollars purchasing subprime loans to be used for future collateralized debt obligations. Due to defendants' misfeasance and malfeasance alleged herein, these subprime mortgages have caused substantial monetary losses to Bear Stearns and other damages, such as to its reputation and goodwill. Moreover, during the Relevant Period, defendants ignored the signs and news of the impending subprime loan failures and violated the Company's publicly disclosed risk management procedures, thereby ensuring the collapse of one of the giant Wall Street investment banks.

3.       Bear Stearns was a multifaceted financial institution that offers, among other things, investment banking and prime brokerage services; it was, during the Relevant Period, the second largest prime brokerage firm in terms of aggregate client assets. Bear Stearns was the fifth-largest U.S. investment bank by market cap and generates more of its revenue from mortgage securities and domestic markets than many of its peers, a statistic which has left the Company poorly positioned as these actions were reckless.

## Bear Stearns Hedge-Fund Fallouts

4.      During the Relevant Period, defendants failed to take appropriate reserves for the large amount of Collateralized Debt Obligations ("CDOs") in its portfolio, both on and off the balance sheet, and this information was not disclosed to investors.  CDOs are complex financial instruments that combine slices of varying assets and debt.  Many CDOs are backed by subprime mortgages - loans given to customers with poor credit history. As those mortgages have increasingly defaulted, banks are being forced to write down the value of bonds and CDOs backed by the loans.

5.      Defendants actively concealed the Company's failure to write down impaired securities tied to subprime debt.  While defendants were directing the Company to issue false and misleading statements regarding the Company's business and financial condition, which was due largely to Bear Stearns' pre-existing exposure to the subprime mortgage market, defendants were also recklessly directing Bear Stearns to acquire a subprime loan portfolio for $1.2 billion from a troubled subprime mortgage lending company and repurchase over $2.6 billion worth of its own shares at artificially inflated prices.  Even worse, certain of the defendants sold their personally held shares while in possession of material non-public information for over $65 million in proceeds.

6.      Defendants' failure to appropriately and promptly take adequate reserves and the Company's false and misleading statements regarding its subprime exposure was due in part to the inadequacy and abandonment of the Company's publicly disclosed risk management procedures and practices. The Company's risk management structure was wholly insufficient to identify the massive risks associated with Bear Stearns' aggressive subprime mortgage financing and investments, and its procedures violated by the defendants as shown through its eventual collapse and forced sale.

7.      As a result of the improper financial reporting, violations of law and mismanagement, Bear Stearns' credibility with investors, clients and counterparties vanished.  At the end of the Relevant Period, Bear Stearns teetered on the brink of bankruptcy and its share price declined from over $170 per share to its eventual forced sale price of $10 per share.

8.    Beginning in July 2007, Bear Stearns began disclosing the true extent of its exposure to the widening subprime mortgage crisis. On July 17, 2007, Bear Stearns informed investors that it was closing two Company-managed hedge funds, whose assets consisted of subprime mortgage-related assets and CDOs. The collapse of these two funds represents over $1.5 billion in losses for investors. Currently, Bear Stearns is the subject of two lawsuits and governmental investigations in connection with the two funds.

9.    On September 20, 2007, the defendants caused or allowed Bear Stearns to announce earnings for the third quarter of fiscal 2007 that were 61% lower than the same quarter in the prior year. Bear Stearns attributed those weak earnings to "extremely challenging" market conditions affecting its mortgage and credit business.

10.    On November 14, 2007, the defendants caused or allowed the Company to announce that it would need to write-down $1.2 billion of its assets linked to mortgage related investments in the fourth quarter. The write-down was at the time equal to 9% of Bear Stearns' equity. However, more losses are forthcoming as the extent of the damage to the Company continues to grow. During a November 14, 2007 conference call, the Company's Chief Financial Officer commented with respect to the exposure of the Company, saying "[w]e're certainly not pleased with the results that we have and the magnitude of the write-downs." The CFO also acknowledged, however, that the market is still challenging and the size of the write-down may change.

11.    Also on November 14, 2007, the Secretary of State of Massachusetts filed a complaint against Bear Stearns alleging that one of its units failed to notify the hedge funds' independent directors that it was trading securities from its owns accounts with hedge funds it also advised. The two hedge funds suffered billions of dollars in losses.

12.    On December 20, 2007, the defendants caused or allowed Bear Stearns to disclose a $1.9 billion write-down of its mortgage inventory. This write-down led to the Company's first reported loss in its 84 year history.

13.    As a result, quarterly net income for the period ended in August 2007 sank 61% to $171.3 million, or $1.16 a share, from the year-earlier period and revenue fell to $1.3 billion from $2.13 billion last year.

### Defendants Announce the Acquisition

14.    While American securities markets were closed on Sunday, March 16, 2008, Bear Stearns announced it had been forced to merge with JPMorgan at a fire sale price (the "Merger"). Even though the Company's shares had sold for approximately $70 per share just a week before and had closed at approximately $30 per share the preceding Friday, the consideration for the deal was set at a shocking $2 per share, or $236 million. Defendants accepted this offer despite: (i) Bear Stearns' Chief Financial Officer's statements on March 14, 2008 that the Company's book value was still in the mid-$80 per share range; (ii) Bear Stearns' Chief Executive Officer and President's statements on March 12, 2008 that he was comfortable with the range of earnings estimates by analysts for the Company's first quarter 2008; (iii) Bear Stearns' other strong and profitable divisions, such as its prime brokerage and global clearing businesses; and (iv) Bear Stearns' stock was trading on the open market in the $60 per share range.

15.    But the inadequate $2 Merger price was only one of the dramatic problems with defendants' proposed coercive deal. The deal also has a so-called "no solicitation" clause that prevents Bear Stearns from soliciting competitive bids and a "force-the-vote" clause that requires Bear Stearns to force call a shareholder vote on the deal, even if the Board withdraws its recommendation of the deal. If the shareholders reject the deal after a vote, Bear Stearns' only recourse is to "restructure" the deal without any chance for an increase in consideration *for a year* – until the deal self-terminates in March 2009. This essentially amounts to a 1-year option to buy Bear Stearns in favor of JPMorgan. Meanwhile, the deal cedes the operation of the Company to JPMorgan's "reasonable discretion." Furthermore, even if the deal fails to close, JPMorgan will have the option of buying Bear Stearns New York City office located in the heart of Manhattan and a separate, unilateral option to buy 19.9% of Bear Stearns.

16.    Defendants are now also facing extraordinary regulatory scrutiny. The extremely low consideration of the Merger and its draconian and restrictive terms have attracted the attention of the Securities and Exchange Commission ("SEC"), which recently sent a notice to JPMorgan that it would be investigating statements made by Bear Stearns before the announcement of the takeover by JPMorgan. This is hardly surprising, given that Bear Stearns was assuring investors and the public of its viability nearly up to the weekend in which it finally faced complete collapse.

17.    Faced with scrutiny and a pending backlash from Bear Stearns shareholders, on March 24, 2008, JPMorgan agreed to increase its offer to approximately $10 per share, which still compares poorly to the $70 per share at which Bear Stearns was trading at only two weeks before. But JPMorgan's decision to increase its offer was not an act of charity. In exchange, the Board agreed to a Stock Exchange Agreement that allows JPMorgan to exchange 20.6 million of its shares for 95 million newly issued Bear Stearns' shares. Along with its open market purchase of Bear Stearns' stock, JPMorgan holds, as of April 8, 2008, approximately 47.41% of the Company's outstanding shares. Moreover, in connection with the agreement, certain members of the Board of Directors holding 7.5 million Bear Stearns shares agreed to vote their personally held shares in favor of the Merger. If the Stock Exchange Agreement is consummated, only near-unanimous opposition from Bear Stearns' remaining shareholders or judicial intervention will prevent the Merger from closing.

18.    Defendants issued the 95 million Bear Stearns shares without first soliciting shareholder approval as required by New York Stock Exchange ("NYSE") rules. Under those rules, defendants can only avoid shareholder approval if they can show that obtaining that approval would seriously jeopardize Bear Stearns' financial viability. Shareholder approval or disapproval of the Share Exchange Agreement, however, does not jeopardize the Company's financial viability – *it only jeopardizes JPMorgan's position*. The Federal Reserve is currently guaranteeing billions of Bear Stearns' assets and obligations. There is no evidence that the Federal Reserve would be unwilling to finance an alternative transaction in the event that another bidder stepped into JPMorgan's shoes.

6

19.     Also on March 24, 2008, Bear Stearns entered into an agreement with JPMorgan, further tying up Bear Stearns assets and making it more difficult for Bear Stearns shareholders should they vote down the agreement. Pursuant to the Guarantee and Collateral Agreement (the "Collateral Agreement"), Bear Stearns agreed to guarantee their obligations to repay JPMorgan for any loans or lines of credit extended by JPMorgan and any debts paid by JPMorgan on behalf of Bear Stearns to creditors prior to the completion of the sale. The Collateral Agreement was secured by a lien on Bear Stearns assets, effectively giving JPMorgan rights to all Bear Stearns assets whether the proposed Merger is approved or not.

20.     In response to the heavy involvement of the Federal Reserve in the proposed Merger and the government's responsibility to taxpayers, the Senate Committee on Finance is now also inquiring into the terms of the Acquisition. On March 26, 2008, the Senate Committee on Finance sent a letter to the CEOs of both Bear Stearns and JPMorgan, as well as to the Federal Reserve Chairman Ben Bernanke, Treasury Secretary Henry Paulson, and Federal Reserve Bank CEO Timothy Geithner requesting the details of the proposed merger, how and by whom it was negotiated, and all parties involved in the proposed Merger. Senate Finance Committee Chairman Max Baucus stated in news release issued on March 26, 2008 by the Senate Committee on Finance, "Americans are being asked to back a brand-new kind of transaction, to the tune of tens of billions of dollars ... and we have a responsibility to all taxpayers to review the details of this deal." Testimony from defendant Schwartz and JPMorgan Chairman and Chief Executive Officer James Dimon was taken by the Senate Committee on Banking, Housing and Urban Affairs on April 3, 2008.

21.     Bear Stearns directors had no qualms in agreeing to vote their personally held shares in favor of the Merger. The Merger is structured such that it will extinguish the Company as a separate entity. In this way, Board members who are named as defendants in a pending shareholder derivative lawsuit may escape liability. Defendants will undoubtedly try to use the fire sale and elimination of Bear Stearns to argue that if JPMorgan acquired the Company, then the derivative plaintiffs should lose standing to pursue claims on behalf of Bear Stearns.

22.    The proposed Merger is the product of a severely flawed process by which Bear Stearns agreed to merge the Company with JPMorgan without providing its shareholders with adequate compensation in exchange. Defendants have structured the proposed Merger in a manner that assures that no better deal can be obtained for shareholders, or even solicited. The proposed deal also locks-up Company jewels and grants a unilateral option to buy approximately 20% of the Company in favor of JPMorgan and vests it with control over Bear Stearns' operations for a year. The deal, thus, subverts the interests of Plaintiffs and the other public stockholders of Bear Stearns.

23.    In pursuing the unlawful plan to squeeze out Bear Stearns public stockholders for grossly inadequate consideration, and without full and fair disclosure of all material information, defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and have aided and abetted such breaches by Bear Stearns officers and directors. Instead of attempting to obtain the highest price reasonably available for the Company's stockholders, defendants are spending a substantial effort to tailor the Acquisition to meet the specific demands of JPMorgan.

24.    Moreover, defendants breached their fiduciary obligations by arranging to squeeze Plaintiffs and Bearn Stearns' shareholders out of their equity interest in Bear Stearns by effectuating a stock-for-stock transaction with JPMorgan in exchange for indemnity and as a fraudulent means of dismissing present shareholder derivative litigation against them. Thus, the only parties that will benefit are defendants who wish to expunge their liability to Bear Stearns.

25.    Because defendants dominate and control the business and corporate affairs of Bear Stearns and are in possession of private corporate information concerning Bear Stearns assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Bear Stearns, which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

26.     In short, the Acquisition is designed to unlawfully divest Bear Stearns' public stockholders of a large portion of the valuable assets of the Company for grossly inadequate consideration. Defendants know that the Company possesses several assets that could increase the value of the Acquisition and provide Bear Stearns shareholders with a benefit from the Acquisition. In fact, defendants even announced just days prior to the announcement of the Acquisition that the Company's book value was $84 per share. Accordingly, Plaintiffs challenge the Acquisition.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act.

28.     This Court has jurisdiction over all claims asserted herein under 28 U.S.C. §1332, as complete diversity exists between Plaintiffs and each defendant and the amount in controversy exceeds the jurisdictional minimum of this Court. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

30.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Bear Stearns maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties

owed to Bear Stearns occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

31.    Plaintiff Samuel T. Cohen is, and was at the time of the transactions of which Plaintiffs complain, an owner and holder of Bear Stearns common stock.  Plaintiff, who resides in Baltimore City, Maryland and is a citizen of the State of Maryland, currently owns 115 shares of Bear Stearns stock.

32.    Plaintiff Jerome Birn is, and was at the time of the transactions of which Plaintiffs complain, an owner and holder of Bear Stearns common stock.  Plaintiff, who resides in Beverly Hills, California and is a citizen of the State of California, currently owns 200 shares of Bear Stearns stock.

33.    Defendant The Bear Stearns Companies, Inc. includes all of its predecessors and affiliated entities (collectively, "Bear Stearns"), and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

34.    Defendant James E. Cayne ("Cayne") is Bear Stearns' Chairman of the Board and has been since June 2001. Cayne is also a Bear Stearns director and has been since 1985. As Chairman and a member of the Bear Stearns Board, Cayne authorized the acquisition of a company's subprime mortgage origination platform and did not exercise valid business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis. Also as a member of the Bear Stearns Board, Cayne authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006.  Cayne was Bear Stearns' Chief Executive Officer ("CEO") from July 1993 to January 2008; a member of the Executive Committee from at least 2007 to January 2008; and President from at least 1991 to June 2001. Because of his positions, defendant Cayne knew, consciously disregarded, was reckless and grossly negligent in not knowing and should

10

have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Cayne participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Cayne received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $17,070,746 | $14,838,829 | 35,788 | $6,154,315 |
| 2005 | $200,000 | $12,721,154 | $10,295,769 | 56,573 | $5,180,904 |

Defendant Cayne sold 219,036 shares of Bear Stearns stock for $23,010,474.01 in proceeds while in possession of material non-public information, all of which was sold in the year end 2006 and 2007. Defendant Cayne approved the Acquisition. Defendant Cayne is a citizen of California.

35.     Defendant Alan D. Schwartz ("Schwartz") is Bear Stearns' current CEO and has been since January 2008. Schwartz is also Bear Stearns' President and a member of the Executive Committee and has been since June 2001 and a director and has been since 1999. Schwartz was Bear Stearns' Co-Chief Operating Officer from June 2001 to January 2008; a director from 1987 to 1996; and Executive Vice President and Head of the Investment Banking Division from 1985 to June 2001. Because of his positions, defendant Schwartz knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Schwartz participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Schwartz received the following compensation from his employment with Bear Stearns:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $16,237,150 | $14,014,065 | 33,847 | $5,233,207 |
| 2005 | $200,000 | $12,072,654 | $9,744,544 | 53,650 | $4,487,164 |

Defendant Schwartz sold 91,233 shares of Bear Stearns stock for $9,867,000.76 in proceeds while in possession of material non-public information, all of which was sold in the year end 2006 and 2007. Defendant Schwartz approved the Acquisition. Defendant Schwartz is a citizen of New York.

36.     Defendant Samuel L. Molinaro, Jr. ("Molinaro") is Bear Stearns' Chief Operating Officer ("COO") and has been since August 2007. Molinaro is also Bear Stearns' Executive Vice President and has been since December 2001, and Chief Financial Officer ("CFO") and has been since 1996. Because of his positions, defendant Molinaro knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Molinaro participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Molinaro received the following compensation from his employment with Bear Stearns:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $12,967,500 | $10,971,750 | 26,691 | $2,364,500 |
| 2005 | $200,000 | $8,052,654 | $6,327,544 | 35,534 | $1,524,739 |

Defendant Molinaro sold 38,552 shares of Bear Stearns stock for $4,230,828.50 in proceeds while in possession of material non-public information, all of which was sold in the year end 2006 and 2007. Defendant Molinaro is a citizen of Connecticut.

37.     Defendant Warren J. Spector ("Spector") was Bear Stearns' Senior Managing Director from August 2007 to December 2007. Spector was also Bear Stearns' President and Co-COO and a member of the Executive Committee from June 2001 to August 2007; a Bear Stearns director from

1999 to August 2007; an Executive Vice President from November 1992 to June 2001; and a director from 1987 to 1996. Because of his positions, defendant Spector knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Spector participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Spector received the following compensation from his employment with Bear Stearns:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $16,194,430 | $14,052,513 | 33,938 | $4,795,112 |
| 2005 | $200,000 | $12,072,654 | $9,744,544 | 53,650 | $4,919,625 |

Defendant Spector sold 116,255 shares of Bear Stearns stock for $19,066,373.04 in proceeds while in possession of material non-public information, all of which was sold in the year end 2006 and 2007. Defendant Spector is a citizen of New York.

38.      Defendant Michael Minikes ("Minikes") is CEO of Bear, Stearns Securities Corp. and has been since January 2008. Minikes was also Bear Stearns' Treasurer from at least 2001 to January 2008. From 1980 to about 2001, Minikes held various positions with Bear Stearns and Bear, Stearns Securities Corp. Because of his positions, defendant Minikes knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Minikes participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Minikes sold 46,496 shares of Bear Stearns stock for $5,678,457.25 in proceeds while in possession of material non-public information, all of which was sold in the year end 2006 and 2007. Defendant Minikes is a citizen of New York.

39.     Defendant Jeffrey M. Farber ("Farber") is Bear Stearns' Senior Vice President –
Finance and has been since March 2007.  Farber is also Bear Stearns' Controller and Principal
Accounting Officer and has been since January 2004.  Farber was Bear Stearns' Assistant Controller
from May 2000 to January 2004.  Because of his positions, defendant Farber knew, consciously
disregarded, was reckless and grossly negligent in not knowing and should have known the adverse,
non-public information about the business of Bear Stearns.  During the Relevant Period, Farber
participated in the issuance of improper statements, including the preparation of the improper press
releases and SEC filings and approval of other statements made to the press, securities analysts and
Bear Stearns shareholders.  Defendant Farber sold 4,324 shares of Bear Stearns stock for
$500,684.51 in proceeds while in possession of material non-public information, of which
$362,534.51 was realized by Defendant Farber on the sale of 3,324 shares in the year end 2006.
Defendant Farber is a citizen of Connecticut.

40.     Individual Defendant Jeffrey Mayer ("Mayer") is Executive Vice President of the
Company and has been since August 2007.  Mayer is also the Co-Head of the Fixed Income Division
of the Company and Bear Stearns since March 2002.  Because of his positions, defendant Mayer
knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have
known the adverse, non-public information about the business of Bear Stearns.  During the Relevant
Period, Mayer participated in the issuance of improper statements, including the preparation of the
improper press releases and SEC filings and approval of other statements made to the press,
securities analysts and Bear Stearns shareholders.  Mayer was named to the Bear Stearns Executive
Committee on August 5, 2007.  Defendant Mayer sold 102,408 shares of Bear Stearns stock for
$9,115,336.08 in proceeds while in possession of material non-public information, all of which was
sold in 2007. Defendant Mayer is a citizen of New Jersey.

41.     Defendant Alan C. Greenberg ("Greenberg") is a Bear Stearns director and has been
since 1985. As a member of the Bear Stearns Board of Directors, Greenberg authorized the
acquisition of a company's subprime mortgage origination platform and did not exercise valid

business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis. Also as a member of the Bear Stearns Board of Directors, Greenberg authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006. Greenberg is also Chairman of Bear Stearns' Executive Committee and has been since at least 1997. Greenberg was Bear Stearns' Chairman of the Board of Directors from at least 1991 to June 2001 and CEO from 1985 to July 1993. Because of his positions, defendant Greenberg knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Greenberg participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Greenberg received the following compensation from his employment with Bear Stearns:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $9,000,000 | $7,612,500 | 18,789 | $3,057,772 |
| 2005 | $200,000 | $7,274,154 | $5,665,819 | 32,026 | $2,183,559 |

Defendant Greenberg sold 278,570 shares of Bear Stearns stock for $37,649,433.01 in proceeds while in possession of material non-public information, all of which was sold in the year end 2006 and 2007. Defendant Greenburg approved the Acquisition. Defendant Greenberg is a citizen of New York.

42.     Defendant Donald J. Harrington ("Harrington") is a Bear Stearns director and has been since 1993. As a member of the Bear Stearns Board of Directors, Harrington authorized the acquisition of a company's subprime mortgage origination platform and did not exercise valid business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis. Also as a member of the Bear Stearns Board of Directors, Harrington authorized the repurchase of over $2.6 billion worth of

the Company's shares at artificially inflated prices during December 2005 through December 2006. Harrington is also a member of Bear Stearns' Compensation Committee and has been since at least 2005. Because of his positions, defendant Harrington knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Harrington participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Harrington sold 1,000 shares of Bear Stearns stock for $171,450 in proceeds while in possession of material non-public information, all of which was sold in 2007. Defendant Harrington approved the Acquisition. Defendant Harrington is a citizen of New York.

43.    Defendant Carl D. Glickman ("Glickman") is a Bear Stearns director and has been since 1985. As a member of the Bear Stearns Board of Directors, Glickman authorized the acquisition of a company's subprime mortgage origination platform and did not exercise valid business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis. Also as a member of the Bear Stearns Board of Directors, Glickman authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006. Glickman is also a member of the Audit Committee and has been since at least 2005. As a member of the Audit Committee, Glickman had a duty to review and discuss earnings press releases, financial information and earnings guidance and discuss with the Finance and Risk Committee Bear Stearns' policies regarding risk assessment and risk management. Glickman is also Chairman of Bear Stearns' Compensation Committee and has been since at least 2005 and a member of the Qualified Legal Compliance Committee. Because of his positions, defendant Glickman knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Glickman participated in the issuance of improper statements, including the preparation of the

16

improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Glickman sold 3,427 shares of Bear Stearns stock for $317,066.04 in proceeds while in possession of material non-public information, all of which was sold in 2007. Defendant Glickman approved the Acquisition. Defendant Glickman is a citizen of Ohio.

44.     Defendant Michael Goldstein ("Goldstein") is a Bear Stearns director and has been since January 2007. As a member of the Bear Stearns Board of Directors, Goldstein authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006. Goldstein is also a member of Bear Stearns' Audit Committee and has been since January 2007. As a member of the Audit Committee, Goldstein had a duty to review and discuss earnings press releases, financial information and earnings guidance and discuss with the Finance and Risk Committee Bear Stearns' policies regarding risk assessment and risk management. Because of his positions, defendant Goldstein knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Goldstein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Goldstein approved the Acquisition. Defendant Goldstein is a citizen of New York.

45.     Defendant Henry S. Bienen ("Bienen") is a Bear Stearns director and has been since 2004. As a member of the Bear Stearns Board, Bienen authorized the acquisition of a company's subprime mortgage origination platform and did not exercise valid business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis. Also as a member of the Bear Stearns Board, Bienen authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006. Bienen is also a member of Bear Stearns'

17

Audit Committee and has been since at least 2005. As a member of the Audit Committee, Bienen had a duty to review and discuss earnings press releases, financial information and earnings guidance and discuss with the Finance and Risk Committee Bear Stearns' policies regarding risk assessment and risk management. Bienen is also a member of the Qualified Legal Compliance Committee. Because of his positions, defendant Bienen knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Bienen participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Bienen approved the Acquisition. Defendant Bienen is a citizen of Illinois.

46.    Defendant Frank T. Nickell ("Nickell") is a Bear Stearns director and has been since 1993. As a member of the Bear Stearns Board of Directors, Nickell authorized the acquisition of a company's subprime mortgage origination platform and did not exercise valid business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis. Also as a member of the Bear Stearns Board, Nickell authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006. Nickell is also a member of Bear Stearns' Finance and Risk Committee and has been since at 2007. As a member of the Finance and Risk Committee, Nickell had a duty to review and discuss with the Audit Committee the policies and procedures regarding risk assessment, risk management and significant risk exposures and trends as well and review and discuss the risk measures and risk models utilized by the Company. Nickell is also a member of the Compensation Committee and has been since at least 2005 and a member of the Corporate Governance and Nominating Committee. Because of his positions, defendant Nickell knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Nickell participated in the issuance of improper statements, including the preparation of the

18

improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders.  Defendant Nickell approved the Acquisition. Defendant Nickell is a citizen of New York.

47.    Defendant Paul A. Novelly ("Novelly") is a Bear Stearns director and has been since 2002.  As a member of the Bear Stearns Board of Directors, Novelly authorized the acquisition of a company's subprime mortgage origination platform and did not exercise valid business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis.  Also as a member of the Bear Stearns Board, Novelly authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006.  Novelly is also Chairman of Bear Stearns' Finance and Risk Committee and has been since January 2007.  As Chairman and a member of the Finance and Risk Committee, Nickell had a duty to review and discuss with the Audit Committee the policies and procedures regarding risk assessment, risk management and significant risk exposures and trends as well and review and discuss the risk measures and risk models utilized by the Company.  Novelly is also a member of the Audit Committee and has been since at least 2005.  As a member of the Audit Committee, Novelly had a duty to review and discuss earnings press releases, financial information and earnings guidance and discuss with the Finance and Risk Committee Bear Stearns' policies regarding risk assessment and risk management.  Defendant Novelly is also a member of the Corporate Governance and Nominating Committee and a member of the Qualified Legal Compliance Committee.  Because of his positions, defendant Novelly knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Novelly participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Novelly sold 50,000 shares of Bear Stearns stock for $4,339,000.00 in proceeds while in possession of material non-public information,

all of which was sold in 2007. Defendant Novelly approved the Acquisition. Defendant Novelly is a citizen of Missouri.

48.    Defendant Frederic V. Salerno ("Salerno") is a Bear Stearns director and has been since 1992. As a member of the Bear Stearns Board of Directors, Salerno authorized the acquisition of a company's subprime mortgage origination platform and did not exercise valid business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis. Also as a member of the Bear Stearns Board of Directors, Salerno authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006. Salerno is also a member of Bear Stearns' Finance and Risk Committee and has been since January 2007. As a member of the Finance and Risk Committee, Salerno had a duty to review and discuss with the Audit Committee the policies and procedures regarding risk assessment, risk management and significant risk exposures and trends as well and review and discuss the risk measures and risk models utilized by the Company. Salerno is also a member of the Audit Committee and has been since at least 2005. As a member of the Audit Committee, Salerno had a duty to review and discuss earnings press releases, financial information and earnings guidance and discuss with the Finance and Risk Committee Bear Stearns' policies regarding risk assessment and risk management. Defendant Salerno is also a member of the Corporate Governance and Nominating Committee and a member of the Qualified Legal Compliance Committee. Because of his positions, defendant Salerno knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Salerno participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Salerno approved the Acquisition. Defendant Salerno is a citizen of Florida.

49.     Defendant Vincent Tese ("Tese") is a Bear Stearns director and has been since 1994. As a member of the Bear Stearns Board of Directors, Tese authorized the acquisition of a company's subprime mortgage origination platform and did not exercise valid business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis. Also as a member of the Bear Stearns Board, Tese authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006. Tese is also Chairman of Bear Stearns' Audit Committee and has been since at least 2005. As Chairman and a member of the Audit Committee, Salerno had a duty to review and discuss earnings press releases, financial information and earnings guidance and discuss with the Finance and Risk Committee Bear Stearns' policies regarding risk assessment and risk management. Tese is also a member of Bear Stearns' Finance and Risk Committee and has been since January 2007. As a member of the Finance and Risk Committee, Tese had a duty to review and discuss with the Audit Committee the policies and procedures regarding risk assessment, risk management and significant risk exposures and trends as well and review and discuss the risk measures and risk models utilized by the Company. Tese is also a member of the Compensation Committee and has been since at least 2005, a member of the Corporate Governance and Nominating Committee and is Chairman of the Qualified Legal Compliance Committee. Because of his positions, defendant Tese knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Tese participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Tese sold 716 shares of Bear Stearns stock for $62,929.24 in proceeds while in possession of material non-public information, all of which was sold in 2007. Defendant Tese approved the Acquisition. Defendant Tese is a citizen of New York.

50.    Defendant Wesley S. Williams, Jr. ("Williams") is a Bear Stearns director and has been since 2004. As a member of the Bear Stearns Board of Directors, Williams authorized the acquisition of a company's subprime mortgage origination platform and did not exercise valid business judgment when it rendered the decision to acquire ECC's whole subprime loan portfolio worth $1.2 billion that was large affected by the subprime mortgage crisis. Also as a member of the Bear Stearns Board of Directors, Williams authorized the repurchase of over $2.6 billion worth of the Company's shares at artificially inflated prices during December 2005 through December 2006. Williams is also a member of Bear Stearns' Audit Committee and has been since at least 2005. As a member of the Audit Committee, Salerno had a duty to review and discuss earnings press releases, financial information and earnings guidance and discuss with the Finance and Risk Committee Bear Stearns' policies regarding risk assessment and risk management. Defendant Williams is also a member of the Qualified Legal Compliance Committee. Because of his positions, defendant Williams knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. During the Relevant Period, Williams participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Bear Stearns shareholders. Defendant Williams approved the Acquisition. Defendant Williams is a citizen of the District of Columbia.

51.    Defendants Cayne, Molinaro, Mayer, Farber, and Schwartz are sometimes collectively referred to herein as the "Officer Defendants." Because of their positions with the Company, the Officer Defendants possessed the power and authority to control the contents of Bear Stearns' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information

22

available to them but not to the public, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Officer Defendants are liable for the false statements pleaded below.

52.     Defendants Bienen, Cayne, Glickman, Goldstein, Greenberg, Harrington, Nickell, Novelly, Salerno, Schwartz, Tese, and Williams are sometimes collectively referred to herein as the "Director Defendants." By reason of their positions as directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. As a result of these duties, the Director Defendants are obligated to use their best efforts to act in the interests of the Company and shareholders to ensure that no waste of corporate assets occurs. The Director Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     Defendants Cayne, Schwartz, Farber, Greenberg, Harrington, Glickman, Minikes, Molinaro and Spector are referred to herein as the "Insider Selling Defendants." Defendant Cayne, Schwartz, Bienen, Glickman, Goldstein Greenburg, Harrington, Nickell, Novelly, Salerno, Tese and Williams are referred to herein as the "Acquisition Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

## DEFENDANTS DUTIES

54.     Officers, directors and/or fiduciaries of Bear Stearns have the ability to control the business and corporate affairs of Bear Stearns. The Individual Defendants owe Bear Stearns and its

23

shareholders fiduciary obligations of trust, loyalty and good faith and are required to use their ability to control and manage Bear Stearns in a fair, honest and equitable manner. The Individual Defendants are not, however, to act in furtherance of their own personal interest or benefit when acting on behalf of the Company.

55.    Each of the Individual Defendants as officers and directors owe Bear Stearns and its shareholders a duty of good faith, loyalty and fair dealing in the business affairs of the Company. Moreover, the Individual Defendants had a duty, as officers and directors of a publicly traded company, to disseminate accurate and truthful information with respect to the financials, operations, management, performance and forecasts of Bear Stearns.

56.    The Individual Defendants directly and/or indirectly controlled, by virtue of their positions as officers and directors of the Company, wrongful acts alleged herein as well as the dissemination of false and misleading statements they caused the Company to issue. Each of the Individual Defendants had access to adverse non-public information about the financial condition, management, and operations of Bear Stearns.

57.    Further, defendants Bienen, Glickman, Goldstein, Novelly, Salerno, Tese and Williams, as members of the Audit Committee, had a special duty to know and understand material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing and discussing: (i) earnings press releases; (ii) financial information and earnings guidance provided to analysts and rating agencies; and (iii) Bear Stearns' policies regarding risk assessment and risk management. Defendants Nickell, Novelly, Salerno and Tese, as members of the Finance and Risk Committee, also had a special duty to know and understand material information as set out in the Finance and Risk Committee's charter which provides that the Finance and Risk Committee is responsible for: (i) reviewing and discussing with the Audit Committee Bear Stearns' policies and procedures regarding risk assessment and risk management of the Company's trading and investment risks; (ii) reviewing and discussing the risk measures and risk models utilized

by the Company in evaluating and limiting financial risks; and (iii) reviewing and discussing with the Audit Committee significant risk exposures and trends.

58.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Bear Stearns, and was at all times acting within the course and scope of such agency.

59.     To discharge their duties, the officers and directors of Bear Stearns were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Bear Stearns were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Bear Stearns conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

25

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

60.    Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Bear Stearns, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Bear Stearns' Board during the Relevant Period.

61.    The Individual Defendants breached their duties of good faith and fair dealing by allowing defendants to cause and causing Bear Stearns to issue false and misleading financial results and by failing to prevent the Individual Defendants from taking illegal actions.

## ACQUISITION DEFENDANTS' FIDUCIARY DUTIES

62.    Under Delaware law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the directors must maximize shareholder value. To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)    adversely affects the value provided to the corporation's shareholders;

(b)    will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits themselves from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

63.     In accordance with their duties of loyalty and good faith, the Acquisition Defendants, as directors and/or officers of Bear Stearns, are obligated under Delaware law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

64.     Plaintiffs allege herein that the Acquisition Defendants, separately and together, in connection with the Acquisition, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to Plaintiffs and other public shareholders of Bear Stearns. Defendants stand on both sides of the transaction, are engaging in self-dealing, are obtaining for themselves personal benefits, including personal financial benefits not shared equally by Plaintiffs or the Class, and choosing not to provide shareholders with all information necessary to make an informed decision in connection with the Acquisition. As a result of the Acquisition Defendants' self-dealing and divided loyalties, neither Plaintiffs nor the Class will receive adequate or fair value for their Bear Stearns common stock in the proposed Acquisition.

65.     The Acquisition Defendants also owe the Company's stockholders a duty of truthfulness under Delaware law, which includes the disclosure of all material facts concerning the Acquisition and, particularly, the fairness of the price offered for the stockholders' equity interest.

The Acquisition Defendants are knowingly or recklessly breaching their fiduciary duties of candor and good faith by failing to disclose all material information concerning the Acquisition.

66.    Because the Acquisition Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, independence and candor in connection with the Acquisition, the burden of proving the inherent or entire fairness of the Acquisition, including all aspects of its negotiation, structure, price and terms, is placed upon defendants as a matter of law.

## FACTUAL BACKGROUND

67.    Bear Stearns was one of the world's leading wealth management, capital markets and advisory companies. Bear Stearns offers a broad range of financial services to private clients, small businesses, and institutions and corporations. In fact, prior to its sale, Bear Stearns was the second-biggest underwriter of mortgage bonds in the U.S.

68.    The recent subprime mortgage crisis began with mortgages that were loaned to subprime borrowers, borrowers with low-rated credit history. The loans were then packaged into security and debt obligations and sold into commercial paper markets. Mortgage backed securities are generally sold as commercial instruments, such as bonds and CDOs. When the borrowers began to default on their mortgage payments, due to increasing interest rates, investment banks, such as Bear Stearns, began to feel the effects in the market for mortgage backed securities.

69.    Since 2006, the erosion of the market for securities linked to subprime mortgages has led to a global credit-market contraction. Holdings of CDOs as well as its high-risk home loans and bonds are among the types of securities that have been suffering the most. Bear Stearns, being the 10th largest underwriter of asset-backed CDOs last year with $9.4 billion for CDOs, has taken one of the biggest hits.

70.    The Individual Defendants caused or allowed Bear Stearns to develop a scheme to conceal a tremendously risky subprime mortgage portfolio. Bear Stearns used this portfolio as the collateral for debt instruments sold or held by the Company. During the Relevant Period, the Individual Defendants directed Bear Stearns to acquire a large inventory of securities backed by

mortgages made to subprime borrowers. These actions were reckless due to the impending subprime mortgage crisis and increasing delinquency rates among subprime borrowers.

71.    In addition, Bear Stearns also provided the initial financing in many instances which has helped create the subprime mortgage crisis in the first instance. Bear Stearns provided warehouse lines of credit to subprime lenders which enabled the subprime lenders to make subprime loans. After the loans were made to subprime borrowers, Bear Stearns was then able to package the subprime loans and sell them as CDOs or invest in them. Thus, by providing the warehouse lines of credit to subprime lenders to begin with, Bear Stearns provided the seed money for lenders to continue to provide subprime loans to those who were unable to afford them.

72.    As a supposed safeguard over the valuation of its financial instruments, the Company stated publicly its practices and procedures regarding risk management. The Company's supposed internal controls to ensure appropriate valuations and adequate financial disclosures failed either through a deficient risk management structure or its lax implementation or both. Bear Stearns' flawed design to protect the firm from these types of overly aggressive investment and business strategies reflected the failures of the Individual Defendants at every turn to prevent the Company's eventual collapse and forced sale.

73.    Despite these material adverse circumstances, the Individual Defendants directed Bear Stearns to issue a series of improper statements that proclaimed record growth. The Individual Defendants have misled investors regarding the financial condition of Bear Stearns and its exposure to risk in the subprime market by failing to disclose the risks created by its subprime lending activities.

74.    In fact, the Company's then CEO, James E. Cayne stated in a press release issued at the end of the fourth quarter in 2006 that, "collateralized loan and debt origination activities increased substantially. The credit franchise delivered its best results ever as the high yield, leverage finance and credit trading areas all produced record revenues." In addition, on March 15, 2007, Cayne, reassured investors in a press release that "[w]e are pleased with this excellent performance,

revenues for the first quarter were up for every business segment ... [g]rowing the company remains a core focus as we continue to invest in the clearing, mortgage, international and asset management franchises with successful results."

75.    However, the Individual Defendants were not able to conceal the truth any longer when Bear Stearns was forced to reveal the risks and value of its mortgage-backed securities to the market and by November 14, 2007, was forced to reveal the extent of its overvaluing of its mortgage-backed debt instruments and announced a write-down of approximately $1.2 billion of mortgage-backed debt instruments held on its balance sheet.

76.    In fact, Bear Stearns credit rating was cut by Standard & Poor's after the securities firm revealed it would write down the value of subprime assets by $1.2 billion, leading to its first quarterly loss since becoming a public company. "About half of Bear Stearns's revenue is derived from fixed income, and a quarter of that comes from mortgage-backed securities" according to analysts at Sanford C. Bernstein & Co. "Bear Stearns has been among the worst performers on the Amex Securities Broker/Dealer Index this year partly because the firm is more reliant on fixed-income revenue and the U.S. market than its peers. It's down 39 percent this year, worst among the five- largest brokers."

77.    One analyst has commented, "while Bear Stearns had much smaller subprime losses than rivals like Merrill Lynch in the third quarter, investors are concerned that Bear Stearns is too reliant on the U.S. mortgage market for future earnings." In fact, the write-down will lead to a loss in the fourth quarter, making fourth quarter 2007 the first unprofitable quarter since at least 1985, when Bear Stearns went public.

78.    In addition, preceding the recent announcement of its massive write-down, during June and July 2007, two hedge funds managed by the Company were roiled by mortgage losses and subsequently went bankrupt. The failure of the two mortgage–related funds, Bear Stearns High-Grade Structured Credit Strategies Fund and High-Grade Structured Enhanced Leverage Fund, cost investors $1.6 billion. On November 15, 2007, Massachusetts securities regulators filed a complaint

accusing Bear Stearns of fraud for allegedly improperly trading with two in-house hedge funds that collapsed in June and July 2007.  Bear Stearns allegedly traded mortgage-backed securities for its own account with the hedge funds without notifying the independent directors in advance.  Advance disclosure of principal trades is required to make sure trades are fair to investors.  Securities Regulators have commented that "hundreds" of principal transactions- including those involving mortgage-backed securities and collateralized debt obligations – were processed without prior approval from the funds' independent directors.  In 2006, 79% of principal transactions lacked prior approval, while 59% were missing prior approval in 2005, and 30% in 2004.  As a result, earnings at Bear Stearns dropped 61 percent in third quarter 2007, the biggest earnings decline in more than a decade.  In fact, the company, under former CEO defendant Cayne, has cut 900 jobs, or about 6 percent of its workforce.

79.    Predictably, Bear Stearns credibility took a massive hit and its share value had already fallen 40% by February 2008.

80.    The true facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period were as follows:

(a)    The Individual Defendants' portfolio of CDOs contained over a billion dollars worth of impaired and risk securities, most of which were backed by subprime mortgage loans;

(b)    The Individual Defendants failed to properly account for highly leveraged loans such as mortgage securities; and

(c)    The Individual Defendants failed to record impairment of debt securities which they knew or disregarded were impaired, causing the Company's results to be false and misleading.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE RELEVANT PERIOD

81.    The Individual Defendants failed to disclose to shareholders known risks regarding its exposure in the subprime debacle and consistently assured shareholders, in Company financial

statements, that the Company had sound risk management policies, and continued to release positive earnings statements.

82.     For example, on March 16, 2006, the Individual Defendants caused or allowed the Company to issue a press release in connection with the filing of its Form 8-K for the second fiscal quarter. The press release highlighted record revenue growth and positive trends in Bear Stearns strategic actions. The press release stated in part:

- *Bear Stearns Reports Record Quarterly Results*
- *Highest Ever Net Revenues, Net Income and EPS*
- *Net Revenues Rise 19% to $2.2 Billion*
- *Net Income Increases 36% to $514 Million*
- *Earnings Per Share Up 34% to $3.54*
- *Record Net Revenues from Institutional Equities, Fixed Income and Wealth Management*

The Bear Stearns Companies Inc. today reported record earnings per share (diluted) of $3.54 for the first quarter ended February 28, 2006, up 34% from $2.64 per share for the first quarter of 2005. Net income for the first quarter of 2006 was a record $514 million, up 36% from $379 million for the first quarter of 2005. Net revenues were a record $2.2 billion for the 2006 first quarter, up 19% from $1.8 billion in the 2005 first quarter. The annualized return on common stockholders' equity was 20.1% for the first quarter of 2006 and 17.1% for the trailing 12-month period ended February 28, 2006.

"I am extremely pleased to report our second consecutive quarter of record net revenues, record net income and record earnings per share," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "These results were driven by strong contributions from all of our businesses, and in particular we saw record revenues in the Institutional Equities, Fixed Income and Wealth Management areas. We are proud of this quarter's outstanding results and look forward to the rest of 2006."

**Capital Markets**

Capital Markets net revenues for the first quarter of 2006 were a record $1.7 billion, up 20% from the first quarter ended February 28, 2005.

- Institutional Equities net revenues were a record $488 million, up 56% from $313 million for the first quarter of 2005. Equity derivatives delivered a second consecutive record quarter on the strength of increased customer activity levels and market-share gains. International sales and trading revenues increased in

the first quarter of 2006 compared with the year-ago quarter, and risk arbitrage net revenues rose reflecting improved market conditions and increased customer activity.

- Fixed Income net revenues were a record $889 million, up 3% from $866 million in the year-ago quarter. The credit businesses were extremely strong, led by the credit derivatives and leveraged finance areas. *Mortgage-related revenues increased from the prior year period, as origination volume remained high and customer demand increased. During the quarter, we ranked as the number one underwriter of U.S. Mortgage-backed securities.*

- Investment Banking net revenues were $297 million in the first quarter of 2006, up 36% from $217 million in the comparable prior-year period. Significantly higher U.S.-completed M&A volumes led to higher advisory, merger and acquisition-related revenues. Merchant banking related revenues also increased compared with the year-ago-period reflecting higher performance fees on merchant banking fund investments and increased principal gains.

## Global Clearing Services

First quarter 2006 Global Clearing Services net revenues were $264 million down 2% from $270 million in the first quarter of 2005. Net interest revenues were unchanged from the prior-year quarter as increased net interest spreads served to offset lower customer balances. Commission revenues declined reflecting marginally lower transaction volumes and rates. Average customer margin debt balances for the quarter ended February 28, 2006 were $64.5 billion, up from $64.0 billion in the prior year quarter. Average customer short balances decreased to $78.2 billion from $88.5 billion for the first quarter of 2005. Average free credit balances were $29.9 billion in the current quarter, down from $31.1 billion in the first quarter last year.

## Wealth Management

Wealth Management net revenues for the first quarter of 2006 were a record $223 million, an increase of 32% from $169 million in the first quarter of 2005. Net revenue growth was largely due to increases in performance and management fees.

- Private Client Services net revenues were $129 million in the first quarter of 2006, an increase of 13% from $114 million in the 2005 first quarter. The increase was mainly attributable to the continued growth of fee-based activities and assets.

- Asset Management net revenues grew 71% to a record $94 million for the first quarter of 2006 from $55 million in the prior year's quarter. The increase is due to higher performance and management fees. Assets under management rose 14% to $45.4 billion as of

February 28, 2006, compared with $40.0 billion as of February 28, 2005.

## Expenses

- Compensation as a percentage of net revenues was 47.9% in the first quarter of 2006 as compared with 49.3% for the quarter ended February 28, 2005.

- Non-compensation expenses were $386 million for the quarter ended February 28, 2006, an increase of 9% from $353 million in the 2005 first quarter. The increase is primarily due to higher professional fees, occupancy, communications and technology and legal costs.

The pre-tax profit margin rose to a record 34.4% in the first quarter of 2006 as compared with 31.5% in the quarter ended February 28, 2005.

As of February 28, 2006, total capital, including stockholders' equity and long-term borrowings, was approximately $57.6 billion. Book value as of February 28, 2006 was $75.46 per share, based on 145.2 million shares outstanding.

## Quarterly Common Stock Cash Dividend Declared

The Board of Directors of The Bear Stearns Companies Inc. declared a regular quarterly cash dividend of 28 cents per share on the outstanding shares of common stock payable April 28, 2006 to stockholders of record on April 18, 2006.

## Quarterly Preferred Stock Cash Dividends Declared

The Board of Directors of The Bear Stearns Companies Inc. declared the following regular quarterly dividends: (i) a cash dividend of $3.075 per share on the outstanding shares of 6.15% Cumulative Preferred Stock, Series E (which is equivalent to 76.875 cents per related depositary share); (ii) a cash dividend of $2.86 per share on the outstanding shares of 5.72% Cumulative Preferred Stock, Series F (which is equivalent to 71.50 cents per related depositary share); and (iii) a cash dividend of $2.745 per share on the outstanding shares of 5.49% Cumulative Preferred Stock, Series G (which is equivalent to 68.625 cents per related depositary share); all payable April 15, 2006 to stockholders of record on March 31, 2006.

83.     The Individual Defendants failed to disclose, however, that being "ranked the number one underwriter for mortgage backed securities for the quarter" also meant that it retained a significant risk exposure on these securitizations.

84.     On June 15, 2006, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing it fiscal second quarter 2006 earnings. Bear Stearns reported earnings of $539 million. Also according to the press release, Bear Stearns' "mortgage franchise retained its number one industry ranking for the first half of fiscal 2006." Defendant Cayne commented that "[t]he first half of 2006 has proved to be [Bear Stearns'] best ever." In particular, the press release provided as follows:

- *Bear Stearns Reports Third Consecutive Record Quarter*
- *Earnings Per Share Rose 78% To A Record $3.72*
- *Record Net Income Of $539 Million, An 81% Increase*
- *Record Net Revenues Of $2.5 Billion*
- *Institutional Equities, Fixed Income And Global Clearing Services Post*
- *Record Quarterly Net Revenues*

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $3.72 for the second quarter ended May 31, 2006, up 78% from $2.09 per share for the second quarter of 2005. Net income for the second quarter of 2006 was $539 million, up 81% from $298 million for the second quarter of 2005. Net revenues for the 2006 second quarter were a record $2.5 billion, up 33% from $1.9 billion for the 2005 second quarter. The annualized return on common stockholders' equity for the second quarter of 2006 was 20.1%, and 18.7% for the trailing 12-month period ended May 31, 2006.

"We are very pleased to report our third consecutive quarter of record setting results. The first half of 2006 has proven to be our best ever," said James E. Cayne, chairman and chief executive officer. "Our success in increasing the depth and breadth of our business both domestically and internationally has fueled our enthusiasm and appetite for further growth. We will continue to explore ways to expand our business through launching new products, gaining market share in existing product areas, and increasing our presence internationally."

**Capital Markets**

Capital Markets net revenues for the second quarter of 2006 were $2.0 billion, up 40% from $1.4 billion for the quarter ended May 31, 2005.

- Institutional Equities net revenues were a record $554 million, up 42% from $390 million for the second quarter of 2005. Higher customer activity levels and favorable market conditions across the equity franchise drove these record results. Equity derivatives and international sales and trading produced record net revenues this quarter.

- Fixed Income net revenues were a record $1.2 billion, up 45% from $808 million in the second quarter of 2005. The mortgage franchise retained its number one industry ranking for the first half of fiscal 2006. Securitization and trading volumes remained high, and origination flow from the vertical integration of the mortgage platform rose producing record net revenues. Interest rate derivatives and foreign exchange produced record net revenues contributing to a record quarter in the interest rate products area. Robust customer activity levels led to record net revenues in both the distressed debt and leverage finance areas driving record net revenues in the credit businesses this quarter.

- Investment Banking net revenues were $278 million, up 20% from the $232 million in the prior year quarter. Merger and acquisition advisory fees increased significantly this quarter as a number of previously announced transactions were completed during the quarter. Underwriting net revenues were up as equity new issuance volumes increased compared with the year-ago quarter. These gains were partially offset by decreases in merchant banking net revenues compared with the prior year quarter.

**Global Clearing Services**

- Global Clearing Services net revenues were $290 million for the second quarter 2006, up 5% from $276 million in the year ago quarter. Net interest revenue increases were driven by higher average customer margin balances and improved net interest margins. Average customer margin debt balances for the quarter ended May 31, 2006 were a record $68.4 billion, up 6% from $64.7 billion in the prior year quarter. Customer short balances averaged $80.2 billion during the second quarter of 2006 down from $86.8 billion in the prior year period.

**Wealth Management**

Wealth Management net revenues for the quarter ended May 31, 2006 were $151 million, down 3% from $156 million in the second quarter of 2005.

- Private Client Services net revenues were $129 million, an increase of 22% from $106 million in the 2005 second quarter. Increased investor activity and management fees from an increase in fee-based assets were the primary drivers of these results.

- Asset Management net revenues were $22 million for the second quarter of 2006 a decrease of 56% from $50 million in the prior year's quarter mainly due to a decline in performance fees on proprietary hedge funds. Assets under management increased 20% to $48 billion on May 31, 2006, from $40 billion on May 31, 2005.

**Expenses**

- Compensation as a percentage of net revenues was 48.8% in the second quarter of 2006 as compared with 49.3% for the second quarter of 2005. Year-to-date compensation to net revenues was 48.4% for 2006 versus 49.3% for the six months ended May 31, 2005.

- Non-compensation expenses were $445 million for the quarter ended May 31, 2006, a decrease of 9% from $488 million in the 2005 quarter. The decline in non-compensation related expenses is primarily due to a reduction in litigation related costs partially offset by increased communications and technology and occupancy costs associated with increased headcount. In addition, CAP plan related expenses and minority interest expense increased in conjunction with increased profitability.

  The pre-tax profit margin increased to 33.4% in the quarter ended May 31, 2006 from 24.7% in the 2005 second quarter.

- As of May 31, 2006, total capital, including stockholders' equity and long-term borrowings, was approximately $58.4 billion. Book value as of May 31, 2006 was $79.30 per share, based on 147.0 million shares outstanding.

85.     On September 14, 2006, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its earnings for its fiscal third quarter 2006. Bear Stearns reported earnings of $438 million. According to the press release, "[m]ortgage-related revenues increased from the prior year period as customer activity and gains in market share more than offset declining industry volumes. Bear Stearns continues to be ranked as the number one underwriter of U.S. Mortgage backed securities for the third quarter ...." Defendant Cayne commented that "Bear Stearns produced excellent results for the third quarter and record results for the first nine months of 2006." In particular, the press release provided as follows:

- *Bear Stearns Reports Third Quarter Earnings Per Share Of $3.02*
- *Net Income Rises 16% To $438 Million*
- *Highest Ever Net Revenues, Net Income And Earnings Per Share*

- *For The First Nine Months Of 2006*
- *All Business Segments Contribute To Strong Growth*
- *Capital Markets Net Revenues Up 13%*
- *Wealth Management Net Revenues Rose 36%*
- *Global Clearing Services Net Revenues Increase 4%*

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $3.02 for the third quarter ended August 31, 2006, up 12% from $2.69 per share for the third quarter of 2005. Net income for the third quarter of 2006 was $438 million, up 16% from $378 million for the third quarter of 2005. Net revenues were $2.1 billion for the third quarter, up 17% from $1.8 billion for the third quarter of 2005. The annualized return on common stockholders' equity for the third quarter 2006 was 15.8%, and 18.4% for the trailing 12-month period ended August 31, 2006.

"Bear Stearns produced excellent results for the third quarter and record results for the first nine months of 2006," said James E. Cayne, chairman and chief executive officer. "Our franchise continues to grow as we selectively hire talented professionals worldwide. We are seizing opportunities in the marketplace to both expand our existing core businesses and enter new areas where we can profitably develop our market presence. I am proud of our success and I am enthusiastic about our future."

## Capital Markets

Net revenues for the Capital Markets segment were $1.5 billion for the quarter ended August 31, 2006, up 13% from $1.4 billion for the third quarter of 2005.

- Institutional Equities net revenues were $436 million for the third quarter of 2006, a 31% increase from $334 million for the comparable prior-year quarter. Strong results from domestic and international sales and trading, structured equity products and energy/commodity activities all contributed to this robust performance.

- Fixed Income net revenues were $878 million for the third quarter 2006, up 19% from $739 million reported for the quarter ended August 31, 2005. Mortgage-related revenues increased from the prior year period as customer activity and gains in market share more than offset declining industry volumes. Bear Stearns continues to be ranked as the number one underwriter of U.S. Mortgage-backed securities for the third quarter as well as for the nine months ending August 31, 2006. The credit businesses remained very strong, led by the leveraged finance and credit trading areas.

- Investment Banking net revenues were $232 million for the quarter ended August 31, 2006, down 23% from $300 million for the year-ago third quarter. Excluding merchant banking, Investment Banking net revenues increased 8% due to increased merger and acquisition advisory fees as a number of previously announced transactions were completed during the quarter.

Partially offsetting the increase in merger and acquisition advisory fees were reduced underwriting net revenues reflecting lower industry activity levels as compared with the prior- year quarter.

## Global Clearing Services

Net revenues for Global Clearing Services were $269 million for the quarter ended August 31, 2006, up 4% from $258 million for the quarter ended August 31, 2005. Higher customer margin debt and customer short balances resulted in increased net interest revenues. Average customer margin debt balances were $68.8 billion during the quarter ended August 31, 2006, up 9% from $63.4 billion in the comparable quarter of fiscal 2005. Customer short balances averaged $82.1 billion for the third quarter of 2006, compared with $81.3 billion for the third quarter of 2005.

## Wealth Management

Wealth Management net revenues for the quarter ended August 31, 2006 were $231 million, an increase of 36% from $170 million for the quarter ended August 31, 2005.

- Private Client Services net revenues were $127 million in the third quarter of 2006, up 12% from $114 million in the prior-year quarter. Increased client activity levels and the continued growth in fee-based assets drove the increase in net revenues for the 2006 third quarter.

- Asset Management net revenues rose 87% to $104 million for the third quarter of 2006 from $56 million in the prior-year quarter. Performance fees increased compared with the third quarter of 2005 as our proprietary hedge fund products recorded strong performance. Management fees also increased as assets under management increased 25% to $50.2 billion at quarter end, up from $40.3 billion on August 31, 2005.

## Expenses

- Compensation as a percentage of net revenues was 48.1% for the third quarter of 2006 versus 47.0% in the quarter ended August 31, 2005. Compensation as a percentage of net revenues for the nine months ended August 31, 2006 was 48.3% and 47.9% for the full year ended November 30, 2005.

- Non-compensation expenses were $437 million for the quarter ended August 31, 2006, a rise of 15% from $381 million for the comparable prior-year period. The increase is primarily related to occupancy fees, higher communications and technology costs associated with

39

additional headcount as well as higher professional fees.

The third quarter 2006 pre-tax profit margin was 31.3% as compared with 32.0% for the third quarter of 2005.

- As of August 31, 2006, total capital, including stockholders' equity and long-term borrowings, was $61.9 billion. The book value of Bear Stearns common stock at August 31, 2006 was $81.52 per share, based on 146.3 million shares outstanding.

86. On December 14, 2006, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its fiscal fourth quarter and full year 2006 earnings. Bear Stearns reported earnings of $563 million for the quarter and $2.1 billion for the year. According to the press release, "[m]ortgage revenues increased reflecting higher volumes and increased commercial-mortgage securitization activity." Defendant Cayne commented that "[w]e are pleased to announce Bear Stearns' fifth consecutive year of record net income and earnings per share." In particular, the press release provided as follows:

- *Bear Stearns Reports Best Ever Quarter*
- *Record Net Income of $563 million, up 38%*
- *Earnings Increase 38% to a Record $4.00 Per Share*
- *Full Year Results Set A Record For The Fifth Consecutive Year*
- *Net Income Increases 40% to $2.1 Billion*
- *Annual Earnings Per Share of $14.27*
- *Net Revenues Increase 25% to a Record $9.2 Billion*
- *Firm Increases Quarterly Dividend 14% to $0.32 Per Share*

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $4.00 for the fourth quarter ended November 30, 2006, up 38% from $2.90 per share for the fourth quarter of 2005. Net income for the fourth quarter of 2006 was $563 million, up 38% from $407 million for the fourth quarter of 2005. Net revenues for the 2006 fourth quarter were $2.4 billion, up 28% from $1.9 billion for the 2005 fourth quarter. The annualized return on common stockholders' equity for the fourth quarter of 2006 was 20.5%.
For the full fiscal year ended November 30, 2006, earnings per share (diluted) were a record $14.27, up 38% from $10.31 for fiscal 2005. Net income for the fiscal year 2006 was $2.1 billion, up 40% from the $1.5 billion earned in the twelve-month period ended November 30, 2005. Net revenues for fiscal year 2006 were $9.2 billion, an increase of 25% from $7.4 billion in the prior fiscal year. The after-tax return on common stockholders' equity was 19.1% for fiscal 2006.

"We are pleased to announce Bear Stearns' fifth consecutive year of record net income and earnings per share," said James E. Cayne, chairman and chief executive officer. "Our continued success is a testament to our unwavering focus on serving our clients with excellence; attracting and retaining talented professionals and profitably expanding our broad and diverse franchise. I look forward to 2007 and our continued expansion both internationally and domestically."

**Capital Markets**

**Fourth Quarter**

Net revenues in Capital Markets, which includes Institutional Equities, Fixed Income and Investment Banking, were $1.8 billion for the fourth quarter of 2006, up 26% from $1.4 billion for the fourth quarter ended November 30, 2005.

- Institutional Equities net revenues were $397 million, up 7% from $373 million for the fourth quarter of 2005. Record results from risk arbitrage and continued strong results from equity derivatives and international sales and trading contributed to this strong performance.

- Fixed income net revenues were $1.1 billion, up 25% from $839 million in the fourth quarter of 2005. The credit business produced record results led by the credit derivatives, distressed debt and leveraged finance areas. Mortgage revenues increased reflecting higher volumes and increased commercial-mortgage securitization activity.

- Investment Banking net revenues were $364 million in the fourth quarter of 2006, up 58% from the $231 million in the comparable prior year period. This increase reflects fees from higher underwriting and merger and acquisition transaction volumes.

**Full Year**

Capital Markets net revenues were a record $7.0 billion for fiscal year 2006, an increase of 25% over the previous record of $5.6 billion reported in 2005.

- Institutional Equities net revenues for the fiscal year ended November 30, 2006 were up 33% to a record $1.9 billion from $1.4 billion in fiscal 2005. Equity derivatives, risk arbitrage, energy/commodity activities and international sales and trading all delivered record results.

- Fixed Income net revenues were a record $4.0 billion in 2006, up 23% from $3.3 billion in 2005. This was the sixth consecutive year of record results and was led by revenue growth in the mortgage and credit departments. In the mortgage business, the record results were driven by market share gains in

commercial mortgage-backed securities and the growth in captive origination volumes from the vertical integration of the mortgage platform. In addition, collateralized loan and debt origination activities increased substantially. The credit franchise delivered its best results ever as the high yield, leverage finance and credit trading areas all produced record revenues.

- Investment Banking reported net revenues of $1.2 billion for fiscal 2006, up 19% from $980 million in the prior fiscal year. The increase in net revenues was due to greater transaction volumes in both underwriting and advisory areas.

## Global Clearing Services

### Fourth Quarter

- Fourth quarter 2006 Global Clearing Services net revenues were $281 million, up 7% from $263 million in the fourth quarter of 2005. Net interest revenues increased due to higher margin debt and customer short balances. Average customer margin debt balances for the quarter ended November 30, 2006 were $72.0 billion, up from $67.4 billion in the prior year quarter. Customer short balances averaged $90.0 billion during the fourth quarter of 2006, up from the prior year fourth quarter average of $81.2 billion.

### Full Year

- Net revenues for the 2006 fiscal year in Global Clearing Services were $1.10 billion, up 3% from $1.07 billion in fiscal 2005. Net interest revenues increased due to higher levels of customer margin debt balances partially offset by declining commission revenues. Average customer margin debt balances for the fiscal year were $68.4 billion as compared with $64.9 billion for the year ended November 30, 2005. Customer short balances averaged $82.6 billion during the 2006 fiscal year, down from the average of $84.4 billion for 2005.

## Wealth Management

### Fourth Quarter

In the Wealth Management segment, which includes Private Client Services and Asset Management, net revenues were $245 million for the quarter ended November 30, 2006, up 33% from $184 million in the fourth quarter of 2005.

- Private Client Services revenues were $133 million in the fourth quarter of 2006, an increase of 14% from $117 million in the 2005 quarter. Increased

equity in client accounts, higher activity levels, and robust growth in fee-based assets drove the quarterly revenue increase.

- Asset Management net revenues grew 66% to $112 million for the fourth quarter of 2006 from $67 million in the prior year quarter. The rise in net revenues was due to increased performance fees from hedge fund products, as well as management fees from a growing base of assets under management.

**Full Year**

Wealth Management net revenues were $850 million for fiscal 2006, an increase of 25% compared with $679 million in fiscal 2005.

- Revenues from Private Client Services rose 15% to $518 million for the 2006 fiscal year from $450 million for fiscal 2005. The improvement reflects the growing contribution of revenues from fee-based assets.

- The Asset Management business reported record net revenues of $332 million for the 2006 fiscal year, up 45% from $229 million in the prior year. Growth in alternative assets under management together with increased performance fees contributed to these excellent results.

- Assets under management rose to $52.5 billion as of November 30, 2006, up 25% from $41.9 billion as of November 30, 2005.

**Expenses**

**Fourth Quarter**

- Compensation as a percentage of net revenues was 43.6% for the fourth quarter of 2006 compared with 46.2% for the quarter ended November 30, 2005.

- Non-compensation expenses were $469 million for the quarter ended November 30, 2006, up 9% from $429 million in the 2005 quarter. The increase is primarily related to higher occupancy fees, professional fees, and communications and technology costs associated with additional headcount.

The 2006 fourth quarter pre-tax profit margin was 37.0%, as compared with 31.1% for the prior year quarter.

**Full Year**

- For the twelve-months ended November 30, 2006, compensation as a percentage of net revenues was 47.1% as compared with 47.9% for the 2005 fiscal year.

- Non-compensation expenses for the fiscal year 2006 were $1.74 billion, 5% higher than the $1.65 billion reported in 2005. The increase is primarily related to increased occupancy expenses, professional fees, and communications and technology costs associated with an expanding workforce.

For fiscal year 2006 the pre-tax margin was 34.1% versus 29.8% in fiscal year 2005. As of November 30, 2006, total capital, including stockholders' equity and long-term borrowings, was $66.7 billion. Book value on November 30, 2006 was $86.39 per share, based on 145.7 million shares outstanding. The company repurchased approximately 10.6 million shares of its common stock during fiscal 2006.

## Quarterly Common Stock Cash Dividend Declared

- The Board of Directors of The Bear Stearns Companies Inc. declared a regular quarterly cash dividend of 32 cents per share on the outstanding shares of common stock payable January 26, 2007, to stockholders of record on January 16, 2007. This represents a 14% increase over the 28 cent per share quarterly dividend paid since January 2006.

## Quarterly Preferred Stock Cash Dividends Declared

- The Board of Directors of The Bear Stearns Companies Inc. declared the following regular quarterly dividends: (i) a cash dividend of $3.075 per share on the outstanding shares of 6.15% Cumulative Preferred Stock, Series E (which is equivalent to 76.875 cents per related depositary share); (ii) a cash dividend of $2.86 per share on the outstanding shares of 5.72% Cumulative Preferred Stock, Series F (which is equivalent to 71.50 cents per related depositary share); and (iii) a cash dividend of $2.745 per share on the outstanding shares of 5.49% Cumulative Preferred Stock, Series G (which is equivalent to 68.625 cents per related depositary share); all payable January 15, 2007 to stockholders of record on December 29, 2006.

87.    In the beginning of 2007, the subprime mortgage crisis began to intensify and the Individual Defendants caused or allowed Bear Stearns to continue to disseminate false information to investors regarding its exposure in its portfolio of mortgage-backed securities.

88.    On February 13, 2007, the Individual Defendants caused Bear Stearns to file its Form 10-K, which included the same financial results previously reported. The Form 10-K also included a certification by Defendant Cayne, which stated:

## CERTIFICATION

I, James E. Cayne, certify that:

1.    I have reviewed this Annual Report on Form 10-K of The Bear Stearns Companies, Inc.

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or cause such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information and;

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

89. Individual Defendant Molinaro signed a nearly identical certification included in the Form 10-K.

90. On March 15, 2007, the Individual Defendants caused or allowed the Company to issue a press release announcing its fiscal first quarter 2007 earnings. Bear Stearns reported earnings of $554 million. Defendant Cayne commented in the press release that "[w]e are pleased with this excellent performance, revenues for the first quarter were up for every business segment." In particular, the press release provided as follows:

- *Bear Stearns Reports First Quarter 2007 Results*
- *Net Revenues Rise In Every Business Segment*
- *Net Revenues Rise 14% to $2.5 Billion*
- *Net Income Increases 8% to $554 Million*
- *Earnings Per Share Up 8% to $3.82*

The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $3.82 for the first quarter ended February 28, 2007, up 8% from $3.54 per share for the first quarter of 2006. Net income for the first quarter of 2007 was $554 million, up 8% from $514 million for the first quarter of 2006. Net revenues were $2.5 billion for the 2007 first quarter, up 14% from $2.2 billion in the 2006 first quarter. The annualized return on common stockholders' equity was 18.3% for the first quarter of 2007 and 18.6% for the trailing 12-month period ended February 28, 2007.

"We are pleased with this excellent performance, revenues for the first quarter were up for every business segment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Growing the company remains a core focus as we continue to invest in the clearing, mortgage, international and asset management franchises with successful results."

## Capital Markets

Capital Markets net revenues for the first quarter of 2007 were $2.0 billion, up 15% from $1.7 billion in the first quarter of 2006.

- Institutional Equities net revenues were $513 million, up 3% from $500 million for the first quarter of 2006. Equity derivatives delivered a record quarter with improved market conditions leading to increased customer activity. International sales and trading revenues increased in the first quarter compared with the year-ago quarter, and risk arbitrage net revenues rose reflecting a high level of activity in announced merger and acquisition transactions.

- Fixed Income net revenues were $1.1 billion, up 27% from $907 million in the year-ago quarter. The credit business produced record results led by the credit derivatives and distressed debt areas. The interest rate area also produced strong results reflecting increased volatility and higher customer volume. Residential mortgage-related revenues decreased from the prior year period, reflecting weakness in the U.S. residential mortgage-backed securities market.

- Investment Banking net revenues were $303 million in the first quarter of 2007, up 3% from $296 million in the comparable prior-year period. Equity underwriting and merger and acquisition activity remained strong in the first quarter of 2007. However, merchant banking revenues were lower than in the prior year quarter. Excluding merchant banking revenues, Investment Banking net revenues increased 20% compared with the first quarter of 2006.

## Global Clearing Services

- First quarter 2007 Global Clearing Services net revenues were $276 million, up 5% from $263 million in the first quarter of 2006. Net interest revenues increased from the prior-year quarter as interest-bearing balances rose to record

levels. Average customer margin debt balances for the quarter ended February 28, 2007 were $81.3 billion, up from $64.5 billion in the prior year quarter. Average customer short balances increased to $94.0 billion for the first quarter of 2007 from $78.2 billion for the first quarter of 2006. Average free credit balances were $33.8 billion in the current quarter, up from $29.9 billion in the first quarter last year.

**Wealth Management**

Wealth Management net revenues for the first quarter of 2007 were $255 million, an increase of 14% from $225 million in the first quarter of 2006. Net revenue continued to grow with higher levels of assets under management.

- Private Client Services net revenues were $136 million in the first quarter of 2007, an increase of 5% from $130 million in the 2006 first quarter. The increase was mainly attributable to revenues associated with the continued growth of fee-based assets.

- Asset Management net revenues grew 25% to $119 million for the first quarter of 2007 from $95 million in the prior year's quarter. The increase was primarily due to higher management fees and investment performance. Assets under management rose 19% to $54.1 billion as of February 28, 2007, compared with $45.4 billion as of February 28, 2006.

**Expenses**

- Compensation as a percentage of net revenues was 48.5% in the first quarter of 2007 as compared with 47.9% for the quarter ended February 28, 2006.

- Non-compensation expenses were $442 million for the quarter ended February 28, 2007, an increase of 15% from $386 million in the 2006 first quarter. The increase is primarily due to higher professional fees, occupancy and communications and technology costs.

The pre-tax profit margin in the first quarter of 2007 was 33.7% as compared with 34.4% in the quarter ended February 28, 2006.

As of February 28, 2007, total capital, including stockholders' equity and long-term borrowings, was approximately $71.8 billion. Book value as of February 28, 2007 was $90.57 per share, based on 145.1 million shares outstanding.

91.    On April 9, 2007, the Individual Defendants caused or allowed the Company to file its Form 10-Q for the first quarter which included the same financial results previously reported.

92.     On June 12, 2007, the media reported that two hedge fund controlled by Bear Stearns had fallen 23% from the beginning of 2007 to present. The High-Grade Structured Credit Strategies Enhanced Leverage Fund was widely exposed to subprime mortgages, or home loans to borrowers with weak credit histories. The two hedge funds managed by the Company were roiled by mortgage losses and subsequently went bankrupt. The failure of the two mortgage cost investors $1.6 billion.

93.     On June 14, 2007, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its earnings for its fiscal second quarter 2007 earnings. Bear Stearns announced earnings of $362 million. Defendant Cayne commented that "[t]he diversity of our franchise is clearly demonstrated in the record net revenues generated this quarter." In particular, the press release provided as follows:

> The Bear Stearns Companies Inc. today reported earnings per share (diluted), after a non-cash charge, of $2.52 for the second quarter ended May 31, 2007, down 32% from $3.72 per share for the second quarter of 2006. Second quarter results include the effect of a $227 million or $0.88 per share (diluted) non-cash charge related to the write-down of intangible assets, representing goodwill and specialist rights of Bear Wagner Specialists. Earnings per share (diluted) excluding this charge would have been $3.40 for the 2007 second quarter. Net income for the second quarter of 2007, after the non-cash charge, was $362 million. Net income excluding the non-cash charge would have been $486 million, down 10% from $539 million for the second quarter of 2006. Net revenues for the 2007 second quarter were a record $2.512 billion, up from the previous record of $2.499 billion reported for the 2006 second quarter. The annualized return on common stockholders' equity for the second quarter of 2007 was 11.6%, and 16.4% for the trailing 12-month period ended May 31, 2007. Excluding the non-cash charge, annualized return on common stockholders' equity for the second quarter of 2007 would have been 15.6%, and 17.5% for the trailing 12-month period ended May 31, 2007.
>
> "The diversity of our franchise is clearly demonstrated in the record net revenues generated this quarter," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "The Global Clearing Services and Wealth Management segments reported record performance while results were also very strong from debt and equity underwriting, equity derivatives and leveraged finance. Internationally, we continue to grow aggressively, hiring talented people, broadening our product platform and reaching new clients in multiple geographies."

A brief discussion of the firm's business segments follows:

**Capital Markets**

Capital Markets net revenues for the second quarter of 2007 were $1.9 billion, down 10% from a record high of $2.1 billion for the quarter ended May 31, 2006.

- Institutional Equities net revenues were $543 million, a slight decline from $560 million for the second quarter of 2006. Record revenues in equity derivatives and risk arbitrage, as well as continued strong results from international sales and trading, drove second quarter 2007 performance. The 2006 second quarter included gains recognized from the initial public offering of NYSE Group, without these gains net revenues for the 2007 quarter would have increased significantly as compared with the prior year period.

- Fixed Income net revenues were $962 million for the 2007 second quarter, down 21% from record revenues of $1.2 billion recorded in the second quarter of 2006. The credit business produced strong results led by credit derivatives and the record net revenues in leveraged finance. Mortgage-related revenues reflected both industry-wide declines in residential mortgage origination and securitization volumes and challenging market conditions in the sub-prime and Alt-A mortgage sectors.

- Investment Banking net revenues were $357 million, up 28% from the $278 million in the 2006 second quarter. Underwriting net revenues increased, driven by active corporate and financial sponsor clients. Merger and acquisition advisory fees were strong, reflecting continued robust market conditions and the completion of a number of marquee transactions.

94.    On July 17, 2007, defendant Cayne informed the investors of two hedge funds managed by Bear Stearns that there "is effectively no value left" in either fund. The collapse of these two funds—whose assets consisted of subprime mortgage-related assets including CDOs—represents over $1.5 billion in losses for investors. Bear Stearns' value declined approximately 20% in the wake of this disclosure.

95.    On August 3, 2007, the Company's credit rating was cut to negative by S&P. This caused Bear Stearns' stock to drop more than $7.00 in one day to a price of $108.35 per share.

96.    Bear Stearns responded to the S&P credit rating cut in a press release on August 3, 2007, stating in relevant part:

50

The Bear Stearns Companies Inc. said today that it is disappointed with S&P's decision to change its outlook on Bear Stearns. Most of the themes highlighted in its report are common to the industry and are not likely to have a disproportional impact on Bear Stearns. S&P's specific concerns over issues relating to certain hedge funds managed by BSAM are unwarranted as these were isolated incidences and are by no means an indication of broader issues at Bear Stearns.

"S&P's action highlights the concerns in the marketplace over the recent instability in the fixed income environment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Contrary to rumors in the marketplace, our franchise is profitable and healthy and our balance sheet is strong and liquid. Bear Stearns has thrived throughout both tumultuous and fortuitous markets for the past 84 years. We are experiencing another market cycle and we are confident in Bear Stearns' ability to succeed in this environment as it has in so many others."

With respect to operating performance and financial condition, the company has been solidly profitable in the first two months of the quarter, while the balance sheet, capital base and liquidity profile have never been stronger. Bear Stearns' risk exposures to high profile sectors are moderate and well-controlled. The risk management infrastructure and processes remain conservative and consistent with past practices. This structure and strong risk management culture has allowed the firm to operate for all of its history as a public company without ever having an unprofitable quarter.

All other major rating agencies have affirmed their stable or positive outlook on Bear Stearns within the last six weeks.

97.     On this news, on August 5, 2007, the Individual Defendants caused or allowed Bear Stearns to announce that defendant Spector had resigned from his positions as President and Co-Chief Operating Officer, member of the Executive Committee and member of the Bear Stearns Board.  In a press release titled "Bear Stearns Announces Management Changes," the Company reported:

The Bear Stearns Companies Inc. announced today that, effective immediately, Alan D. Schwartz has been named the company's sole president, and Samuel L. Molinaro, Jr. will become chief operating officer in addition to his current duties as chief financial officer. Jeffrey Mayer, co-head of the Fixed Income Division, has been named to the Bear Stearns Executive Committee. Warren J. Spector has resigned his positions of president and co-chief operating officer, member of the Executive Committee and member of the Board of Directors of Bear Stearns.

51

Commenting on the management changes, James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc., said, "In light of the recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure. These promotions reflect and acknowledge the depth of talent in our senior management team. Alan and Sam have demonstrated outstanding judgment and leadership skills during their long tenures at Bear Stearns, have made tremendous contributions to building the firm, and are well prepared to assume greater responsibility. Since assuming co-leadership of our fixed income business in 2002, Jeff has helped build a highly successful global fixed income franchise. They all, along with many others, play critical roles in leading Bear Stearns. I have every confidence in this team to continue Bear Stearns' 84-year legacy of success and profitable growth. Finally, I particularly want to thank Warren Spector for his significant contributions to Bear Stearns."

Mr. Spector said, "I am leaving with nothing but the highest respect and regard for Bear Stearns and all the talented professionals with whom I have been privileged to work. Bear Stearns is a special firm that has weathered countless challenging markets in its history. For that reason, I intend to remain a significant shareholder and will follow the firm's future success with great pride."

Alan D. Schwartz joined Bear Stearns in 1976. He became executive vice president and head of the Investment Banking Division in 1985. Mr. Schwartz was named president and co-chief operating officer in June 2001.

Samuel L. Molinaro Jr., executive vice president and chief financial officer, joined the company in 1986. In 1996, Mr. Molinaro was promoted to the position of chief financial officer and in 2002 was named a member of the company's Executive Committee.

Jeff Mayer is a senior managing director and co-head of the firm's Global Fixed Income Division. Joining Bear Stearns in 1989, he became the head of the Mortgage Department seven years later and has been co-head of the Global Fixed Income Division with Craig Overlander since 2002.

98.    On September 20, 2007, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its third fiscal quarter 2007 earnings. The Company, seemingly no longer able to sustain its profitability due to its risks and exposure in the subprime market, reported disappointing earnings of $171.3 million, down 61% from the same quarter for 2006. According to the press release, "[m]arket conditions in both the mortgage and credit business were extremely challenging this quarter." Despite this, defendant Cayne continued to reassure investors of "'solid revenues in Investment Banking and record revenues in Global Equities and Global Clearing

Services,'" and stated that he was "'confident in the underlying strength of [the Company's] business and proud of the effort and determination displayed by [the Company's] employees during these challenging times.'"  Additionally, at this time, the Company's Board of Directors increased the Company's share repurchase program to all employees to purchase up to $2.5 billion worth of common stock.  The press release stated in part:

> The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $1.16 for the third quarter ended August 31, 2007, down 62% from $3.02 per share for the third quarter of 2006. Net income for the third quarter of 2007 was $171.3 million, down 61% from $438 million for the third quarter of 2006. Net revenues were $1.3 billion for the third quarter, down 38% from $2.1 billion for the third quarter of 2006. The annualized return on common stockholders' equity for the third quarter of 2007 was 5.3%, and 13.7% for the 12-month period ended August 31, 2007. Third quarter results include approximately $200 million in losses and expenses related to the BSAM High-Grade hedge funds.

> "The third quarter was characterized by extremely difficult securitization markets and high volatility levels across asset classes. While our fixed income results clearly reflect these market conditions, we reported solid revenues in Investment Banking and record revenues in Global Equities and Global Clearing Services." said James E. Cayne, chairman and chief executive officer. "I am confident in the underlying strength of our business and proud of the effort and determination displayed by our employees during these challenging times."

> **Capital Markets**

> Net revenues for the Capital Markets segment were $1.0 billion for the quarter ended August 31, 2007, down 36% from $1.6 billion for the third quarter of 2006.

> • Institutional Equities net revenues were a record $719 million for the 2007 third quarter, a 53% increase from $471 million for the comparable prior-year quarter. This strong performance was driven by record results in structured equity products and robust international sales and trading net revenues.

> • Fixed Income net revenues were $118 million for the 2007 third quarter, down 88% from $945 million reported for the quarter ended August 31, 2006. Market conditions in both the mortgage and credit businesses were extremely challenging this quarter. A general re-pricing of risk in the market led to significant reductions in both mortgage and credit-related revenues as volumes decreased while asset values declined.

- Investment Banking net revenues were $211 million for the quarter ended August 31, 2007 down 9% from $232 million for the year-ago third quarter. Merger and acquisition advisory fees increased as a number of announced transactions were completed during the quarter. Total underwriting net revenues were flat as increased equity underwriting revenues were offset by lower fixed income underwriting revenues. Merchant Banking revenues decreased during the quarter due to changes in mark-to-market values of several portfolio companies.

## Global Clearing Services

Net revenues for Global Clearing Services were a record $332 million for the quarter ended August 31, 2007, up 30% from $255 million for the third quarter of 2006. Higher average customer margin debt and average customer short balances resulted in increased net interest revenues. Average customer margin debt balances were $102.2 billion during the quarter ended August 31, 2007, up 49% from $68.8 billion in the comparable quarter of fiscal 2006. Customer short balances averaged $102.2 billion for the third quarter of 2007, compared with $82.1 billion for the third quarter of 2006.

## Wealth Management

Wealth Management net revenues for the quarter ended August 31, 2007 were a negative $38 million compared with $233 million for the quarter ended August 31, 2006.

- Private Client Services net revenues were $148 million in the third quarter of 2007, up 15% from $128 million in the prior-year quarter. Increased client activity levels driven by market volatility and the continued growth in fee-based assets drove the increase in net revenues for the 2007 third quarter.

- Asset Management net revenues were a negative $186 million for the third quarter of 2007 compared with $105 million in the prior-year quarter. Included in the quarter's results is a loss of approximately $200 million relating to the BSAM High-Grade hedge funds. The negative impact included the reversal of accrued performance fees, the write down of hedge fund investments and receivables, and lower management fees related to proprietary hedge fund products. Assets under management increased 15% to $57.8 billion at quarter end, up from $50.2 billion at August 31, 2006.

## Expenses

- Compensation as a percentage of net revenues was 49.9% for the third quarter of 2007, versus 48.1% in the quarter ended August 31, 2006. Compensation as a percentage of net revenues for the nine months ended August 31, 2007 was 49.0% versus 48.3% for the nine months ended August 31, 2006.

- Non-compensation expenses were $492 million for the quarter ended August 31, 2007, an increase of 13% from $437 million for the comparable prior-year period. The increase is primarily related to occupancy fees, higher communications and technology costs associated with additional headcount as well as higher professional fees.

The third quarter 2007 pre-tax profit margin was 13.1%, compared with 31.3% for the third quarter of 2006.

As of August 31, 2007, total capital, including stockholders' equity and long-term borrowings, was $78.2 billion. Book value as of August 31, 2007 was $91.82 per share, based on 144.6 million shares outstanding, primarily reflecting open-market stock repurchases during the quarter.

**Share Repurchase Authorization**

The Board of Directors approved an amendment to the company's share repurchase program authorizing the purchase of up to $2.5 billion in aggregate cost of common stock. This amendment supercedes the previous $2.0 billion authorization, under which the company had acquired approximately $1.3 billion of common stock. The share repurchase program will be used both to acquire shares of common stock for the company's employee stock award plans and for up to $1.0 billion in corporate share repurchases. Purchases may be made in the open market or through privately negotiated transactions in 2007 or beyond.

**Quarterly Common Stock Cash Dividend Declared**

The Board of Directors of The Bear Stearns Companies Inc. declared a regular quarterly cash dividend of 32 cents per share on the outstanding shares of common stock payable October 26, 2007 to stockholders of record on October 16, 2007.

**Quarterly Preferred Stock Cash Dividend Declared**

The Board of Directors of The Bear Stearns Companies Inc. declared the following regular quarterly dividends: (i) a cash dividend of $3.075 per share on the outstanding shares of 6.15% Cumulative Preferred Stock, Series E (which is equivalent to 76.875 cents per related depositary share); (ii) a cash dividend of $2.86 per share on the outstanding shares of 5.72% Cumulative Preferred Stock, Series F (which is equivalent to 71.50 cents per related depositary share); and (iii) a cash dividend of $2.745 per share on the outstanding shares of 5.49% Cumulative Preferred Stock, Series G (which is equivalent to 68.625 cents per related depositary share); all payable October

15, 2007 to stockholders of record on September 28, 2007.

## BEAR STEARNS' SUBPRIME DISCLOSURES AND THEIR AFTERMATH

99.    On November 14, 2007, Bear Stearns disclosed in a Form 8-K filing that it expected to write-down its mortgage inventory, including its CDO warehouse portfolio, by approximately $1.2 billion.  In particular, Bear Stearns' Form 8-K disclosed the following:

> On November 14, 2007, Samuel L. Molinaro, Jr., Executive Vice President, Chief Financial Officer and Chief Operating Officer of The Bear Stearns Companies Inc. (the "Company"), made a presentation at the Merrill Lynch Banking and Financial Services Investor Conference. Mr. Molinaro's participation in the conference was previously announced and the conference was available to the public via webcast. During the presentation, Mr. Molinaro provided an update on the Company's collateralized debt obligations (or "CDO's") and subprime related exposures. A slide used by Mr. Molinaro for this portion of the presentation is filed herewith as Exhibit 99.1 and incorporated herein by reference.

> As of August 31, 2007, the Company had total ABS CDO related exposures of approximately $2 billion, which consisted of $963 million of AAA super senior, $165 million below AAA and $944 million of CDO Warehouse. These positions have been materially reduced through November 9, 2007. The CDO Warehouse exposure as of August 31, 2007 has essentially been liquidated or converted into CDO's. The Company's overall CDO position as of November 9, 2007 was $884 million, down from approximately $2 billion as of August 31, 2007. During the period between August 31, 2007 and November 9, 2007, the Company significantly increased its short subprime exposures reducing the August 31, 2007 net exposure of approximately $1 billion to a negative $52 million net exposure as of November 9, 2007.

> As a result of the extremely challenging environment, the Company has gone through an exhaustive process of revaluing the mortgage and CDO portfolios. As a result, the Company will be taking a net write-down of approximately $1.2 billion on these positions and others in our mortgage inventory. Net of tax, this write down is approximately $700 million. The vast majority of these losses are attributable to write downs on the CDO and CDO warehouse portfolio. Consequently, the Company anticipates having a loss for the 4th quarter of 2007. The Company has no off-balance-sheet exposures to CDO or subprime collateral held by conduits or other entities including Structured Investment Vehicles (SIVs).

100.    Then, on December 20, 2007, Bear Stearns made further disclosures of its exposure to the subprime mortgage crisis.  Specifically, Bear Stearns disclosed a net loss of $854 million—the

Company's *first loss in over 84 years*. This loss stemmed from a $1.9 billion dollar write-down—

substantially larger than it's previously announced $1.2 billion write-down—of its mortgage related

assets, including CDOs. Bear Stearns' fiscal fourth quarter and full year 2007 earnings press release

provided as follows:

> The Bear Stearns Companies Inc. reported results today for the fiscal year and the fourth quarter ended November 30, 2007. For the fiscal year the company reported $1.52 earnings per share (diluted), compared with $14.27 for fiscal 2006. Net income for the fiscal year was $233 million compared with $2.1 billion earned in fiscal year ended November 30, 2006. Net revenues for the 2007 fiscal year were $5.9 billion, compared with $9.2 billion in the prior fiscal year. The after-tax return on common stockholders' equity was 1.8% for fiscal 2007.
>
> In early November the company announced that it anticipated write-downs of approximately $1.2 billion in mortgage inventory net of hedges. At November 30, total net inventory write-downs were $1.9 billion. These write-downs served to reduce fourth quarter earnings per share (diluted) by $8.21. Including these write-downs the company reported a loss for the fourth quarter ended November 30, 2007 of $6.90 per share1. For the comparable fourth quarter of 2006, the company reported earnings per share (diluted) of $4.00. The net loss for the fourth quarter of 2007 was $854 million as compared with net income of $563 million for the fourth quarter of 2006. Net revenues for the 2007 fourth quarter were a loss of $379 million down from revenues of $2.4 billion for the 2006 fourth quarter.
>
> "We are obviously upset with our 2007 results, particularly in light of the fact that weakness in fixed income more than offset strong and, in some areas, record-setting performance in other businesses," said James E. Cayne, chairman and chief executive officer. "Our underlying fixed income franchise remains strong and we have taken steps to size the division to market conditions. We are taking appropriate measures to position Bear Stearns for renewed profitability in 2008 by focusing our resources on the businesses with growth potential in the current environment, while streamlining our operations in areas with lower expected activity levels. We are confident that these efforts will ensure Bear Stearns remains a strong and profitable competitor in the global marketplace in the years to come."
>
> "When Bear Stearns became a public company, consistent with our entrepreneurial roots and to ensure alignment of interests between management and shareholders, we designed our executive compensation programs to pay for performance. In a year in which we produced unacceptable results, the plans are working as they were designed -- and the members of the executive committee will not receive any bonuses for 2007."

*  *  *

57

## CAPITAL MARKETS

**Fourth Quarter**

Net revenues in Capital Markets, which includes Institutional Equities, Fixed Income and Investment Banking, were a loss of $956 million in the fourth quarter of 2007, down from net revenues of $1.9 billion in the fourth quarter ended November 30, 2006.

- Institutional Equities net revenues were $384 million, down 11% from $430 million in the fourth quarter of 2006. Record results from international equity sales and trading and continued strong results from domestic equity sales drove this quarterly performance partially offset by reduced performance in structured equity products.

- Fixed Income net revenues were a loss of $1.5 billion, down from net revenues of $1.1 billion in the fourth quarter of 2006. The continued re-pricing of credit risk and the severe dislocation in the structured products market led to illiquidity in the fixed income markets, lower levels of client activity across the fixed income sector and a significant revaluation of mortgage inventory. Total write-downs were $1.9 billion in the quarter net of hedges.

- Investment Banking net revenues were $205 million in the fourth quarter of 2007, down 44% from the $364 million in the comparable prior-year period. This decrease reflects lower fees from fixed income underwriting which were partially offset by continued strong merger and acquisition activity levels.

**Full Year**

Capital Markets net revenues were $3.9 billion in fiscal year 2007, a decrease of 46% from the $7.3 billion reported in 2006.

- Institutional Equities net revenues in the 2007 fiscal year were up 10% to a record $2.2 billion from $2.0 billion in fiscal 2006. International sales and trading, risk arbitrage and principal strategies all delivered record results.

- Fixed Income net revenues were $685 million in 2007, down from $4.2 billion in 2006. Results for 2007 were heavily influenced by the severe market conditions across the fixed income sector. More broadly, the re-pricing of credit also led to significantly lower net revenue levels due to illiquidity in the markets as trading activity levels deteriorated across the spectrum of fixed income products.

- Investment Banking reported net revenues of $1.1 billion in fiscal 2007, down 8% from $1.2 billion in the prior fiscal year. Increases in equity

underwriting and higher transaction volumes in advisory areas were more than offset by lower fixed income underwriting net revenues and merchant banking results.

101.    Also on December 20, 2007, FIC LP ("FIC"), a San Francisco partnership that had invested in the two hedge funds that had collapsed during July 2007, sued Bear Stearns over the Company's management of the funds.  This suit followed in the footsteps of a similar suit that Barclays Bank PLC had filed against the Company on the day before.  FIC is seeking class action status on behalf of other investors in the two funds.  Moreover, the SEC and the U.S Attorney's office in Brooklyn are currently conducting criminal and civil investigations of the funds' collapse.

102.    On January 8, 2008, defendant Cayne resigned his position as CEO of the Company.

103.    On or about January 9, 2008, Bear Stearns announced that it was closing a third hedge fund that had invested in mortgage backed securities.  The collapse of this fund represents hundreds of millions worth of additional losses to investors and could potentially trigger further lawsuits and investigations.

104.    During the fourth quarter, Bear Stearns cut 1,400 jobs or approximately 9% of its workforce.  The Company incurred $100 million in severance costs in connection with the layoffs.

105.    In the wake of these devastating disclosures, during the Relevant Period, Bear Stearns' value declined from over $170 per share to less than $80 per share—a $10.3 billion market capitalization loss.

106.    Bear Stearns' Relevant Period statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

    1.    Bear Stearns' was more exposed to the subprime market crisis than it had disclosed;

    2.    Bear Stearns' portfolio of billions in subprime mortgage related assets and CDOs would eventually be written-down by billions of dollars; and

    3.    As a result of the foregoing, Bear Stearns reported earnings and business prospects were inaccurate.

## THE PROPOSED ACQUISITION

107.    Unfortunately for Bear Stearns, this was not even close to the end of their troubles. In the months following Bear Stearns' initial disclosure of the collapse of two of its hedge funds, Bear Stearns continued its downward spiral with the Company's share price declining from almost $145 per share in early July 2007, to approximately $60 per share approximately one month ago. Bear Stearns common stock now trades at approximately $10 per share due to the announcement on March 16, 2008, that Bear Stearns would be bought out by JPMorgan in a stock-for-stock transaction totaling approximately $236 million, or $2 per share. This was a result of the Individual Defendants' failure to appropriately account for the subprime mortgage crisis that the Individual Defendants had exposed the Company to, as described above, and its propensity to overextend credit to those who would likely not be able to repay Bear Stearns.

108.    On March 10, 2008, information was leaked into the market concerning Bear Stearns' liquidity problems, which caused the stock to drop to $62.30 per share. *MarketWatch* reported on Bear Stearns' potential liquidity issues, stating in relevant part:

> Alan "Ace" Greenberg, chairman of the New York-based company's executive committee, denied any liquidity problems, according to CNBC.
>
> Meanwhile, Moody's Investors Service downgraded 163 bits of securities issued by Bear that are backed by so-called Alt-A mortgages. The cuts came as delinquencies and foreclosures climbed higher than expected, the ratings agency said.
>
> Shares of Bear Stearns dropped as much as 14% in setting a 52-week low at $60.26 earlier in the session. They stood at $64.39 during afternoon trading, down about 8%.
>
> Liquidity is the ability to borrow new money or raise it some other way to meet upcoming obligations and spending requirements. It also refers to the ability of brokerage firms and other market players to quickly sell assets without those holdings losing value.
>
> The mortgage crisis has sparked a broader credit crunch in which hedge funds, brokerage firms and others are being forced to cut borrowing, also known as de-leveraging. That's triggering forced selling, which makes the situation even worse, limiting liquidity.

Investment banks like Bear Stearns are at the center of this phenomenon.

"The company's shares are down again today, this time because of concerns about liquidity [banks are insisting on higher-margin levels]," said Egan-Jones Ratings.

"A core issue is whether Bear Stearns will be able raise capital and deal with the increased funding costs," the ratings agency, paid by investors rather than issuers, wrote in a Monday note to clients.

A gauge of a company's borrowing costs can be gleaned from the market in credit-default swaps, or CDS. These derivatives pay out in the event of default, and so they appreciate in value when the perceived creditworthiness of a borrower declines.

CDS on Bear Stearns traded at 610 basis points over Treasurys on Monday. A basis point is one hundredth of a percentage point.

109.    Despite the recent issues surrounding liquidity at Bear Stearns, the Company reported it was still strong and was maintaining a large liquidity cushion.  In fact, defendant Schwartz even announced days before the merger announcement that Bear Stearns was maintaining a book value of $84 per share.  This all seemed like good news for Bear Stearns.  Unfortunately, the subprime mess Bear Stearns had entwined itself in had caused investors, clients and counterparties to lose confidence in Bear Stearns at alarming rates and Bear Stearns stock price continued to plummet.

110.    On March 14, 2008, two days before the Acquisition and despite Bear Stearns announcement that it maintained a strong liquidity cushion, Bear Stearns announced that JPMorgan would provide a secured loan facility in order for Bear Stearns to access liquidity as needed.  Bear Stearns noted that its' "liquidity position in the last 24 hours had significantly deteriorated."  These loans, which were to provide an unspecified amount of funding and were to be insured by the Federal Reserve, did nothing to increase confidence in Bear Stearns and, instead, only served to prompt chatter and speculation in the market that Bear Stearns, one of the largest and strongest investment banks, was collapsing and would either be facing bankruptcy or be up for sale, likely to JPMorgan itself.  Following this announcement, Bear Stearns stock plummeted from an already low $57 per share on March 13, 2008 to $30 per share on March 14, 2008.

111.    On March 16, 2008, Bear Stearns announced the Board had unanimously approved a stock-for-stock exchange with JPMorgan to sell Bear Stearns for approximately $236 million, or $2 per share.  The press release stated as follows:

> JPMorgan Chase & Co. announced it is acquiring The Bear Stearns Companies Inc. The Boards of Directors of both companies have unanimously approved the transaction.
>
> The transaction will be a stock-for-stock exchange. JPMorgan Chase will exchange 0.05473 shares of JPMorgan Chase common stock per one share of Bear Stearns stock. Based on the closing price of March 15, 2008, the transaction would have a value of approximately $2 per share.
>
> Effective immediately, JPMorgan Chase is guaranteeing the trading obligations of Bear Stearns and its subsidiaries and is providing management oversight for its operations. Other than shareholder approval, the closing is not subject to any material conditions. The transaction is expected to have an expedited close by the end of the calendar second quarter 2008. The Federal Reserve, the Office of the Comptroller of the Currency (OCC) and other federal agencies have given all necessary approvals.
>
> In addition to the financing the Federal Reserve ordinarily provides through its Discount Window, the Fed will provide special financing in connection with this transaction. The Fed has agreed to fund up to $30 billion of Bear Stearns' less liquid assets.
>
> "JPMorgan Chase stands behind Bear Stearns," said Jamie Dimon, Chairman and Chief Executive Officer of JPMorgan Chase. "Bear Stearns' clients and counterparties should feel secure that JPMorgan is guaranteeing Bear Stearns' counterparty risk. We welcome their clients, counterparties and employees to our firm, and we are glad to be their partner."
>
> Dimon added, "This transaction will provide good long-term value for JPMorgan Chase shareholders. This acquisition meets our key criteria: we are taking reasonable risk, we have built in an appropriate margin for error, it strengthens our business, and we have a clear ability to execute."
>
> "The past week has been an incredibly difficult time for Bear Stearns. This transaction represents the best outcome for all of our constituencies based upon the current circumstances," said Alan Schwartz, President and Chief Executive officer of Bear Stearns. "I am incredibly proud of our employees and believe they will continue to add tremendous value to the new enterprise."

The transaction is expected to be ultimately accretive to JPMorgan Chase's annual earnings.

"This transaction helps us fill out some of the gaps in our franchise with manageable overlap," said Steve Black, co-CEO of JPMorgan Investment Bank. "We know the Bear Stearns leadership team well and look forward to working with them to bring our two companies together."

"Acquiring Bear Stearns enables us to obtain an attractive set of businesses," said Bill Winters, co-CEO of JPMorgan Investment Bank. "After conducting due diligence, we're comfortable with the quality of Bear Stearns' business, and are pleased to have them as part of our firm."

"JPMorgan Chase's management team has a strong track record of effective merger integration," said Heidi Miller, CEO of JPMorgan Treasury & Securities Services business. "We will work closely in the coming weeks with Bear Stearns' clients and management to execute the transaction quickly."

112.    Also March 17, 2008, *The Wall Street Journal* reported on the sale, in "J.P. Morgan

Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis," stating in relevant part:

Pushed to the brink of collapse by the mortgage crisis, Bear Stearns Cos. agreed -- after prodding by the federal government -- to be sold to J.P. Morgan Chase & Co. for the fire-sale price of $2 a share in stock, or about $236 million.

Bear Stearns had a stock-market value of about $3.5 billion as of Friday -- and was worth $20 billion in January 2007. But the crisis of confidence that swept the firm and fueled a customer exodus in recent days left Bear Stearns with a horrible choice: sell the firm -- at any price -- to a big bank willing to assume its trading obligations or file for bankruptcy.

"At the end of the day, what Bear Stearns was looking at was either taking $2 a share or going bust," said one person involved in the negotiations. "Those were the only options."

To help facilitate the deal, the Federal Reserve is taking the extraordinary step of providing as much as $30 billion in financing for Bear Stearns's less-liquid assets, such as mortgage securities that the firm has been unable to sell, in what is believed to be the largest Fed advance on record to a single company. Fed officials wouldn't describe the exact financing terms or assets involved. But if those assets decline in value, the Fed would bear any loss, not J.P. Morgan.

*      *      *

The deal already is prompting howls of protest from Bear Stearns shareholders, since the New York company last week indicated that its book value

63

was still close to its reported level of about $84 share at the end of the fiscal year. "Why is this better for shareholders of Bear Stearns than a Chapter 11 filing?" one Bear shareholder asked J.P. Morgan executives in a conference call last night.

\* \* \*

James Cayne, Bear Stearns's chairman, who had been participating in a bridge tournament when the crisis unfolded, returned to New York on Saturday and participated in the negotiations, said one person familiar with the discussions.

"We're very comfortable with what we found [in due diligence] and what we acquired, but we needed a pretty substantial cushion" from the Fed, Bill Winters, co-head of J.P. Morgan's investment bank, said in a conference call last night.

The deal is expected to close by the end of June, an unusually quick time frame. Federal regulators already have signed off on the deal, which will require a vote of Bear Stearns shareholders.

113.    Following the Merger announcement and the report by *The Wall Street Journal*, Bear Stearns stock plummeted 85% on March 17, 2008 from $30 per share to an unprecedented low of $4.81 per share. The market was dumbfounded with the absurdly low and embarrassing sale price, especially considering Bear Stearns' announcement just days before the Acquisition was announced that the Company's book value was $84 per share, or 97.6% greater than the sale price of $2 per share. Moreover, at the time the transaction was announced, Bear Stearns' stock was trading at $30 per share, far above the Acquisition price. After the Acquisition was announced, Bear Stearns stock plunged far below its pre-Acquisition announcement price of $30 per share; however, it *never* reached a low of $2 per share. These facts are both indications that Bear Stearns' shareholders believed the Company was worth more than the Acquisition price.

114.    The Acquisition announcement came after just one and a half days of due diligence by JPMorgan and an agreement by the Federal Reserve to fund $30 billion of Bear Stearns' less liquid assets on non-recourse terms (later revised to $29 billion) and drastically reducing JPMorgan's risk in agreeing to this Acquisition. This agreement by the Federal Reserve cuts sharply in favor of JPMorgan, who is able to transfer the risks associated with these assets to the average taxpayer who is already facing a strained economy rather than assume the risk themselves.

115.    In addition to JPMorgan's reduced risk, thanks to the Federal Reserve, JPMorgan will reap huge benefits from the Acquisition that further indicate defendants did not maximize shareholder value in this Acquisition. As part of the agreement, JPMorgan will acquire Bear Stearns' headquarters, a building in the heart of New York City that has been valued between approximately $1 billion and 1.5 billion alone.

116.    In addition, JPMorgan is slated to acquire divisions of Bear Stearns that are still profitable and strong, including it's prime brokerage business and global clearing business, businesses which should increase the per share price to Bear Stearns shareholders, not allow JPMorgan to benefit without benefit to the Bear Stearns' shareholders.

117.    Put simply, the Individual Defendants are giving JPMorgan a phenomenal deal at the detriment to the Company's shareholders. JPMorgan will receive all the benefits of owning what was one of the largest and strongest investment banking companies for next to nothing, and with $29 billion of risk assumed by the Federal Reserve while Bear Stearns' shareholders are receiving $10 per share of a company that had a book value of $84 per share just days before.

118.    Further, on March 16, 2008, defendants approved an amendment to the By-laws of Bear Stearns that provides the payment of any indemnification for the defendants for expenses, including attorneys' fees, shall be paid or reimbursed promptly upon demand by the defendants.

119.    Bear Stearns had falsely reported to the investing public the stability and strength of the Company, which had caused Bear Stearns' stock to trade at artificially inflated prices. The real story, however, was that Bear Stearns: (i) failed to fully disclose the risks associated with its underlying investments; (ii) failed to inform investors and shareholders that the Company's hedge funds were rapidly deteriorating due to the subprime mortgage market meltdown with no plan as to how to rescue the funds; and (iii) that, in order to escape personal liability for their actions, the Individual Defendants fraudulently negotiated the Acquisition of Bear Stearns to JPMorgan.

### DEFENDANTS AGREE TO A STOCK EXCHANGE AGREEMENT THAT THREATENS TO MAKE THE SHAREHOLDER VOTE A MERE FORMALITY

120.    On March 24, 2008, faced with scrutiny and a pending backlash from Bear Stearns' shareholders, defendants acted to guarantee the closure of the Merger. First, JPMorgan agreed to increase its offer to approximately $10 per share, which still compares poorly to the $70 per share at which Bear Stearns was trading at only two weeks before. But the price to be paid for that increased consideration is a heavy one. In exchange, Bear Stearns and the Individual Defendants agreed to a Stock Exchange Agreement that allows JPMorgan to exchange 20.6 million of its shares for 95 million newly issued Bear Stearns' shares. This agreement will give JPMorgan voting control over 39.5% of the Company's outstanding shares. The Individual Defendants also agreed to vote their approximately 7.5 million Bear Stearns shares in favor of the Merger.

121.    Under NYSE rules, generally, companies traded on the exchange must first solicit shareholder approval before issuing new shares. Defendants, however, seek to avoid shareholder approval by relying upon NYSE Listed Company Manual Paragraph 312.05, which states:

> Exceptions may be made to the shareholder approval policy in Para. 312.03 upon application to the Exchange when (1) the delay in securing stockholder approval *would seriously jeopardize the financial viability of the enterprise* and (2) reliance by the company on this exception is *expressly approved by the Audit Committee* of the Board.

122.    Defendants Tese, Bienen, Glickman, Goldstein, Novelly, Salerno and Williams as members of the Audit Committee, lent their express approval to the Stock Exchange Agreement.

123.    Defendants' invocation of the Paragraph 312.05 exception is self-motivated and unfounded. Importantly, there is no evidence that a delay caused by seeking shareholder approval of the Stock Exchange Agreement would jeopardize Bear Stearns' financial viability. Since before the Merger was announced, the Federal Reserve has stepped in with emergency funding and has guaranteed billions worth of Bear Stearns' assets. There is no evidence that the Federal Reserve would withdraw its funding and guarantees in the event that Bear Stearns abandoned the Merger in

exchange for a superior offer from an alternative bidder. The only thing at jeopardy is JPMorgan's position to acquire Bear Stearns for a grossly inadequate consideration.

124.    The Stock Exchange Agreement will have severe effects on Plaintiffs and the Class' shareholder rights. The Stock Exchange Agreement's execution, along with its open market purchase of Bear Stearns' stock, provides JPMorgan, as of April 8, 2008, with approximately 47.41% of the Company's outstanding shares, guaranteeing that only a near-unanimous shareholder opposition or judicial intervention will prevent the Merger from closing. Moreover, defendants' disregard of NYSE rules may result in the de-listment of Bear Stearns.

## THE GUARANTEE AND COLLATERAL AGREEMENT FURTHER ENTWINES BEAR STEARNS AND JPMORGAN

125.    Also on March 24, 2008, JPMorgan sought to further protect itself from a termination of the proposed Merger and entered into the Collateral Agreement with Bear Stearns and certain of its subsidiaries. As stated in JPMorgan's Form 8-K filed with the SEC on March 28, 2008, pursuant the Collateral Agreement, Bear Stearns and its subsidiaries agreed to guarantee their obligations to repay JPMorgan "(1) any loans or other advances of credit by JPMorgan … and (2) any amounts paid by JPMorgan Chase to creditors of Bear Stearns and its affiliates under the [Amended and Restated Guaranty Agreement] and the JPMorgan Chase guarantee, entered into on March 23, 2008, in favor of the Federal Reserve Bank of New York." Bear Stearns' guarantee in the Collateral Agreement is secured "by granting a lien on substantially all of [Bear Stearns and its subsidiaries'] respective assets." In guaranteeing the Collateral Agreement with this lien, Bear Stearns is effectively giving JPMorgan control over and ownership of almost all of Bear Stearns' assets whether the proposed Merger is approved by Bear Stearns' shareholders or not.

## INCREASED GOVERNMENT SCRUTINY OF THE PROPOSED MERGER

126.    In response to the heavy involvement of the Federal Reserve in the proposed Merger and the government's responsibility to taxpayers, the Senate Committee on Finance is now also inquiring into the terms of the Acquisition. On March 26, 2008, the Senate Committee on Finance

sent a letter to the CEOs of both Bear Stearns and JPMorgan, as well as to the Federal Reserve Chairman Ben Bernanke, Treasury Secretary Henry Paulson, and Federal Reserve Bank CEO Timothy Geithner requesting the details of the proposed merger, how and by whom it was negotiated, and all parties involved in the proposed Merger. Senate Finance Committee Chairman Max Baucus stated in news release issued on March 26, 2008 by the Senate Committee on Finance, "Americans are being asked to back a brand-new kind of transaction, to the tune of tens of billions of dollars ... and we have a responsibility to all taxpayers to review the details of this deal." Testimony from defendant Schwartz and JPMorgan Chairman and Chief Executive Officer James Dimon was taken by the Senate Committee on Banking, Housing and Urban Affairs on April 3, 2008.

## DEFENDANTS FAILED TO MAXIMIZE SHAREHOLDER VALUE

127.    The Individual Defendants acted fast to push this coercive deal through. Despite the enormity of the implications of this deal and the complexity of the apparent liquidity issues that the Company faced, the Merger announcement came after just one and a half days of due diligence by JPMorgan. JPMorgan's task was made easier due to an agreement by the Federal Reserve to fund $29 billion of Bear Stearns' less liquid assets on non-recourse terms, drastically reducing JPMorgan's risk in agreeing to this Merger. This agreement by the Federal Reserve cuts sharply in favor of JPMorgan, who is able to transfer the risks associated with these assets to the taxpayers. But the Federal Reserve had no special or unique interest in favoring JPMorgan over other American suitors. Due to the failure of the Individual Defendants to satisfy their fiduciary obligations to Bear Stearns, rather than shop Bear Stearns with the backing of the Federal Reserve's portable guarantees, the Individual Defendants sold the Company short and bound the Company to the coercive Merger's deal terms that foreclosed Bear Stearns from soliciting other bidders.

128.    The Individual Defendants used an arsenal of restrictive and coercive deal terms to tie the Company's hands and bar it from getting a better deal. In fact, Bear Stearns cannot even look for a better deal or get out of JPMorgan's $10 deal for an entire year, even if the Board withdraws its recommendation of the deal. Under the "No Solicitation" clause of §6.9 of the Agreement and Plan

of Merger by and between Bear Stearns and JPMorgan (the "Merger Agreement") the Company is barred from soliciting alternative transactions.

129.    Other restrictive terms address stockholder approval of the deal and the one year closed loop that the Company is trapped in if the deal is rejected. First, under a "force-the-vote" style clause embodied in §6.3 of the Merger Agreement, the "Company shall submit this Agreement to its stockholders at the stockholder meeting even if its Board of Directors shall have withdrawn, modified or qualified its recommendation." Pursuant to §6.10 of the Merger Agreement, if shareholders reject the Merger, the Company is bound to "negotiate a restructuring of the transaction" as long as the deal has not been terminated and "neither party shall have any obligation to alter or change the amount or kind of the Merger Consideration." Therefore, JPMorgan can lock up the Company for a year until the deal self-terminates.

130.    The Individual Defendants also gave the keys to JPMorgan during this year lock-up period and tried to deal away the fiduciary obligations they owe to Bear Stearns to JPMorgan. Under §5.1 of the Merger Agreement, even though the Individual Defendants as fiduciaries are obliged to manage and operate Bear Stearns and to get the best deal possible for stockholders on a change of control, the Individual Defendants nonetheless agreed that, until the deal is effective, JPMorgan "shall be entitled to direct the business, operations and management of the Company and its subsidiaries in its reasonable discretion."

131.    In addition to JPMorgan's reduced risk, thanks to the Federal Reserve, JPMorgan will reap huge benefits from this Merger. First, the Individual Defendants ensured that JPMorgan would get at least 20% of the Company, by granting JPMorgan a separate option to purchase that block of stock at $10 per share. The Individual Defendants further tied Bear Stearns' hands by granting JPMorgan a lock-up to the very headquarters where Bear Stearns operates its business in New York. Under §6.11 of the Merger Agreement, JPMorgan will have the option to acquire Bear Stearns' headquarters, a building in the heart of New York City as a result of the Merger Agreement.

132.    In retrospect, these draconian terms may be unnecessary given the Stock Exchange Agreement recently approved by the Individual Defendants. This agreement, along with its open market purchase of Bear Stearns' stock, stands to put over 47% of Bear Stearns' outstanding shares under JPMorgan's control, which all but assures the closing of the Merger. As alleged above, Bear Stearns' shareholders will have no opportunity to vote against the Stock Exchange Agreement even though it involves the issuance of over 95 million unregistered shares.

133.    JPMorgan is slated to acquire divisions of Bear Stearns that are still profitable and strong, including its prime brokerage business and global clearing business. JPMorgan should not be allowed to acquire these divisions before paying a reasonable consideration to Bear Stearns' shareholders.

134.    Put simply, the Individual Defendants are granting JPMorgan a bulletproof deal at the expense of Bear Stearns' shareholders. Under the Merger Agreement, JPMorgan immediately receives all of the benefits of owning one of the largest and most prestigious investment banking operations on Wall Street at a substantial discount. The Individual Defendants' extraordinary giveaway of Bear Stearns to JPMorgan has not been lost on Wall Street. JPMorgan's market capitalization has increased by tens of billions of dollars since this deal was first announced.

135.    As a result of defendants' conduct to merge the Company with JPMorgan at such a low consideration, Bear Stearns' public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company. In order to meet their fiduciary duties, the Individual Defendants are and were obligated to maximize shareholder value, not structure a fire-sale deal to get themselves out of the liability exposure they now face due to their misconduct.

136.    Finally, defendants breached their fiduciary obligations by arranging to squeeze Plaintiffs and Bearn Stearns' shareholders out of their equity interest in Bear Stearns by effectuating a stock-for-stock transaction with JPMorgan in exchange for indemnity and as a fraudulent means of

70

dismissing present shareholder derivative litigation against them. Thus, the only parties that will benefit are defendants who wish to expunge their liability to Bear Stearns.

### THE ACQUISITION OF ENCORE CREDIT CORP

137.    On October 10, 2006, the Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its acquisition of ECC Capital Corporation's ("ECC") subprime mortgage origination platform of ECC's subsidiary, Encore Credit Corp. ECC was a mortgage finance real estate investment trust (REIT) that originated and invested in residential mortgage loans. ECC offered a series of mortgage products to borrowers with a particular emphasis on "nonconforming" borrowers who generally do not satisfy the credit, collateral, documentation or other standards required by conventional mortgage lenders and loan buyers and it managed a portfolio of these loans. The press release emphasized that the acquisition of ECC's mortgage origination platform would give the Company a "substantial stake in the subprime lending business." In particular, the press release provided as follows:

> The Bear Stearns Companies Inc. has agreed to acquire ECC Capital Corporation's mortgage banking platform, the two companies announced today. Under the agreement, Bear Stearns' mortgage bank subsidiary, Bear Stearns Residential Mortgage Corporation, will purchase the subprime mortgage origination platform of ECC Capital's subsidiary, Encore Credit Corp. Encore Credit, specializing in subprime mortgage origination, will operate as a separate division of Bear Stearns Residential Mortgage Corporation.

> "The acquisition of ECC Capital's origination unit will give Bear Stearns a substantial stake in the subprime lending business," said Jeff Verschleiser, a senior managing director in the mortgage department at Bear Stearns. "We continue to diversify our product mix to give independent mortgage brokers additional options through Bear Stearns Residential Mortgage Corporation. With our advanced technology, sophisticated risk management systems and capital markets expertise, we are well positioned to continue to broaden our already formidable mortgage franchise."

> Shabi Asghar, ECC Capital's President and Co-CEO, said, "As part of the Bear Stearns team, the Encore Credit sales force can now expect to have access to more competitive loan pricing, to have a broader product menu and to be integrated into Bear Stearns' state-of-the-art production platform technology, which will provide our

brokers with greater efficiency and service. Our origination business seems to be a natural fit with Bear Stearns' expansion in the subprime market." Mr. Asghar will be President and CEO of the business unit after the transaction closes. As part of the acquisition, Bear Stearns will take over Encore Credit's operating centers in Irvine, Cal., Downers Grove, Ill. and Glen Allen, Va. Bear Stearns will also acquire selected portfolios of whole loans. Encore Credit will leverage the benefits of Bear Stearns Residential Mortgage Corporation's existing technology, legal and compliance infrastructure. Bear Stearns Residential Mortgage Corporation expects to employ most of the personnel of Encore.

This acquisition is the latest addition to Bear Stearns' market-leading mortgage franchise. Bear Stearns Residential Mortgage Corporation began operations in April 2005 to provide mortgage brokers with an easy, streamlined solution for financing home loans. With an innovative technology platform called BearDirect.net, it now lends some $600 million per month in primarily Alt-A loans. Coupled with Encore Credit's mostly subprime mortgage origination, the combined platform will generate over $1 billion in loans per month.

"Bear Stearns has been buying loans from ECC Capital for over three years and the performance of its loans has been favorable compared with other originators in the marketplace," Mr. Verschleiser said. "Encore has a very strong sales organization, and as part of Bear Stearns Residential Mortgage Corporation we will be able to expand Encore Credit's product mix and improve its pricing and funding costs."

138.    As part of its acquisition of ECC's subprime mortgage banking platform, Bear Stearns also acquired $1.2 billion of ECC's whole loan portfolio.  Moreover, the acquisition of ECC provided defendants with the information regarding the looming subprime mortgage crisis to cast doubt on the Company's subsequent public statements on the financial well-being of the Company.

139.    Prior to the Bear Stearns acquisition of Encore Credit, however, ECC had experienced dramatic net losses for 2005 and 2006.  According to ECC's Form 10-K filed with the SEC on June 4, 2007, ECC experienced a net loss of $64,124,000 for the year ended December 31, 2005 and $134,642,000 for the year ended December 31, 2006.

140.    During the same period ECC was experiencing such great net losses, ECC's stock price was also rapidly plummeting.  On November 25, 2005, ECC's stock was trading at $3.19.  On January 6, 2006, the stock had decreased and was trading at $2.37.  On October 6, 2006, the day that Bear Stearns announced that it would be acquiring ECC, ECC's stock price was a measly $0.97 and,

at the time Bear Stearns' purchase of ECC was almost complete on February 9, 2007, ECC's stock was trading even lower at $0.93.

141.    Since Bear Stearns' acquisition of ECC, the ECC announced on March 1, 2007 that it had been notified by the New York Stock Exchange ("NYSE") that it had fallen below the NYSE's continued listing standard relating to minimum share price.  The NYSE requires that a listed company's common stock trade at a minimum average closing share price of $1.00 during a consecutive 30-day trading period.    On March 19, 2007, the NYSE suspended trading for ECC.

142.    During October 2006, the Individual Defendants knew or should have known that the acquisition of ECC's mortgage origination platform would cause harm to Bear Stearns.  Despite the looming subprime mortgage market crisis as well as ECC's dramatic net losses and plummeting stock price, the Individual Defendants breached their fiduciary duties to Bear Stearns and recklessly directed Bear Stearns to acquire ECC's mortgage origination platform and the $1.2 billion of ECC's whole subprime loan portfolio.

## THE IMPROPER BUYBACK

143.    During the Relevant Period, while Bear Stearns' stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $2.6 billion worth of Bear Stearns' shares at an average price of approximately $139.22 per share, which is substantially higher than Bear Stearns' current share price of less than $80 per share and comparable to the $161.92 per share the defendants averaged in selling their own Bear Stearns stock holdings during the Relevant Period.  On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the Company's exposure to the subprime mortgage lending crisis.  While Bear Stearns was repurchasing these shares, the Insider Selling Defendants made the sales described herein.

## DAMAGES TO BEAR STEARNS CAUSED BY THE INDIVIDUAL DEFENDANTS

144.    As a result of the Individual Defendants' improprieties, Bear Stearns disseminated improper statements concerning its business prospects as alleged above.  These improper statements have devastated Bear Stearns' credibility as reflected by the Company's collapse.

145.    Further, as a direct and proximate result of the Individual Defendants' action, Bear Stearns has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

1.    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Bear Stearns;

2.    costs incurred from the $2.6 billion that Bear Stearns spent repurchasing its own stock;

3.    costs incurred from the reckless acquisition of ECC's subprime mortgage banking platform and $1.2 billion of ECC's whole subprime loan portfolio;

4.    costs incurred in defending Bear Stearns in lawsuits filed in connection with the collapse of the Company's two hedge funds during July 2007;

5.    costs incurred in connection with governmental investigations of the collapse of the two hedge funds;

6.    costs incurred in connection with the collapse of a third hedge fund announced on or about January 9, 2008;

7.    costs incurred in connection with massive lay-offs including severance costs, which totaled over $100 million during Bear Stearns' fiscal fourth quarter 2007;

8.    costs incurred in connection with the forced sale of the Company to JPMorgan, including those associated with the issuance of 65 million new shares to effectively prevent a shareholder vote and guarantee the approval of the sale.

146.    Moreover, these actions have irreparably damaged Bear Stearns' corporate image and goodwill.  For at least the foreseeable future, Bear Stearns will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

74

behavior and have misled the investing public, such that Bear Stearns' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

147.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

148.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects and results; (ii) enhance the Individual Defendants' executive and directorial positions at Bear Stearns and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) allow the Individual Defendants to sell over $65 million of their personally held shares; (iv) deceive the investing public, including shareholders of Bear Stearns, regarding the Individual Defendants' management of Bear Stearns' operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period; and (v) allow the Individual Defendants to sell Bear Stearns as a fraudulent means of dismissing the present shareholder derivative litigation against themselves. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

149.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that Bear Stearns was misrepresenting its business prospects.

75

150.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

151.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

152.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## INSIDER SELLING

153.    The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect.  They also knew that the misstatements would create an inflated stock price. The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth.  Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Bear Stearns' stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| CAYNE | 12/18/2006 | 46,415 | $164.72 | $7,645,478.80 |
| | 12/21/2007 | 172,621 | $89.01 | $15,364,995.21 |
| | | 219,036 | | $23,010,474.01 |
| | | | | |

| | | | | |
|---|---|---|---|---|
| **FARBER** | 7/28/2006 | 1,000 | $138.15 | $138,150.00 |
| | 12/18/2006 | 881 | $164.68 | $145,083.08 |
| | 12/21/2007 | 2,443 | $89.01 | $217,451.43 |
| | | **4,324** | | **$500,684.51** |
| | | | | |
| **GLICKMAN** | 12/5/2007 | 3,427 | $92.52 | $317,066.04 |
| | | **3,427** | | **$317,066.04** |
| | | | | |
| **GREENBERG** | 11/30/2006 | 21,295 | $143.48 | $3,055,406.60 |
| | 12/18/2006 | 5,768 | $164.68 | $949,874.24 |
| | 1/3/2007 | 150,396 | $163.11 | $24,531,091.56 |
| | 3/22/2007 | 1,818 | $151.26 | $274,990.68 |
| | 12/21/2007 | 99,293 | $89.01 | $8,838,069.93 |
| | | **278,570** | | **$37,649,433.01** |
| | | | | |
| **HARRINGTON** | 1/17/2007 | 1,000 | $171.45 | $171,450.00 |
| | | **1,000** | | **$171,450.00** |
| | | | | |
| **MAYER** | 12/21/2007 | 102,408 | $89.01 | $9,115,336.08 |
| | | **102,408** | | **$9,115,336.08** |
| | | | | |
| **MINIKES** | 12/18/2006 | 19,274 | $164.72 | $3,174,813.28 |
| | 3/22/2007 | 1,295 | $151.26 | $195,881.70 |
| | 12/21/2007 | 25,927 | $89.01 | $2,307,762.27 |
| | | **46,496** | | **$5,678,457.25** |
| | | | | |
| **MOLINARO** | 12/18/2006 | 9,344 | $164.68 | $1,538,769.92 |
| | 3/22/2007 | 1,482 | $151.26 | $224,167.32 |
| | 12/21/2007 | 27,726 | $89.01 | $2,467,891.26 |
| | | **38,552** | | **$4,230,828.50** |
| | | | | |
| **NOVELLY** | 12/28/2007 | 50,000 | $86.78 | $4,339,000.00 |
| | | **50,000** | | **$4,339,000.00** |
| | | | | |
| **SCHWARTZ** | 12/18/2006 | 21,833 | $164.72 | $3,596,331.76 |
| | 3/22/2007 | 1,500 | $151.26 | $226,890.00 |
| | 12/21/2007 | 67,900 | $89.01 | $6,043,779.00 |
| | | **91,233** | | **$9,867,000.76** |
| | | | | |
| **SPECTOR** | 12/18/2006 | 44,096 | $164.68 | $7,261,729.28 |
| | 12/21/2006 | 69,197 | $164.12 | $11,356,611.64 |
| | 3/22/2007 | 2,962 | $151.26 | $448,032.12 |
| | | **116,255** | | **$19,066,373.04** |

| TESE | 12/26/2007 | 716 | $87.89 | $62,929.24 |
| | | 716 | | $62,929.24 |
| | | | | |
| Total: | | 952,017 | | $114,009,032.44 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

154.    Plaintiffs bring this action derivatively in the right and for the benefit of Bear Stearns to redress damages suffered and to be suffered by Bear Stearns as a direct result of Defendants' breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by the Individual Defendants. This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have. Bear Stearns is named as a nominal defendant in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

155.    Plaintiffs will adequately and fairly represent the interests of Bear Stearns in enforcing and prosecuting its rights.

156.    Plaintiffs are and were owners of the stock of Bear Stearns during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

157.    The Board of Bear Stearns at the time the original complaint was filed consisted of the following twelve individuals: defendants Greenberg, Schwartz, Cayne, Glickman, Harrington, Salerno, Nickell, Tese, Novelly, Bienen, Williams and Goldstein. A majority of the directors, if not all, face a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand.

158.    Plaintiffs have not made any demand on the present board of Directors of Bear Stearns to institute this action because such demand would have been a futile and useless act for the foregoing and following reasons:

159.    During the Relevant Period, defendants Greenberg, Schwartz, Cayne, Glickman, Harrington, Salerno, Nickell, Tese, Novelly, Bienen and Williams, as members of the Board during

the Relevant Period, authorized the acquisition of ECC's subprime mortgage origination platform. ECC was largely affected by the subprime mortgage crisis. The Board did not exercise valid business judgment when it rendered the decision to acquire a Company's whole subprime loan portfolio worth $1.2 billion. Moreover, the Board failed to properly discuss or consider the negative effects that the acquisition of ECC's subprime assets would have on the Company's business and business prospects. Accordingly, demand would have been futile.

160.    Defendants Greenberg, Schwartz, Cayne, Glickman, Harrington, Salerno, Nickell, Tese, Novelly, Bienen, Williams and Goldstein, as members of the Board during the Relevant Period, authorized the repurchases of over $2.6 billion worth of the Company's shares at artificially inflated prices. Bear Stearns repurchased these shares under two stock repurchase programs that the Board authorized during December 2005 and December 2006. The Board's decisions to authorize the stock repurchases were not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider Bear Stearns' exposure to the subprime mortgage crisis. Further, defendants Greenberg, Schwartz, Cayne, Glickman and Harrington engaged in self-dealing in that they sold their personally held shares while directing the Company to buy shares. Accordingly, demand would have been futile.

161.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding Bear Stearns' true business prospects. While in possession of this material, adverse, non-public information regarding the Company, the following current members of the Bear Stearns Board participated in the illegal insider selling by selling the following amounts:

  1.  while in possession of adverse, non-public information, Greenberg sold 179,277 shares of Bear Stearns stock for proceeds of $28,811,363.08;

  2.  while in possession of adverse, non-public information, Cayne sold 46,415 shares of Bear Stearns stock for proceeds of $7,645,478.80;

3.      while in possession of adverse, non-public information, Schwartz sold 23,333 shares of Bear Stearns stock for proceeds of $3,823,221.76;

4.      while in possession of adverse, non-public information, Glickman sold 3,427 shares of Bear Stearns stock for proceeds of $317,066.04; and

5.      while in possession of adverse, non-public information, Harrington sold 1,000 shares of Bear Stearns stock for proceeds of $171,450.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Moreover, these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them would have been futile.

162.    Defendants Nickell, Novelly, Salerno and Tese were, during the Relevant Period, members of the Finance and Risk Committee. The Finance and Risk Committee is responsible by its charter for: (i) reviewing and discussing with the Audit Committee Bear Stearns' policies and procedures regarding risk assessment and risk management of the Company's trading and investment risks; (ii) reviewing and discussing the risk measures and risk models utilized by the Company in evaluating and limiting financial risks; and (iii) reviewing and discussing with the Audit Committee significant risk exposures and trends. Thus, these defendants had a duty to know and accordingly did know that: (i) Bear Stearns faced exposure to the subprime mortgage crisis; and (ii) the Company's Relevant Period statements did not properly disclose that exposure. On information and belief, the Finance and Risk Committee reviewed and discussed Bear Stearns' exposures to the subprime crisis, which has been ongoing since at least mid-2006, during the course of its reviews and discussions of Bear Stearns' financial risks. Despite their knowledge of Bear Stearns' exposure to the subprime mortgage crisis, these defendants consciously disregarded their fiduciary duties owed to Bear Stearns by causing or allowing the improper statements alleged above. Accordingly, demand would have been futile as to defendants Nickell, Novelly, Salerno and Tese.

163.    Defendants Bienen, Glickman, Goldstein, Novelly, Salerno, Tese and Williams were, during the Relevant Period, members of the Audit Committee.  The Audit Committee is responsible by its charter for: (i) reviewing and discussing earnings press releases; (ii) reviewing and discussing financial information and earnings guidance provided to analysts and rating agencies; and (iii) discussing with the Finance and Risk Committee Bear Stearns' policies regarding risk assessment and risk management, including Bear Stearns' major financial and credit risk and the steps management has taken to monitor and control such risks.  Thus, these defendants had a duty to know and accordingly did know that: (i) Bear Stearns faced exposure to the subprime mortgage crisis; and (ii) the Company's Relevant Period statements did not properly disclose that exposure.  On information and belief, the Audit Committee held discussions with the Finance and Risk Committee concerning Bear Stearns' exposure to the subprime crisis, which has been ongoing since at least mid-2006.  Despite their knowledge of Bear Stearns' exposure to the subprime mortgage crisis, these defendants consciously disregarded their fiduciary duties owed to Bear Stearns by causing or allowing the improper statements and earnings press releases alleged above.  Thus, Bienen, Glickman, Goldstein, Novelly, Salerno, Tese and Williams face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them would have been futile.

164.    The principal professional occupation of Greenberg is his employment with Bear Stearns, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  Specifically, Bear Stearns paid Greenberg the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $9,000,000 | $7,612,500 | 18,789 | $3,057,772 |
| 2005 | $200,000 | $7,274,154 | $5,665,819 | 32,026 | $2,183,559 |

Accordingly, Greenberg lacks independence from defendants Glickman, Harrington, Nickell and Tese, who are not disinterested and/or independent and who exert influence over Greenberg's compensation by virtue of their positions as members of the Compensation Committee.  The Compensation Committee has the authority to review and approve Greenberg's base salary, bonus

and equity compensation. This lack of independence renders defendant Greenberg incapable of impartially considering a demand to commence and vigorously prosecute this action.

165.    The principal professional occupation of Schwartz is his employment with Bear Stearns, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, Bear Stearns paid Schwartz the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $250,000 | $16,237,150 | $14,014,065 | 33,847 | $5,233,207 |
| 2005 | $200,000 | $12,072,654 | $9,744,544 | 53,650 | $4,487,164 |

Accordingly, Schwartz lacks independence from defendants Glickman, Harrington, Nickell and Tese, who are not disinterested and/or independent and who exert influence over Schwartz's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Schwarz's base salary, bonus and equity compensation. This lack of independence renders defendant Schwartz incapable of impartially considering a demand to commence and vigorously prosecute this action.

166.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

167.    The Director Defendants of Bear Stearns, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Bear Stearns' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

168.    The acts complained of constitute violations of fiduciary duties owed by Bear Stearns' officers and directors and these acts are incapable of ratification.

169.    Each of the Director Defendants of Bear Stearns authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various

improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

170.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the current Board has failed and refused to seek recovery for Bear Stearns for any of the wrongdoing alleged by Plaintiffs herein.

171.    Notwithstanding Defendants knowledge of the claims and causes of action raised by Plaintiffs, Bear Stearns' Board of Directors has failed and refused to seek recovery for Bear Stearns for any of the wrongdoing alleged by Plaintiffs herein.

172.    Plaintiffs have not made any demand on shareholders of Bear Stearns to institute this action since such demand would have been a futile and useless act for the following reasons:

(a)    Bear Stearns is a publicly held company with over 145 million shares outstanding, and over thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for Plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force Plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## CLASS ACTION ALLEGATIONS

173.    Plaintiffs brings this action on his own behalf and as a class action under Federal Rule of Civil Procedure Rule 23 on behalf of all holders of Bear Stearns stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

174.    This action is properly maintainable as a class action.

175.    The Class is so numerous that joinder of all members is impracticable. According to Bear Stearns SEC filings, there were 145,633,335 million shares of Bear Stearns common stock outstanding as of February 20, 2008.

176.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)    whether defendants are breaching their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiffs and the other members of the Class in connection with the Acquisition;

(b)    whether defendants are engaging in self-dealing in connection with the Acquisition;

(c)    whether defendants are breaching their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiffs and the other members of the Class in connection with the Acquisition;

(d)    whether defendants are unjustly enriching themselves and other insiders or affiliates of Bear Stearns;

(e)    whether defendants are breaching any of their other fiduciary duties to Plaintiffs and the other members of the Class in connection with the Acquisition, including the duties of good faith, diligence, honesty and fair dealing;

(f)    whether defendants are breaching their fiduciary duties of candor to Plaintiffs and the other members of the Class in connection with the Acquisition by failing to disclose all material information concerning the Acquisition;

(g)    whether defendants, in bad faith and for improper motives, are impeding or erecting barriers to discourage other offers for the Company or its assets;

(h)    whether the Acquisition compensation payable to Plaintiffs and the Class is unfair and inadequate; and

(i)    whether Plaintiffs and the other members of the Class would be irreparably harmed were the Acquisition complained of herein consummated.

177.    Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

178.    Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

179.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

180.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

181.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

**(On Behalf of Plaintiffs and the Class for Breach of Fiduciary Duties Against the Acquisition Defendants)**

182.    Plaintiffs repeat and reallege each allegation set forth herein.

183.    The Individual Defendants have violated the fiduciary duties of care, loyalty, candor, good faith and independence owed to the public shareholders of Bear Stearns and have acted to put their personal interests ahead of the interests of Bear Stearns' shareholders.

184.    By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiffs and other members of the Class of the true value inherent in and arising from Bear Stearns.

185.    The Individual Defendants have violated their fiduciary duties by entering Bear Stearns into the Merger Agreement without regard to the effect of the proposed transaction on Bear Stearns' shareholders.

186.    The Individual Defendants and, in particular, defendants Tese, Bienen, Glickman, Goldstein, Novelly, Salerno and Williams violated their fiduciary duties by entering Bear Stearns into the Stock Exchange Agreement and expressly approving it without first seeking shareholder approval in disregard to the effect of that agreement on Bear Stearns' shareholders.

187.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Bear Stearns because, among other reasons:

(a)    they failed to take steps to maximize the value of Bear Stearns to its public shareholders and they took steps to avoid competitive bidding, to cap the value of Bear Stearns' stock and to give the Individual Defendants an unfair advantage, by, among other things, agreeing to the coercive deal terms alleged herein and failing to adequately solicit other potential acquirors or alternative transactions;

(b)    they failed to properly value Bear Stearns and its various assets and operations;

(c)    they acted to negotiate and agree to unfair terms in an attempt to extinguish the Company as a separate entity and that the Individual Defendants may escape liability for their breaches of fiduciary duties; and

(d)    they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the proposed Merger.

188.    Because the Individual Defendants dominate and control the business and corporate affairs of Bear Stearns, and are in possession of private corporate information concerning Bear Stearns' assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Bear Stearns which makes it

inherently unfair for them to pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

189.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiffs and the other members of the Class.

190.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiffs and the Class, and may consummate the proposed Merger which will exclude the Class from its fair share of Bear Stearns' valuable assets and operations, and/or benefit defendants in the unfair manner complained of herein, all to the irreparable harm of the Class.

191.    The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiffs and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

192.    As a result of the Individual Defendants' unlawful actions, Plaintiffs and the other members of the Class will be irreparably harmed in that they will not receive the value to which they are entitled for their shares or their fair portion of the value of Bear Stearns' assets and operations. Unless the proposed Merger is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiffs and the members of the Class, will not engage in arm's-length negotiations on the proposed Merger terms, and will not supply to Bear Stearns' minority stockholders sufficient information to enable them to cast informed votes for an against adoption of the proposed Merger Agreement and may consummate the proposed Merger, all to the irreparable harm of the members of the Class.

193.    Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiffs and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT II

### (Derivatively on Behalf of the Company Against All Defendants for Breach of Fiduciary Duty)

194. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

195. As alleged in detail herein, Cayne, and each of the Individual Defendants, had a duty to Bear Stearns and its shareholders to, amongst other things, ensure that the Company operated in a diligent, honest and prudent manner.

196. Plaintiffs assert this claim derivatively on behalf of Bear Stearns against Cayne and all of the Director Defendants.

197. Cayne and the Individual Defendants have breached their fiduciary duties of care, loyalty and good faith owed to Bear Stearns and its stockholders.

198. Further, each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199. By reason of the foregoing, Bear Stearns has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

200. Plaintiffs and Bear Stearns have no adequate remedy of law.

## COUNT III

### (Derivatively on Behalf of the Company Against All Defendants for Violation of the Exchange Act §§10(b) and Rule 10b-5)

201. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

202. During the Relevant Period, Individual Defendants disseminated or approved public statements that improperly portrayed Bear Stearns' business prospects, growth and margins. The

Individual Defendants knew that the Company's public statements concerning its business prospects were misleading and intended to deceive, manipulate and/or defraud in connection therewith.

203.     Individual Defendants knew, consciously disregarded and were reckless and grossly negligent in causing the false and misleading statements to be made. Individual Defendants caused the Company's common stock to be inflated due to the improper reporting of the value of the Bear Stearns' business prospects, especially concerning the Company's reckless acquisition of ECC, which further increased the risk and exposed the Company to the subprime mortgage crisis, and its fire sale to JPMorgan for a wholly unfair and inadequate price. Accordingly, Individual Defendants violated the Exchange Act §10(b) and Rule 10b-5.

204.     Furthermore, the Insider Selling Defendants sold over $65 million worth of shares of Bear Stearns' common stock at inflated prices during the Relevant Period while in possession of material non-public information. These defendants misappropriated Bear Stearns' proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Bear Stearns stock without disclosing the information alleged to have been concealed herein.

205.     At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of Bear Stearns' business prospects, especially concerning the Company's exposure to the subprime mortgage market crisis, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Molinaro were causing Bear Stearns to repurchase over $2.6 billion worth of its own stock on the open market at an average inflated price of approximately $139.22 per share, which is substantially higher than Bear Stearns' current share price of under $80 per share.

206.     As such, the Director Defendants and defendant Molinaro violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

89

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Bear Stearns and others in connection with their purchases of Bear Stearns common stock during the Relevant Period.

207.     As a result of the Director Defendants' and defendant Molinaro's misconduct, Bear Stearns has and will suffer damages in that it paid artificially inflated prices for Bear Stearns common stock purchased on the open market.  Bear Stearns would not have purchased Bear Stearns common stock at the prices it paid, had the market previously been aware that the market price of Bear Stearns' stock was artificially and falsely inflated by defendants' misleading statements.  As a direct and proximate result of these defendants' wrongful conduct, Bear Stearns suffered damages in connection with its purchases of Bear Stearns common stock during the Relevant Period.  By reason of such conduct, the Director Defendants and defendant Molinaro are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

208.     Therefore, during the Relevant Period, Individual Defendants directly and proximately caused Bear Stearns' damages.

## COUNT IV

### (Derivatively on Behalf of the Company Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information)

209.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

210.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Bear Stearns common stock on the basis of such information.

211.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset

belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Bear Stearns common stock.

212.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Bear Stearns common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

213.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT V

### (Derivatively on Behalf of the Company Against All Defendants for Waste of Corporate Assets)

214.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

215.    Each Individual Defendant owes and owed to Bear Stearns the obligation to protect Bear Stearns' assets from loss or waste.  The Individual Defendants' failure to adequately evaluate and monitor Bear Stearns' risk in the CDO market constituted a waste of Bear Stearns' corporate assets and was grossly unfair to Bear Stearns.  No person of ordinary, sound business judgment could conclude that the Individual Defendants' decision to become so overextended in the risky CDO market was a sound exercise of business judgment.

216.    Furthermore, as a result of the misconduct described above, the Individual Defendants wasted corporate assets by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying $2.6 billion to repurchase the Company' stock and paying bonuses to certain of its executive officers.

217.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

91

218.    Plaintiffs, on behalf of Bear Stearns, have no adequate remedy at law.

## COUNT VI

### (Derivatively on Behalf of the Company Against All Defendants for Abuse of Control)

219.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

220.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Bear Stearns, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing Bear Stearns to violate it publicly disclosed risk management procedures and issue statements that improperly portrayed Bear Stearns' business prospects.

221.    As a direct and proximate result of the Individual Defendants' abuse of control, Bear Stearns has sustained significant damages.  These damages include, but are not limited to, Bear Stearns' severe loss of market credibility as reflected in its eventual forced sale and $2.6 billion paid to repurchase the Company's stock.

222.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

223.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

## COUNT VII

### (Derivatively on Behalf of the Company Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement)

224.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

225.    By their allegations alleged herein, Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets, risks and business of Bear Stearns in a manner consistent with the operations of a publicly held corporation.

226.    As a direct and proximate result of these defendants' gross mismanagement and breaches of duty alleged herein, Bear Stearns has sustained significant damages in excess of $1 billion dollars.

227.    As a result of the misconduct and breaches of duty alleged herein, these defendants are liable to the Company.

## COUNT VIII

### (Derivatively on Behalf of the Company Against All Defendants for Unjust Enrichment)

228.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

229.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Bear Stearns.

230.    Plaintiffs, as shareholders and representatives of Bear Stearns, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and in favor of Bear Stearns against all of the defendants as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.    Declaring that the Individual Defendants are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Bear Stearns damages;

C.    Directing Bear Stearns to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Bear Stearns and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Bear Stearns to nominate at least three candidates for election to the Board;

3.    a proposal to ensure the accuracy of the qualifications of Bear Stearns' directors, executives and other employees;

4.    a proposal to control insider selling;

5.    a proposal to ensure that Bear Stearns prudently expends funds in stock repurchase programs;

6.    a proposal to better manage and disclose Bear Stearns' credit risks; and

7.    appropriately test and then strengthen the internal audit and control functions.

D.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that Plaintiffs on behalf of Bear Stearns have an effective remedy;

E.    As to the Count I, declaring that this action is properly maintainable as a class action;

F.    Declaring and decreeing that the Acquisition agreement entered into by the Company was approved in breach of the fiduciary duties of defendants and is therefore unlawful and unenforceable;

94

G.    Awarding to Bear Stearns restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

H.    Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for shareholders;

I.    Directing defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Bear Stearns shareholders until the process for the sale or auction of the Company is completed and the highest possible price is obtained;

J.    Rescinding, to the extent already operative or implemented, the Merger Agreement or any of the terms thereof including without limitation the "No-Solicitation," "force-the-vote," "Restructuring Efforts," and restrictive shareholder vote clauses and the "Covenants Relating to Conduct of Business" and the Asset Option;

K.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

L.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  April 10, 2008

**BROWER PIVEN**
 **A Professional Corporation**

David A.P. Brower

488 Madison Avenue, Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300

*Counsel for Plaintiff Sam Cohen*

95

**ROBBINS UMEDA & FINK, LLP**
JEFFREY P. FINK
GEORGE C. AGUILAR
JILL E. KLEMANN
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

**LAW OFFICES OF THOMAS G. AMON**
**THOMAS G. AMON**
250 West 57th Street, Suite 1316
New York, New York 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427

*Counsel for Plaintiff Jerome Birn*

# VERIFICATION

I, Samuel T. Cohen, verify:

I am the Plaintiff in the above-entitled action; I hereby verify that I was a shareholder of The Bear Stearns Companies, Inc. at the times the misconduct complained of in the Verified Amended Shareholder Derivative and Class Complaint ("Complaint") occurred. Additionally, I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of April 2008 at Baltimore, Maryland.

_____
Samuel T. Cohen

<u>VERIFICATION</u>

I, George C. Aguilar, hereby declare as follows:

      1.     I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in The Bear Sterns Companies, Inc. action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

      2.     I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

      Executed this 3rd day of April 2008, at San Diego, California

GEORGE C. AGUILAR